Richard P. Weisbeck, Jr.
Melissa D. Wischerath
Lipsitz Green Scime Cambria LLP
42 Delaware Avenue, #120
Buffalo, NY 14202
(716) 849-1333
rweisbeck@lglaw.com
mwischerath@lglaw.com

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN GUGINO, | |
| Plaintiff, | Case No.:   1:21-cv-283 |
| v. | **COMPLAINT** |
| CITY OF BUFFALO,<br>MAYOR BYRON BROWN,<br>POLICE OFFICER ROBERT McCABE,<br>POLICE OFFICER AARON TORGALSKI,<br>POLICE OFFICER JOHN LOSI,<br>POLICE COMMISSIONER<br>BYRON C. LOCKWOOD,<br>DEPUTY POLICE COMMISSIONER<br>JOSEPH GRAMAGLIA, | **JURY TRIAL REQUESTED** |
| Defendants. | |

Complaint-1

The Supreme Court has expressly held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Were we to accept defendants' view of the First Amendment, we see little that would prevent the police from ending a demonstration without notice for the slightest transgression by a single protester (or even a mere rabble rouser, wholly unconnected to the lawful protest). We see no need to deviate from the "clear and present danger" analysis as established by the Supreme Court.

*Jones v. Parmley*, 465 F.3d 46, 57–58 (2d Cir. 2006)

Against this backdrop, it would be passing strange to presume that protesters exercising a foundational constitutional right have weaker substantive due process rights than citizens in other contexts. To be sure, government officials may stop or disperse a protest when faced with an "immediate threat to public safety, peace, or order," including "interference with traffic upon the public streets." *Parmley*, 465 F.3d at 57 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). But this authority is not without limits. Among other things, officials have an obligation, "absent imminent harm," to inform demonstrators that they must disperse, and may not use unreasonable force. In short, our cases amply establish that protesters enjoy robust constitutional protection, protection of which reasonable law enforcement officers are well aware.

*Edrei v. Maguire*, 892 F.3d 525, 541 (2d Cir. 2018).

## I.   Introduction

1.      This is a civil rights action arising under Title 42 of the United States Code, Section 1983. On June 4, 2020, Defendants violated the constitutional rights of Plaintiff, Martin Gugino, specifically, his rights to freedom of speech, peaceful assembly, petition the government for redress of grievance, movement, unreasonable seizures, and freedom from the unlawful use of force by government agents, and to due process of law.

2.      Defendants violated the constitutional rights of Plaintiff, Martin Gugino, by enacting an unconstitutional week long curfew, which was selectively enforced against peaceful protesters, including Martin Gugino, and by using unlawful and unnecessary force against Plaintiff, Martin Gugino, despite having committed no crimes or violations of law, all in an effort to suppress the exercise of his constitutional rights, including his right to protest.

3.      Defendants deployed a 57-member militarized force called the "emergency response team" ("ERT") to enforce the unconstitutional and draconian curfew issued by Defendant, City of Buffalo, and to disperse three peaceful protesters sitting on the steps of City Hall.

4.      Mere minutes after the 8 p.m. city-wide curfew, three of the Defendants, Police Officer Robert McCabe, Police Officer Aaron Torgalski and Police Officer John Losi, unlawfully, unreasonably and forcibly assaulted Plaintiff, Martin Gugino, by shoving him without warning in violation of his clearly established constitutional rights guaranteed under the First, Fourth and Fourteenth Amendments to the United States Constitution.

5.      Following the unlawful assault, several members of the ERT walked by without care as Plaintiff, Martin Gugino, lay unconscious on the sidewalk, blood pouring from his fractured skull.

6.      Shortly thereafter, Defendants took action to conceal the unlawful conduct by the police officers.

## II.    The Deaths of George Floyd and Breonna Taylor, and Black Lives Matter

7.    On May 25, 2020, George Floyd, an African American man, was killed by Minneapolis police officers. The brutality of the murder garnered national attention: One police officer knelt on Mr. Floyd's neck for more than eight minutes, while other officers casually stood by and watched as Mr. Floyd begged for his life before succumbing to asphyxiation.

8.    Mr. Floyd's death followed the fatal shooting on March 13, 2020, of Kentucky EMT, Breonna Taylor, also African-American. Ms. Taylor was killed by police as she slept during the execution of a no-knock warrant for associates of her romantic partner.

9.    The brutality of these homicides - committed by agents of the state – specifically, police officers, along with the seeming failure to hold the officers involved accountable for their criminal conduct, garnered national attention.

10.    Widespread public protests of these and other incidents of police brutality and unlawful conduct against African Americans spontaneously developed in the days after Mr. Floyd's killing. Nearly every U.S. city saw protests under the loosely organized Black Lives Matter ("BLM") movement.

## III.    Freedom of Assembly and Curfew Orders

11.    In *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969), the Supreme Court held that subjecting the right of free expression in publicly owned places to the prior restraint of a license, without narrow, objective, and definite standards, is unconstitutional, and a person faced with such a law may ignore it and exercise his First

Amendment rights. As long as people "peaceably" assemble to picket, protest, or distribute handbills, the state may not penalize the assembly.

12.     Government restrictions on speech and assembly must be content neutral and view-point neutral. In any regulation of content-based or viewpoint-based speech, the government must show that the regulation is narrowly tailored and necessary to achieve a compelling government interest.

13.     The right to assemble for the redress of grievances may also be limited under the "time, place, and manner" doctrine set forth in *United States v. O'Brien* 391 U.S. 367 (1968).

14.     A curfew limiting the freedom to assemble is the harshest restriction available to the government. A curfew may only be available to the government when there is a "clear and present danger" to the residents affected by the curfew. The curfew must be narrowly tailored to achieve the government's goal of removing the danger, must not be overly broad, abridging the rights of citizens outside the danger, and must provide peaceable assemblers with alternative means of communication.

15.     A curfew restricting assembly for an unreasonable period of time or for an arbitrarily defined location will be strictly scrutinized for being overly broad and unconstitutional.

16.     Courts will also strictly scrutinize regulations that attempt to limit assembly in places traditionally open to the public, such as parks and sidewalks, especially those near government offices.

17.     As noted above, while "time, place, and manner" restrictions on gatherings are permitted if content and viewpoint neutral, these limits are tightly controlled by the

location chosen to assemble, with a traditional "public forum" afforded the least

government restrictions, requiring narrow tailoring of any limits.

## IV.    Niagara Square as a Public Forum

18.      Niagara Square is the epitome of a "public forum", as the concept was first

examined by the Supreme Court in *Hague v. Committee for Industrial Organization*, 307

U.S. 496 (1939), and established as a doctrine in *Southeastern Promotions, Ltd. v.

Conrad*, 420 U.S. 546 (1975).

19.      The site was first used as the frontier town's public square as early as

1763. In 1804, the city's planner, Joseph Ellicott, a protégé of Pierre L'Enfant, placed it

at the center of his plans for Buffalo, protecting pedestrians from wheeled traffic, and

surrounded by critical government offices, including City Hall. Ellicott laid out Buffalo

around a series of wide, diagonally radiating streets extending from Niagara Square. In

1832, when the town incorporated as a city, Niagara Square was the chief residential

and civic quarter. In 1875, Frederick Law Olmsted redesigned the layout around the

square, reaffirming its place as the center of civic congregation and government in the

city.

20.      Niagara Square has been the center of political assembly, including

Presidential visits and civil rights protests, since its development. Resident abolitionists

angered by the signing of the 1850 Fugitive Slave Act by Buffalonian President, Millard

Fillmore, filled the square to protest Fillmore's pro-slavery actions. In 1932, tens of

thousands of women gathered in Niagara Square to call for the end to Prohibition. John

F. Kennedy drew over 100,000 to Niagara Square with his visit on October 13, 1962.

Six months after Martin Luther King, Jr.'s visit to Buffalo, thousands gathered in Niagara

Square for vigils mourning his assassination in Memphis. Later that year, Presidential candidate, Hubert Humphrey, led anti-Vietnam War and Civil Rights protests in Niagara Square, as captured by the photo below.



Fig. 1 is a still of Humprey standing on Delaware Avenue, just off Niagara Square in front of the Statler Hotel in September, 1968.

21.     Presently, Niagara Square is lined with important city, state, and federal government buildings, including City Hall, the City of Buffalo Police and Fire Headquarters, and the City and Federal courthouses. A monument to President William McKinley, who was assassinated in Buffalo in 1901, is located at the center of the square.

22.     Nowhere else in the city of Buffalo could one find a place more intentionally designed to afford the city's citizens their constitutionally enshrined rights to express their disapproval or seek change or accommodation than Niagara Square.

## V.    Buffalo BLM Protests and City-wide Curfews

23.     On June 2, 2020, Defendant Brown instituted a city-wide one week curfew of all "nonessential pedestrian and vehicular traffic" from June 2 until June 8, during the

hours of 8 p.m. until 5 a.m.  (Attached hereto and more fully incorporated as **Exhibit A**, is the week long city-wide curfew order). A press release from Defendant City of Buffalo included a quote from Defendant Brown, which read: "Individuals traveling to or from work or for some other legitimate reason including childcare, medical care, or other necessary activity, will be allowed to do so." He further stated, "I have ordered a curfew for the City of Buffalo to protect the peaceful protesters who want to express their justified concerns and outrage over the murder of George Floyd and other instances of police brutality across the nation, residents who are concerned for their safety, the health and safety of our law enforcement community, and public and private property." He also stated, "The Buffalo Police Department has been instructed not to unnecessarily detain any person out for a legitimate purpose."

24.     Despite the instruction from Defendant, Mayor Byron Brown, the Buffalo Police Department ("BPD") demanded that citizens disperse during curfew hours upon threat of arrest and use of force even though they had a "legitimate purpose" when peacefully protesting and demonstrating against police brutality and police misconduct.



Fig. 2 is a screenshot from the Mayor's June 2, 2020 press release.[1]

## VI.   Continued Peaceful BLM Protests from morning of June 2 to evening of June 4, 2020

25.      On June 2, 2020, the first day of the city-wide curfew, no violence was reported during protests throughout the city or county.

26.      On June 3, 2020, Cheektowaga and Buffalo were the only remaining municipalities in Erie County to impose curfews for the upcoming overnight hours. In regard to the potential for future curfews, Erie County Executive Mark Poloncarz stated, according to the *Buffalo News*, "We have no information indicating general unrest that could be planned. We don't have any indication there will be issues."[2]

27.      In the afternoon, protestors gathered in Niagara Square. As the 8 p.m. curfew neared, Defendant Losi, along with four other BPD officers, approached the

---

[1] Available at https://www.buffalony.gov/CivicAlerts.aspx?AID=657 last accessed on February 2, 2021.
[2] Available at https://buffalonews.com/news/local/no-countywide-curfew-tonight-but-those-in-buffalo-cheektowaga-remain/article_f7268a32-2e8b-5a01-a2e3-81c2141372f7.html last accessed on February 2, 2021.

group with the following proposal, "First and foremost, maybe some of you were here yesterday, or you saw what happened here yesterday so I am coming out to talk to you. Ask you. There is an 8 o'clock curfew today so in order for us not to have to come out and take that kind of action, and if you guys are good with it and will leave at 8 o'clock then there is no need to bring anybody in, no need for us to do anything. " In exchange, Defendant Losi would kneel "in solidarity" starting at five minutes to 8 p.m., for five minutes.

28.      During the exchange, one person in the crowd asked Defendant Losi about the selective enforcement of the curfew against protesters in Niagara Square. The person said, "I have been noticing that in other neighborhoods, other parts of the city, other police districts the curfew has not been enforced. It's only been enforced down here, downtown. Um. And I believe that the curfew may be a violation of our constitutional rights to freedom of speech." Defendant Losi interrupted and said, "I am not going to be able to speak on that because obviously it's not my call." The person politely replied, "I understand."

29.      Thereafter, Defendant Losi resumed his proposal to kneel with the crowd in solidarity, which the crowd agreed to and was met with positive cheers, "thank you", and a round of applause for the officers involved.

30.      At about five minutes before 8 p.m., Defendant Losi again approached the group of protesters and knelt down in front of them. Alongside him were the four other BPD officers. Out in front of him, a few members of the press, and the crowd of about 30 people knelt together in solidarity. Afterwards, as the group dispersed, the crowd

clapped for the BPD officers, exchanged handshakes, and a few even hugged the officers. [3]



Fig. 3 is a still from the video on June 3, 2020 with Defendant Losi and protesters kneeling in silence.

31.      Despite the peaceful nature of the June 3, 2020 protests, Defendant Brown failed to cancel the ongoing one week city-wide, 8 p.m. to 5 a.m. curfew and continued to restrain the legitimate purpose of protesters to exercise their First Amendment constitutional rights.

**VII.     Protests in Niagara Square on June 4, 2020**

32.      On June 4, 2020, protestors gathered in Niagara Square during the afternoon and evening. The events were peaceful and most protestors left the site before curfew.

33.      Prior to curfew on June 4, 2020, Defendants closed off all non-police traffic to Niagara Square.

---

[3] The video footage of this exchange on June 3, 2020 between the protesters and Defendant Losi is available at  https://www.investigativepost.org/2020/06/04/police-protesters-give-peace-a-chance/ last accessed on January 26, 2021



Fig. 4 is a still from drone footage taken at 7:28 p.m. on June 4, 2020 by James Grimaldi available at https://youtu.be/i4lNmDuGlt0 last accessed on February 2, 2021.

34.     Plaintiff, Martin Gugino, arrived at Niagara Square and walked towards City Hall at approximately 7:28 pm.  At that time, there were approximately 15 protesters gathered around the sidewalk and steps of City Hall.

35.     At 8 p.m., the militarized ERT lined up at the entrance to Niagara Square on Perkins Drive. The 57 member ERT unit greatly outnumbered the peaceful citizens sitting on the steps of City Hall and any pedestrians remaining in the square.

36.     Plaintiff, Martin Gugino, was one of three peaceful citizens, along with reporter Mike Desmond of WBFO, who was seated on the steps of City Hall when the ERT was deployed.

37.     Plaintiff, Martin Gugino, noticed the ERT assembling on the edge of the square, and became alarmed when he saw they were dressed in military riot gear and wielding heavy batons.

38.     After 8 p.m., the ERT formed a line that spanned across the entire street between City Hall and Niagara Square.

39.       Suddenly, the ERT began to march in formation towards the three

peaceful citizens sitting on the steps of City Hall, yelling "Move Forward March."



Fig. 5 is a still from the Spectrum footage taken from Niagara Square.

40.       Thereafter, Plaintiff, Martin Gugino, stood up from the steps, out of

concern for the safety of other peaceful citizens, and walked towards the line in an

attempt to speak with the police officials.

41.       The ERT yelled out in chorus, "push him, push him." [4]

42.       In that moment, Plaintiff, Martin Gugino, a seventy-five year old man, was

unlawfully assaulted when he was forcibly shoved to the ground without warning in

violation of his clearly established constitutional rights under the First, Fourth and

---

[4] Id.

Fourteenth Amendments to the United States Constitution.[5]



Fig. 6 is a still from the Spectrum footage taken from Niagara Square.

43.     More specifically, Defendant Losi shoved Defendants McCabe and Torgalski towards Plaintiff, Martin Gugino, and Defendants McCabe and Torgalski unlawfully assaulted Plaintiff by forcibly pushing him to the ground, where he laid incapacitated and seriously injured with blood pooling from his ear.

44.     The sound of Martin Gugino's skull fracturing could be heard almost instantly and was captured on video by nearby reporters.[6]

---

[5] Video footage by Spectrum News and photojournalist Anthony Nelson shows the assault from across the Square and is available at https://twitter.com/i/status/1268702159295655938  last accessed on January 31, 2021.
[6] Video footage by Mike Desmond and WBFO is available https://www.youtube.com/watch?v=QSBZGv5wzK4 last accessed on January 31, 2021.

45.      Defendant McCabe attempted to check on Plaintiff, Martin Gugino,
however, Defendant Losi stopped him from doing so. More than a dozen Buffalo officers
walked by Plaintiff, Martin Gugino, as he lay bleeding on the sidewalk in front of City
Hall.



Fig. 7 is a still from the Spectrum footage, which depicts Plaintiff laying on the sidewalk
in front of City Hall.

46.      Plaintiff, Martin Gugino, was transported to Erie County Medical Center
having suffered a concussion and fractured skull. He was initially treated in the intensive
care unit and after nearly four weeks on June 30, was released from the hospital.

47.      Around 8:50 p.m., Defendant City and BPD issued the following
statement:



Fig. 8 is a screenshot of the email sent to the press.

48.      Approximately, 20 minutes after the police statement was made public, the local NPR affiliate WBFO released the distressing video that would go viral in the days that followed, which clearly showed that the Plaintiff, Martin Gugino, did not trip and fall during a skirmish. Unlike most victims of unlawful police brutality, this instance happened to be captured and documented by local news reporters who were recording the events in real time.

49.      On June 4, 2020 at 11:08 p.m., Defendant Brown posted about the event on his official Facebook page admitting that there had been "days of peaceful protests" leading up to this incident and repeating the false claim that Plaintiff, Martin Gugino, had been involved in a "physical altercation" when he was "knocked down":



Mayor Byron W. Brown ✔ is in **Buffalo, New York**.
June 4 at 11:08 PM · Buffalo, NY · 🌐

Tonight, after a physical altercation between two separate groups of protesters participating in an illegal demonstration beyond the curfew, two Buffalo Police officers knocked down a 75-year-old man. The victim is in stable but serious condition at ECMC. I was deeply disturbed by the video, as was Buffalo Police Commissioner Byron Lockwood. He directed an immediate investigation into the matter, and the two officers have been suspended without pay. After days of peaceful protests and several meetings between myself, Police leadership and members of the community, tonight's event is disheartening. I hope to continue to build on the progress we have achieved as we work together to address racial injustice and inequity in the City of Buffalo. My thoughts are with the victim tonight.



Fig. 9 is a screenshot of Defendant Brown's June 4, 2020 Facebook post.

## VIII.    The Aftermath

50.      On June 5, 2020, Buffalo Police Benevolent Association ("BPA") president, John Evans, emailed all members of the BPA claiming that the "officers did nothing wrong but execute an order from the DPC [Deputy Commissioner Gramaglia] to clear the Square."



Fig. 10 is a screenshot from the PBA president John Evans June 5, 2020 email.

51.      Shortly thereafter, all 57 members of the ERT resigned from their positions, which Evans publicly stated was "to support the two suspended officers, and in disgust of how the administration is handling the entire incident."[7]

52.      On June 10, 2020, Defendant Brown released the following statement to the press, "It has become apparent that meeting protesters with a tactical unit of officers does not lead to peaceful results."[8]

53.      Gov. Andrew Cuomo tweeted about the assault on Thursday night, calling it "wholly unjustified and utterly disgraceful".[9] The following day, the Governor further described the footage of the assault on Plaintiff as "fundamentally offensive and frightening, who are we, how did we get to this place?"[10]

---

[7]Available at https://spectrumlocalnews.com/nys/buffalo/public-safety/2020/06/05/buffalo-police-officers-resign-from-emergency-response-team last accessed on February 16, 2021.
[8] Available at https://www.mercurynews.com/2020/06/10/buffalo-bars-riot-team-looks-to-form-new-policing-unit/ last accessed January 31, 2021.
[9] Available at https://twitter.com/NYGovCuomo/status/1268739684504604673 last accessed on February 2, 2021.
[10] Available at https://www.youtube.com/watch?v=M_rcMJWj0mc&feature=share last accessed on February 16, 2021.

54.      Lt. Gov. Kathy Hochul tweeted, "The incident we saw in front of #Buffalo City Hall is deeply disturbing. In no way was violence justified. Those officers must be held accountable for their actions. This is the city of good neighbors. We should be lifting each other up when so many of us are being knocked down."[11]

55.      Representative Brian Higgins issued a statement on June 5, 2020, "The completely unwarranted use of force by police in front of Buffalo City Hall last night is a call to action for our city and country. Videos are exposing unchecked bad actors and the painful truth of what has been happening in our communities for far too long. George Floyd's murder has led to a nationwide outcry for change. This unacceptable incident right here in our community — and others across the country in the wake of this tragedy — shows how widespread and urgent of a change is needed. The House of Representatives will soon release a legislative package led by the Congressional Black Caucus addressing equal justice and police brutality.  There is clearly much work to do. I am eager to work with my colleagues to advance these measures swiftly."[12]

56.      New York State Attorney General Letitia James released a statement on June 5, 2020: "The video captured on June 4th shows what appears to be a horrific display of abuse and lack of concern for New Yorkers by the Buffalo Police Department. My office supports the investigation by the Erie County District Attorney's Office, and we stand by ready to assist should they need it."[13]

---

[11] Available at https://twitter.com/LtGovHochulNY/status/1268870036971761671 last accessed on February 2, 2021.
[12] Available at https://higgins.house.gov/media-center/press-releases/statement-by-congressman-brian-higgins-38 last accessed on February 2, 2021.
[13] Available at https://ag.ny.gov/press-release/2020/attorney-general-james-statement-buffalo-police-department-video last accessed on February 2, 2021

57.      On June 13, in a CBS interview, Mayor Byron Brown said, "I don't believe common sense was used. I don't believe the push was necessary."[14]

## IX.   The Emergency Response Team (ERT)

58.      In 2014, following the death of Mike Brown Jr., an 18-year-old unarmed black teenager who was fatally shot by police officer Darren Wilson in the city of Ferguson, Missouri, a suburb of St. Louis., and the two weeks of protest that followed Brown's death in Ferguson, Missouri, the Buffalo Emergency Response Team was formed.[15]

59.      The Buffalo Police Department applied for the FEMA Field Force Operations course through the U.S. Department of Homeland Security in 2014.[16]

60.      Two years later, in July of 2016, the Buffalo Emergency Response Team was unveiled.[17]

61.      At the unveiling, Lt. Thomas Whelan, the commander of the Emergency Response Team (ERT), spoke to reporters at WIVB channel 4 about the ERT's training and purpose stating, "There's a very fine line between policing and honoring people's civil rights."[18]

62.      Lt. Whelan further described the ERT as follows, "To move people, keep avenues open and remove protesters that are there to disrupt other people's rights."[19]

---

[14] Available at https://youtu.be/9osv00Kyu4U last accessed on February 2, 2021.
[15] Available at https://www.wivb.com/news/only-on-4-buffalo-police-unveil-specialized-team-for-mass-demonstrations/ last accessed on January 31, 2021.
[16] Id.
[17] Id.
[18] Id.
[19] Id

63.     During the unveiling, News 4 reported that it "watched dozens of officers run drills on how to hold a line and move a crowd. The unit is practicing to make sure that line isn't crossed."[20]

64.     The City spent about $30,000 from the Buffalo Police Department budget for the ERT's military armor and equipment. "We don't show up at every event dressed as these officers behind me, we show up just like the normal police show up," said Lt. Whelan.  "As the event, and things in the event, are elevated then we elevate our posture. I just want compliance, that's the name of the game."[21]

### X.     Policy, Practice, Custom of Shoving and Assaulting BLM Protesters

65.     On May 30, 2020, two peaceful protesters were forcibly shoved and assaulted by the ERT team while they were standing with raised firsts in Niagara Square.[22]

66.     In an interview to News Channel 7, one protester reported that she suffered a fractured rib and a welt as a result of being assaulted by members of the ERT.

---

[20] Id.
[21] Id.
[22] Available at https://twitter.com/i/status/1275544421254209538 last accessed on February 15, 2021.



Fig. 11 is a screenshot of the protester's welt after the shove as depicted on the Channel 7 interview.



Fig. 12 is a screenshot of the protester standing in Niagara Square with her fist raised in the air.



Fig. 13 is a screenshot of the moment prior to the shove on May 30, 2020.



Fig. 14 is a screenshot of the shove on May 30, 2020 in Niagara Square.

67.     On June 1, 2020, another peaceful protester was tackled by police and pushed from behind during a live news interview with WIVB Channel 4.[23]

## XI.   Policy, Practice, Custom of Using Excessive Force Against Citizens

68.     Upon information and belief, Defendants have a policy, practice and/or custom of using, concealing, excusing and/or condoning the unlawful use of unnecessary and/or excessive force against citizens, including utilizing internal investigative procedures to exonerate the police officers who committed unlawful, violent crimes against citizens.

69.     The policy of Defendant, City of Buffalo, as set forth above, is decades-old, and has not changed despite federal oversight. In 2017, the University at Buffalo and Cornell law schools released a study based on two years of research into Buffalo Police Department policing practices, which documented decades of policing abuses.[24] Among other violations, the researchers "found that the BPD engages in a pattern or practice of…3) excessive use of force, particularly against individuals of color; and 4) retaliating against people engaging in constitutionally protected expression and lack of redress."

70.     The following examples, while not exhaustive, are illustrative of the foregoing policy, practice and/or custom of using, concealing, excusing and/or condoning the unlawful use of force against citizens and protecting those officers who use unlawful excessive force.

---

[23] Available at https://www.wivb.com/news/local-news/buffalo/watch-protester-tackled-by-police-during-news-4-interview/?fbclid=IwAR1hfpEsq40uOua4LU6POzX0XKM6KA7bQn3WXa-0x1n_j8ySuwNBh_EPue4 last accessed on February 10, 2021.
[24]  Anjana Malhotra, Unchecked Authority without Accountability in Buffalo, New York: The Buffalo Police Department's Widespread Pattern and Practice of Unconstitutional Discriminatory Policing, and the Human, Social and Economic Costs. SUNY Buffalo Law School, State University of New York (2017).

71.     On June 25, 1977, Richard Long, 18, and planning his first semester at Buffalo State College, was dragged from his brother's car at 2:30 a.m., and beaten and stomped to death by police officers, Philip Gramaglia and Gary Atti, and Buffalo businessman, Jack Giammaresi.

72.     Following the murder of Richard Long, and the beating of Rodney King by the LAPD in 1994, and others, 42 U.S.C. § 14141, took shape, allowing the Justice Department to investigate almost any report of police actions that suggest a pattern of violations of citizens' constitutional civil rights. The U.S. Department of Justice ("DOJ") opened an investigation pursuant to 42 U.S.C. § 14141 into the City of Buffalo and its police department ("BPD") on December 9, 1997. On September 19, 2002, DOJ, the BPD, the Police Benevolent Association, Inc. ("PBA"), and the American Federation of State, County, and Municipal Employees Local 264 ("Local 264") entered into a Memorandum of Agreement (MOA) to resolve issues relating to unreasonable search and seizure.[25] The MOA was set to terminate three years after its effective date, provided that the DOJ determined that the BPD had been in substantial compliance for at least one year, or unless modified by the parties. That would have been in 2005. Instead, on July 9, 2007, the agreement was extended for one more year, and then terminated on July 8, 2008.[26]

73.     In 2006, Officer Cariol Horne intervened to stop a fellow officer, Gregory Kwiatkowski, who was choking a handcuffed man who had already been placed under

---

[25]  Available at https://www.clearinghouse.net/chDocs/public/PN-NY-0004-0001.pdf last accessed on February 16, 2021.
[26] Available at https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/buffalo_pd_amend_agrement_7-9-07.pdf last accessed on February 16, 2021.

arrest.  Horne was assaulted by the officer during the intervention, and thereafter the Buffalo Police Department punished officer Cariol Horne by terminating her for attempting to stop the assault by her fellow officer upon a citizen —just one year shy of receiving her full pension.[27]

74.     In May, 2009, Officer Gregory Kwiatkowski again came under scrutiny when he used "unreasonable and excessive" force on four African-American teenagers he arrested.

75.     In 2012, 17 year-old Wilson Morales was shot by Buffalo police after evading arrest in a speeding vehicle. In January 2020, the Buffalo Common Council agreed to a $4.5 million settlement with Morales to settle the excessive force lawsuit.[28]

76.     In 2012, Officer Anthony Porzio was suspended for 30 days for assaulting a handcuffed suspect; he is still on the force.[29]

77.     In December 2014, a federal judge sentenced former Buffalo Police Officer John Cirulli, 31, to a year of probation. Cirulli was recorded kicking and slapping a black man John Willet during an arrest in April while Willet was on the ground with his hands cuffed.

78.     In Dec. 2017, two Buffalo police officers took actions during the arrest of Wardel "Meech" Davis, III, which led to Davis' death. While a review by the state Attorney General's Office concluded the officers were not responsible for Davis' death, the report noted that the officers involved refused to cooperate with the investigators'

---

[27] Available at https://youtu.be/O4OOcGfVWns last accessed on February 16, 2021.
[28]  Available at https://www.investigativepost.org/2020/02/04/police-shooting-costs-buffalo-4-5-million/ last accessed on February 16, 2021.
[29] Available at https://www.youtube.com/watch?v=ei_y8C0vBTA last accessed on February 16, 2021.

requests for interviews. The report also faulted the department for not outfitting its officers with body cameras or squad cars with dash cameras.

79.      In February, 2019, two Buffalo police officers, Joshua Craig and Anthony D'Agostino, watched, but failed to intervene, in the beating of handcuffed Shaun Porter by cell-block attendant Matthew Jaskula. One of the officers can be seen on a video laughing during the assault.  After an excessive force lawsuit was filed, the City of Buffalo agreed to a $300,000 settlement with the victim.

80.      In May 2020, Erie County District Attorney John Flynn announced he was investigating a Buffalo Police arrest caught on camera. During the arrest, which was caught on cell phone video, a Buffalo Police officer repeatedly punched suspect Quentin Suttles in the head while Suttles was on the ground. An excessive force lawsuit has been filed.

81.      In June, 2020, Dean Taylor, age 60, filed a lawsuit in State Supreme Court[30], alleging that two Buffalo police officers beat him over the head while he stood on a street corner taking video of police activity down the street.

82.      In June, 2020, Ruweyda Salim, a 25-year-old woman was concerned about the number of police officers on the scene for what she believed was a man in distress, and was using her cell phone to record the police response when a Buffalo police lieutenant, Mike DeLong called her a f***ing c**t and pushed his body up against her.[31]

---

[30] INDEX NO. 802972/2020.
[31] The recorded video is available at https://wgrz.com/embeds/video/71-b7bc89f8-2855-44dd-bdf9-fbc194f26289/iframe?jwsource=cl last accessed on February 16, 2021.

83.     Despite the repeal of New York State Civil Rights Law 50-A, the City of Buffalo and BPD continue its practice of shielding police disciplinary and other records from public view. On July 22, 2020, August 5, 2020, and August 17, 2020, the attorneys for Plaintiff, Martin Gugino, submitted a request for Buffalo Police Department records pursuant to Freedom of Information Law (FOIL), N.Y. Public Officers Law §§ 84-90. To date, the City of Buffalo has failed to respond.

## XII.   JURISDICTION

84.     This action is commenced pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343 (3) and (4). Supplemental jurisdiction over Plaintiff's claims under New York common law is founded on 28 U.S.C. § 1367(a).

85.     Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(b), because all of the events giving rise to the claims occurred in this district.

## XIII.   PARTIES

86.     Plaintiff, Martin Gugino, was, at all relevant times, a resident of Erie County, New York.

87.     Plaintiff, Martin Gugino, was assaulted by defendants on June 4, 2020, as further described herein.

88.     Defendant City of Buffalo is a political subdivision of the State of New York. The Buffalo Police Department is a department or division of the City. Defendant City of Buffalo is authorized under the laws of the State of New York to maintain a police department, the BPD, which acts as its agent in the area of law enforcement. Defendant

City of Buffalo is responsible for the policies, practices, supervision, and conduct of the BPD, including the appointment, training, supervision, and conduct of all BPD personnel and BPD's compliance with federal and state law. Defendant City of Buffalo receives federal financial assistance for its programs and activities, including for programs and activities of the BPD.

89.     Upon information and belief, each person who used unlawful, unnecessary and excessive force to enforce the curfew and declined to provide immediate medical aide on June 4, 2020, was an agent or employee of the City of Buffalo.

90.     Upon information and belief, each and every decision to unlawfully and/or unreasonably assault and/or use force in enforcing the curfew and to "clear the square" on June 4, 2020, was the result of a policy decision of the City of Buffalo.

91.     At all relevant times, Defendant, Byron W. Brown, was the Mayor of the City of Buffalo, a New York State resident acting in the capacity of chief executive officer, agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.

92.     As Mayor of the City of Buffalo, Defendant Brown is the chief policy making official for the City and all of its agencies, including the BPD. He is responsible for ensuring that BPD personnel obey the laws of the United States and of the State of New York. Defendant Brown is sued in his official and individual capacities.

93.     In consultation with the Buffalo City Council, Defendant Brown made the final decision to declare a state of emergency and impose a curfew with input from the Commissioner and Deputy Commissioner and staff in the field.

94.        Defendant Byron Lockwood is the current Commissioner of the BPD, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City of Buffalo. As Commissioner of the BPD, Defendant Lockwood is responsible for the policy, practice, supervision, implementation, and conduct of all BPD matters, as well as the training, supervision, and conduct of all BPD personnel, including those named as defendants in this action. He has for all times relevant hereto been responsible for enforcing the rules and policies of the BPD and for ensuring that BPD personnel obey the laws of the United States and of the State of New York.

95.        In his oversight capacities, Defendant Lockwood directed, oversaw, encouraged, ratified and/or failed to prevent the unlawful and unconstitutional conduct of BPD officers and personnel in the ERT on June 4, 2020.

96.        Defendant Lockwood played a role in developing the BPD's plan to clear Niagara Square and acted as the incident commander in charge of the police response to the June 4, 2020 demonstration. Defendant Lockwood directly supervised his officers' and deputies' conduct and issued specific directives as he followed the progress at Niagara Square. Defendant Lockwood is sued in his official and individual capacities.

97.        Defendant Deputy Commissioner Joseph Gramaglia is a Deputy Commissioner of the BPD, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City of Buffalo. As Deputy Commissioner of the BPD, Defendant Gramaglia is responsible for the policy, practice, supervision, implementation, and conduct of the ERT and he has for all times relevant hereto been responsible for enforcing the rules and policies of the BPD and for ensuring that BPD personnel obey the laws of the United States and of the State of New York.

98.     Defendant Gramaglia directed and authorized BPD to "clear the square" and gave the order to deploy a militarized emergency response team to clear the square of three peaceful protesters on June 4, 2020.

99.     In his oversight capacities, Defendant Gramaglia directed, oversaw, encouraged, ratified and/or failed to prevent the unlawful and unconstitutional conduct of BPD officers and personnel in the ERT.

100.    Defendant Gramaglia played a role in developing the BPD's plan to clear Niagara Square and acted as the deputy in charge of the police response to the June 4, 2020 demonstration. Defendant Gramaglia directly supervised his officers' conduct and issued specific directives as he followed the progress at Niagara Square. Defendant Gramaglia is sued in his official and individual capacities.

101.    Defendant Robert McCabe is an officer employed by the Buffalo Police Department, and was a member of the police department's ERT. On June 4, 2020, McCabe shoved Martin Gugino after being instructed by ERT team members to "Push Him", and then walked past him as he lay on the ground incapacitated with blood pooling from his ear, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City of Buffalo. Defendant McCabe is sued in his individual capacity.

102.    Defendant Aaron Torgalski is an officer employed by the Buffalo Police Department, and was a member of the police department's ERT. On June 4, 2020, Torgalski shoved Martin Gugino after being instructed by ERT team members to "Push Him" and then walked past him as he lay on the ground incapacitated with blood pooling from his ear, and acts under color of state law in the capacity of agent, servant, and

employee of Defendant City of Buffalo. Defendant Torgalski is sued in his individual capacity.

103.    Defendant John Losi is a detective employed by the Buffalo Police Department, and was a member of the police department's ERT. On June 4, 2020, Losi was part of the ERT team, yelled "Push Him", shoved Defendants McCabe and Torgalski towards Plaintiff, and thereafter urged Defendant Torgalski and McCabe to keep moving and not offer medical aide to Martin Gugino as he laid on the ground incapacitated, and acts under color of state law in the capacity of agent, servant, and employee of Defendant City of Buffalo. Defendant Losi is sued in his individual capacity.

104.    Defendants have acted or are continuing to act under the color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City of Buffalo and/or the BPD in engaging in the conduct described herein.

105.    At all times relevant herein, defendants have acted for and on behalf of the City of Buffalo and/or the BPD with the power and authority vested in them as officers, agents, and employees of the City of Buffalo and/or the BPD and incidental to the lawful pursuit of their duties as officers, employees, and agents of the City and/or the BPD.

106.    At all times relevant herein, Defendants violated and/or continue to violate clearly established constitutional standards under the First, Fourth, and Fourteenth Amendments, of which a reasonable person would have known.

## XIV.    CAUSES OF ACTION

### FIRST CLAIM:

### MUNICIPAL AND SUPERVISORY LIABILITY (*Monell* - 42 U.S.C. § 1983) against the City of Buffalo

#### Count 1: Municipal Liability – Curfews Violating Plaintiff's First and Fourteenth Amendment Rights

107.    Plaintiff, Martin Gugino, realleges each and every paragraph in this Complaint as if fully set forth herein.

108.     The City of Buffalo has a policy, practice and/or custom of using curfews to prohibit and prevent protests and demonstrations and other activity protected by the First Amendment.

109.    The curfew which is the subject of this action violated the constitutionally guaranteed rights of Plaintiff, Martin Gugino, under the First and Fourteenth Amendments to the United States Constitution.

110.    Defendant Byron Brown, who is a final policy maker, directly committed or commanded the violation of the plaintiff's rights by implementing the unlawful curfew.

111.    The unlawful Curfew Order was established and enforced by the City and policy-making officials within the BPD and caused the deprivation of plaintiff's rights.

112.    The curfew order was not narrowly tailored to achieve a compelling state interest.

113.    The curfew prohibited and suppressed far more speech, assembly, and other protected First Amendment activity than necessary to achieve any claimed compelling state interest.

114.    The curfew was, in effect, a prior restraint on free speech activity and assembly and failed to allow for ample alternative channels of communication.

115.    The curfew was inconsistently and selectively enforced on the nights it was in effect, specifically targeting individuals exercising their constitutionally guaranteed rights under the First and Fourteenth Amendments.

116.    Mayor Byron Brown, in a press release publicizing the week-long curfew on June 2, 2020, stated that there were exemptions to the city-wide curfew for citizens who had "legitimate reasons" and claimed the purpose of the city-wide curfew was to "protect peaceful protesters." (Attached hereto and more fully incorporated as **Exhibit B** is the June 2, 2020 press release).

117.    Plaintiff, Martin Gugino, had a legitimate reason for being at Niagara Square and was present for a legitimate purpose, specifically, to peacefully exercise his constitutionally guaranteed First Amendment right to assemble and speak in public places.

118.    Therefore, Plaintiff, Martin Gugino, was exempt from the curfew order at the time he was assaulted by Buffalo Police Officers.

119.    As a direct and proximate result of the actions and omissions described in this complaint, Plaintiff, Martin Gugino, incurred economic and noneconomic damages as alleged herein.

120.    Plaintiff, Martin Gugino, intends to continue exercising his First Amendment right to protest on the streets and in public places within the City of Buffalo, New York. Given that the work to end unlawful police abuse, violence, and brutality has continued virtually unabated, it is reasonably foreseeable that the Plaintiff will once

again be subjected to unconstitutional curfews if the Court does not enjoin the

overbroad, illegal practice.

121.     Plaintiff was required to hire attorneys to represent him in this matter and

are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 1988.

### Count 2: Municipal Liability – Unlawful Practice or Policy Allowing Unlawful or Unreasonable Use of Force as a Tactic to Disperse in Violation of First, Fourth, and Fourteenth Amendments

122.     Plaintiff realleges each and every paragraph in this Complaint as if fully

set forth herein.

123.     The City of Buffalo has a policy, practice and/or custom of declaring First

Amendment protests to be an "illegal demonstration", and within said policy allowing

police officers to assault citizens who are peacefully exercising their constitutionally

guaranteed rights.

124.     Defendants have a policy, practice and/or custom of declaring and

concluding that citizen activity protected under the First Amendment does not constitute

a "legitimate purpose" when enforcing the curfew and determining whether said activity

is exempt from the curfew.

125.     Defendants have a policy, practice, and/or custom of deploying a

militarized police unit against protesters even when the majority of the citizens are

engaged in peaceful protest, have not committed a crime and do not pose a physical

threat to law enforcement or others.

126.     Defendants have a policy, practice, and/or custom of using curfews and/or

unlawful physical force without justification or other legal grounds to do so, to compel

citizen demonstrators to move or disperse, and thereafter, declining to provide immediate emergency medical aid.

127.     The unlawful or unreasonable use of force as a tactic to disperse was established and enforced by the City and policy-making officials within the BPD and caused the deprivation of plaintiff's rights.

128.     The authorization and direction to deploy the ERT on June 4, 2020, was part of a decision-making process "to clear the Square" communicated through the chain of command to the officers in the field.

129.     Defendants' use of the ERT and the assault on Plaintiff, Martin Gugino, was disproportionate to the non-existent security risk posed by Plaintiff and caused substantial physical injuries. Defendants exercised power without any reasonable justification in the service of a legitimate government objective.

130.     Plaintiff, Martin Gugino, had not engaged in any behavior that justified the use of unlawful, unnecessary and excessive force.

131.     On June 4, 2020, the City of Buffalo tacitly and/or explicitly authorized the unlawful and/or unreasonable use of force in enforcing the curfew and deployment of the ERT against protestors and residents of Buffalo, including Plaintiff, Martin Gugino.

132.     The City of Buffalo, acting pursuant to the foregoing policies, practices, or customs, unlawfully used force and assaulted Plaintiff, Martin Gugino.

133.     In addition to the foregoing policies, practices or customs, Defendant City of Buffalo has failed to properly train and/or supervise its officers, agents, and employees (a) as to proper practices, methods and techniques for policing public protests and/or demonstrations; (b) as to when and under what circumstances the ERT

should be deployed when public protests and/or demonstrations are taking place; (c) as to when and under what circumstances force, if any, could be used against a particular citizen involved in public protests and/or demonstrations; (d) as to when and under what circumstances emergency medical aid should be given to any citizen who is protesting.

134.　　　By failing to properly train and/or supervise its officers, Defendant City of Buffalo has displayed deliberate indifference to Plaintiff's constitutional rights, sufficient to support a verdict that those policies, practices and/or customs caused the use of unlawful and excessive force against Plaintiff, Martin Gugino.

135.　　　One example of the failure to train and supervise, is that on June 4, 2020, the ERT was deployed despite the fact that there was no avenue to keep open (since the police had closed traffic and Plaintiff was standing on the sidewalk), there was no "line" to hold (since there were only 3 peaceful protesters rather than large crowds), no crowd to move, nor an elevation of the event to justify the deployment of the ERT. See ¶¶58-64 *supra*.

136.　　　The need for more or better supervision of the militarized police force in enforcing the curfew to protect against violating the constitutional rights of peaceful citizens was obvious, but Defendants made no meaningful attempt to forestall or prevent the unconstitutional and unlawful conduct of its employees and agents.

137.　　　As a direct and proximate result of the actions and omissions described in this Complaint, Plaintiff incurred economic and noneconomic damages, as alleged herein.

138.    Plaintiff was required to hire attorneys to represent him in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count 3: Municipal Liability – Unlawful Practice of Concealing, Excusing and/or Condoning the Unlawful Use of Force in Violation of First, Fourth, and Fourteenth Amendments

139.    Plaintiff realleges each and every paragraph of this Complaint as if fully set forth herein.

140.    Upon information and belief, Defendants have a policy, practice and/or custom of concealing, excusing and/or condoning the unlawful use of unnecessary and/or excessive force against citizens, particularly against individuals of color and people engaging in constitutionally protected expression, including utilizing internal investigative procedures to exonerate the police officers who committed unlawful, violent crimes against citizens.

141.    The policy, practice and/or custom was implemented on June 4, 2020, after the Buffalo Police Department unlawfully assaulted Plaintiff, Martin Gugino.

142.    At approximately 8:50 p.m., the City and BPD issued the following statement:



Fig. 16 is a screenshot of the email sent to the press.

143.    Approximately, 20 minutes after the police statement was made public, the local NPR affiliate WBFO released the distressing video that would go viral in the days that followed, which clearly showed that the Plaintiff did not trip and fall during a skirmish. Unlike most victims of police brutality and excessive force, this instance happened to be captured and documented by local news reporters who were recording the events in real time.

144.    Without this video, the false statement of events concocted and disseminated by the City may seem credible.  However, as the video reveals, there was no skirmish with protesters and Plaintiff, Martin Gugino, was not injured as a result of tripping and falling.

145.    The City of Buffalo tacitly and explicitly authorized the false statement to conceal, excuse and/or condone the unlawful use of force and/or retaliation against

citizens and residents of Buffalo, New York, including Plaintiff, Martin Gugino, on June 4, 2020.

146.       The decision to email members of the press the false statement on June 4, 2020, was part of a decision-making process communicated through the chain of command to avoid responsibility for the unlawful assault committed upon Plaintiff, Martin Gugino and deprive plaintiff his rights under the First, Fourth, and Fourteenth Amendments.

147.       Upon information and belief, other actions were initiated to conceal the unlawful assault committed upon Plaintiff, Martin Gugino, by Buffalo Police Department officers, all of which were intended to exonerate them from criminal conduct.

148.       The City of Buffalo, acting pursuant to this policy, practice, or custom, falsely claimed Plaintiff was injured when he slipped and fell.

149.       On June 17, 2020, more than 200 off duty or retired law enforcement officers blocked traffic and gathered in front of Buffalo City Court building on Delaware Avenue apparently exercising their first amendment constitutional rights (the same rights Plaintiff was exercising when he was assaulted) to express support for Defendants, McCabe and Torgalski, during their arraignment on criminal charges related to the charges of second degree assault.

150.       PBA president Evans, expressed support for the two officers who assaulted the peaceful elderly citizen and decrying the criminal charges brought against them stating, "These guys did nothing but do what they were ordered to do. This is disgusting!!"

06-17-2020

We will forward any donations to the officers. Checks can be
sent to the PBA office, 68 Court st, Bflo NY 14202

Want to say thank you to everyone that was able to make it
this morning. The support was overwhelming!! Was great to
see all the BPD retirees as well as all the other agencies and
departments. Thank you !!!

These guys did nothing but do what they were ordered to do.
This is disgusting !!!

Fig. 13 is a screenshot of the PBA president's public blog post on use of force reporting
dated June 17, 2020.

151.     On July 20, 2020, after the repeal of New York State Civil Rights Law 50-
A, News 4 WIVB Buffalo released a list of Buffalo Police officers with the most
excessive force complaints over the past five years, which included the top 10% of
Buffalo officers with the most excessive force complaints from June 30, 2015, through
June 30, 2020. In addition, the list contained the top 10% of officers who have the most
external complaints against them during the same five-year period.[32]

152.     In response to the public disclosure of unlawful violent conduct by Buffalo
police officers, PBA president, as part of the policy, practice and/or custom described
above, wrote the following to all members:

---

[32] Available at https://www.wivb.com/news/top-stories/you-now-know-the-buffalo-officers-with-most-excessive-force-complaints-in-5-years/ last accessed on February 4, 2021.

> Saw the top 10 story. What a joke. <u>Those officers should be commended</u>!!! To think of all the shitheads they've locked up, and there are so few complaints is astonishing. My advice, <u>keep doing what you are doing</u>. To try and make cops villains is ridiculous. Look at all the illegal guns those officers have taken off the streets. As well as, all the carnage that has been avoided. Look at the great arrests that have been made, the evil they have put behind bars... Let's see that story...

Fig. 15 is a screenshot of the PBA president's public blog post on officers with the most excessive force complaints dated May 22, 2020. (Emphasis supplied).

153.       This policy, practice and/or custom not only erodes public confidence in the Buffalo Police Department, but also requires law abiding police officials to acquiesce to and comply with this illegal policy.

154.       In addition to the foregoing policy, practice and/or custom, Defendant City of Buffalo has failed to properly train and/or supervise its officers, agents, and employees to (a) ensure that unlawful force is not used against citizens; (b) ensure accountability, discipline and removal from the police force when excessive force is used; and (c) require its police officers to intervene and stop another police officer from using unlawful force against a citizen.

155.       By failing to train and/or supervise its officers, Defendant City of Buffalo has displayed deliberate indifference to Plaintiff's constitutional rights, sufficient to support a verdict that those policies, practices and/or customs caused the use of unlawful, unnecessary and excessive force against Plaintiff, Martin Gugino.

156.       Defendant City is directly liable to Plaintiff for its unconstitutional policy, practice and/or custom and for failing to properly train and/or supervise its officers.

Case 1:21-cv-00283-LJV   Document 1   Filed 02/22/21   Page 43 of 55

157.     As a direct and proximate result of the actions and omissions described in this complaint, Plaintiff incurred economic and noneconomic damages, as alleged herein.

158.     Plaintiff was required to hire attorneys to represent him in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count 4: Municipal Liability – Retaliation and Failure to Train and Supervise Police Officers Interacting with Citizens Exercising Their First Amendment Right.**

159.     Plaintiff realleges each and every paragraph in this Complaint as if fully set forth herein.

160.     Defendants have a policy, practice and/or custom of retaliating against citizens engaging in constitutionally protected expression.

161.     On June 4, 2020, the City of Buffalo tacitly and explicitly authorized the retaliation against citizens engaging in constitutionally protected expression against protestors and residents of Buffalo, including Plaintiff, Martin Gugino.

162.     The City of Buffalo, acting pursuant to the foregoing policies, practices, or customs, retaliated against Plaintiff, Martin Gugino, by assaulting him.

163.     Defendant City of Buffalo has failed to properly train and/or supervise its officers, agents and employees on (a) how to interact with peaceful protesters; and, (b) how to refrain from retaliating against citizens engaged in constitutionally protected expression, (c) how to interact with citizens filming police brutality, and/or police interactions.

Complaint-43

164.     These failures resulted in violation of Plaintiff's rights under the First, Fourth and Fourteenth Amendments of the U.S. Constitution.

165.     As a direct and proximate result of the actions and omissions described in this complaint, Plaintiff incurred economic and noneconomic damages, as alleged herein.

166.     Plaintiff was required to hire attorneys to represent him in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM:

### (First & Fourteenth Amendment – Curfews, Violation of Speech, Assembly, Movement, and Petition – All Defendants)

167.     Plaintiff, Martin Gugino, restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

168.     The First Amendment guarantees Plaintiff, Martin Gugino, the protected rights to freedom of speech, to peacefully assemble, and to petition the government for redress of grievances.

169.     The 8:00 p.m. city-wide curfew order prohibited all protest and assembly activity, as well as other protected activity and, as such, is overbroad and unconstitutional.

170.     The curfew order issued by Defendant Brown violates the First Amendment because:

170.1.     Both on its face and as applied, is impermissibly content- and viewpoint-based, because it exempts and permits certain kinds of expression, namely that

presented by members of the news media and other essential workers, while silencing expression on other topics, namely the protest against unlawful police brutality;

170.2.     Both on its face and as applied, violates the long-established strict scrutiny standard because it does not advance a compelling government interest and is not the least restrictive means of achieving the government's objectives;

170.3.     It is substantially overbroad and abridges substantially more speech than necessary;

170.4.     It impermissibly closes public forums, namely streets and sidewalks, to constitutionally-protected expression; and

170.5.     Both on its face and as applied, it imposes an invalid time, place, and manner restriction on speech because it is not narrowly tailored to a substantial government interest, and fails to leave open sufficient alternative avenues of expression.

171.     The curfew chilled or attempted to chill the First Amendment activity of Plaintiff and others.

172.     The curfew lacked constitutionally sufficient notice to those subject to or impacted by the curfews, including Plaintiff, Martin Gugino.

173.     The curfew, as enacted and implemented by Defendants, violated the First Amendment rights of protestors and residents, including Plaintiff, Martin Gugino.

174.     Plaintiff, Martin Gugino, was engaged in constitutionally protected activity under the First Amendment when he was unlawfully assaulted by Defendants, McCabe, Torgalski, and Losi. His constitutionally protected activity, included walking on a sidewalk in a public square, attempting to speak to a police officer or officers and

protesting the widespread use of unlawful force by police agencies throughout the United States.

175.     Defendants violated rights held by Plaintiff, Martin Gugino, which were clearly established, and no reasonable person similarly situated to Defendants could have believed that such conduct was lawful or within the bounds of reasonable discretion. Defendants thus lack qualified or statutory immunity from suit or liability.

176.      As a direct and proximate result of the policies and conduct of Defendants, Plaintiff was required to seek medical treatment for his injuries in an amount to be determined at trial, and will, in the future, be compelled to incur additional obligations for said treatments as a result of his ongoing pain and suffering. Plaintiff is entitled to economic and noneconomic compensatory damages in a sum to be determined at trial.

177.     The actions of Defendants were recklessly indifferent to Plaintiff's civil rights, and callously disregarded his age, safety and health, particularly in light of known risks to the health and safety of an elderly Plaintiff who was shoved to the ground. As such, punitive damages should be awarded against the individual Defendants in a sum to be determined at trial.

178.     Plaintiff was required to hire attorneys to represent him in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM:**

**(First, Fourth & Fourteenth Amendments to the U.S. Constitution –
Retaliation - against all Defendants)**

179.     Plaintiff restates and realleges each and every paragraph of this
Complaint as if fully set forth herein.

180.     Plaintiff, Martin Gugino, was engaged in constitutionally protected activity
when the Defendants McCabe, Torgalski, Losi, Lockwood and Gramaglia, acting or
purporting to act in the performance of their official duties as law enforcement officers,
pursuant to the orders and policies of the Defendant City of Buffalo and Defendant
Brown, when they assaulted Plaintiff, Martin Gugino, causing serious personal injury
that would chill an ordinary person from continuing to engage in that activity.

181.     Upon information and belief, those actions and omissions, including the
implementation of the curfews and the state violence used to enforce the curfews, were
substantially motivated by a desire to retaliate against Plaintiff, Martin Gugino, for
exercising his constitutionally-protected rights, and punish him for the actions of others.

182.     The retaliation by Defendants was motivated by evil motive or intent,
involved reckless or callous indifference to Plaintiff's First, Fourth, and Fourteenth
Amendment rights guaranteed and secured by the United States Constitution, and/or
was done so wantonly or oppressively.

183.     As a direct and proximate result of Defendants' unconstitutional actions,
including the implementation and enforcement of the unconstitutional curfews, and use
of force to "clear the Square" Plaintiff suffered injuries entitling him to recover
compensatory and punitive damages.

**FOURTH CLAIM:**

**(Fourth and Fourteenth Amendments – Excessive Force and Deliberate Indifference to Health and Safety, and False Arrest/False Imprisonment and Unreasonable Search and Seizure, 42 U.S.C. § 1983)**

184.     Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

185.     By their unlawful actions as described herein, Defendants, under color of law, subjected Plaintiff, Martin Gugino, to the deprivation of rights, privileges, or immunities guaranteed and secured by the United States Constitution, namely, Plaintiff's rights to freedom from unreasonable seizure by the use of unlawful, unnecessary and excessive use of force against Plaintiff.

186.     Defendants violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated as Defendants could have believed that such conduct was lawful or within the bounds of reasonable discretion. Therefore, Defendants lack qualified or statutory immunity from suit or liability.

187.     As a direct and proximate cause of the actions described herein, Plaintiff sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

188.     Defendants' use of force was sufficiently unreasonable and conscience-shocking.

189.     The actions of Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff, Martin Gugino. As a result of

this intentional conduct, Plaintiff, Martin Gugino, is entitled to punitive damages against Defendants, in an amount sufficient to punish them and to deter others from similar conduct.

190.     Plaintiff was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM:

### Vagueness
### (42 U.S.C. § 1983)

191.     Plaintiff realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

192.     The Emergency Order issued by Defendant Mayor Byron Brown is void for vagueness and therefore violates the First Amendment and Fourteenth Amendments of the United States Constitution.

193.     Under 42 U.S.C. § 1983, Plaintiff, Martin Gugino, is entitled to injunctive relief prohibiting the City of Buffalo from violating his rights, privileges and immunities— and those of others not before the Court.

## SIXTH CLAIM:

### (Fourteenth Amendment – Selective Enforcement Equal Protection)

194.     Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

195.     The curfew, as applied, discriminated against Plaintiff, Martin Gugino, simply for exercising his First Amendment protected opinions and activities.

196.     Plaintiff, Martin Gugino, as compared with others similarly situated, such as persons <u>not</u> engaging in protected first amendment activities, which included enjoying dinner at outside dining establishments which had reopened during the week long curfew, shopping, taking a walk, among many other activities, was "selectively treated" and that such "selective treatment" was based on "impermissible considerations" including, among other things, "intent to inhibit or punish the exercise of constitutional rights." *Bar-Levey v. Gerow*, No. 18 Civ. 9454 (NSR), 2020 WL 814925, at *5 (S.D.N.Y. Feb. 19, 2020) (citing *Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017)).

197.     More specifically, "the curfew" was selectively enforced against individuals, such as Plaintiff, Martin Gugino, who was engaged in peaceful demonstrations, many of which were organized to promote the right of assembly, free speech, and to be free from police brutality and other use of excessive force against citizens. Throughout the City, the curfew was not enforced against individuals enjoying outdoor dining, grocery shopping, walking their dogs, and engaged in other activities.

198.     The selective treatment was based on an intent to inhibit or punish the exercise of constitutional rights, especially whereas here the video of the assault shows the intent was to inhibit and punish the exercise of the constitutional rights of a senior citizen and a handful of other citizens who were peacefully petitioning the government on a public sidewalk in Niagara Square, in front of City Hall, a public building.

199.     As a direct and proximate cause of the actions described herein, Plaintiff sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

200.     The actions of Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiff. As a result of this intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in an amount sufficient to punish them and to deter others from like conduct.

201.     Plaintiff was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## SEVENTH CLAIM:

## (Failure to Intervene)

202.     Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

203.     "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994).

204.     An officer who fails to intercede when unlawful, unnecessary and excessive force is used, or another constitutional violation occurs, is liable for the preventable harm caused by the actions of other officers.

205.     Here, there were several officers and supervisors who had a "realistic opportunity" to intervene and failed to do so.

206.     As a direct and proximate cause of the actions described herein, Plaintiff sustained economic and noneconomic damages, including physical pain and suffering;

loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

207.    The actions of Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiff. As a result of this intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in an amount sufficient to punish them and to deter others from similar conduct.

208.    Plaintiff was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## EIGHTH CLAIM:

## (Assault)

209.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

210.    Defendant Losi shoved Defendants McCabe and Torgalski towards Plaintiff, and Defendants McCabe and Torgalski forcibly pushed Plaintiff, Martin Gugino, a senior citizen, to the ground, where he laid incapacitated and seriously injured with blood pooling from his ear.

211.    Defendants Losi, McCabe and Torgalski intended to either to inflict personal injury *or* to arouse apprehension of harmful or offensive bodily contact.

212.    As a direct and proximate cause of the actions described herein, Plaintiff sustained economic and noneconomic damages, including physical pain and suffering;

loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

213.    The actions of Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiff. As a result of this intentional unlawful conduct, Plaintiff is entitled to punitive damages against Defendants, in an amount sufficient to punish them and to deter others from similar conduct.

214.    Plaintiff was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## NINTH CLAIM:

## (Battery)

215.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

216.    Defendants, Losi, McCabe and Torgalski, intentionally made bodily contact with Plaintiff, Martin Gugino, the intended contact was itself offensive and was without the consent of Plaintiff, Martin Gugino.

217.    As a direct and proximate cause of the actions described herein, Plaintiff Martin Gugino sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

218.     The actions of Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiff. As a result of this intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in an amount sufficient to punish them and to deter others from similar conduct.

219.     Plaintiff, Martin Gugino, was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## TENTH CLAIM:

## (Negligence)

220.     Plaintiff, Martin Gugino, restates and realleges each and every paragraph of this Complaint as if fully set forth herein.

221.     Upon information and belief, the incident hereinbefore described was caused as a result of the negligent, careless, reckless and unlawful conduct on the part of Defendant, City of Buffalo, for failing to comply with the applicable departmental policies, for inadequately training its officers, employees and agents, and failing to supervise its officers, employees and agents.

222.     As a direct and proximate cause of the actions described herein, Plaintiff sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

223.     Plaintiff, Martin Gugino, was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## XIV.    RELIEF REQUESTED

Plaintiff, Martin Gugino, respectfully requests that this Court:

a.  Exercise jurisdiction over Plaintiff's claims and grant him a jury trial;

b.   Award Plaintiff economic and non-economic damages, in an amount to be ascertained according to proof, and interest on said sums from the date of Judgment;

c.  Award Plaintiff punitive damages against Defendants McCabe, Torgalski, Losi, Lockwood Gramaglia, and Brown in an amount sufficient to punish them and deter others from similar conduct;

d.  Award Plaintiff reasonable attorney's fees and costs as provided by 42 U.S.C. § 1988; and

e.   Grant Plaintiff such other and further relief as this Court deems just and appropriate, including, declaratory and injunctive relief.

Respectfully submitted this 22nd day of February, 2021.

/s/ Richard P. Weisbeck, Jr.
Richard P. Weisbeck, Jr.
Melissa D. Wischerath
Lipsitz Green Scime Cambria LLP
47 Delaware Avenue, #120
Buffalo, NY 14202
(716) 849-1333
rweisbeck@lglaw.com
mwischerath@lglaw.com

Complaint-55