IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARTIN GUGINO,

              Plaintiff,           Case No. 1:21-CV-283

vs.

CITY OF BUFFALO,                         PLAINTIFF'S RULE 56.1
MAYOR BYRON BROWN,               STATEMENT OF UNDISPUTED
POLICE OFFICER ROBERT MCCABE,      FACTS
POLICE OFFICER AARON TORGALSKI,
POLICE OFFICER JOHN LOSI,
POLICE COMMISSIONER BYRON C. LOCKWOOD,
DEPUTY POLICE COMMISSIONER JOSEPH GRAMAGLIA,

              Defendants.

---

      Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiff, Martin Gugino, submits that no genuine issues of material fact exist to be tried with respect to the facts set forth below and he is therefore entitled to summary judgment as a matter of law as to the following Claims: Claim 1, counts 1; 2; Claim 2; Claim 4; Claim 5.

      1.     Mayor Byron Brown's Executive declaration issued on June 2, 2020, banned "all nonessential pedestrian and vehicular traffic within the City of Buffalo" from the hours of 8 p.m. to 5 a.m. for 7-days. Wischerath Dec., Ex. 1. This order is referred to at times herein as the "Brown curfew."

      2.     The purpose of the Brown curfew was not partially directed to the curtailment of COVID-19 transmission, but rather was due solely to the purported "conditions of civil unrest and disturbance within the City of Buffalo." Id.

      3.     The Brown curfew far exceeded the curfews enacted in other cities across the Country following the George Floyd protests because it contained no definitions or express

1

exemptions for press, the homeless, or first responders such as law enforcement or emergency medical providers. Id.

4. The Brown curfew contained no definition as to what was deemed lawful or violative. Id.

5. The Brown curfew contained no prescribed penalty nor crime for violative conduct. Id.

6. The Brown curfew was never published to the public in a newspaper of general circulation. Wischerath Dec., Ex. 2. Ex. 2 at 24:20-23 and 25:1-13.

7. The City admitted it was not in compliance with the State law publication requirements at the time the curfew was enacted. Id at 26-27.

8. The Brown curfew was not filed by the City clerk in compliance with New York State law, but rather was placed on the Common Council's Agenda for the Common Council to act on the order, which it received and filed at a virtual regular meeting of the Common Council on June 9, 2020. Id. at 26-27. See also, Wischerath Dec., Ex. 3.

9. Some City officials and defendants testified that the Brown curfew applied to the press, others did not. For example, Defendant Losi testified that members of the press were not exempt from the curfew and that he planned to arrest press who were out after curfew. Wischerath Dec., Ex. 4 at 413:12-20. See also, Detective Palizay's testimony that there were no exemptions to the curfew. Wischerath Dec., Ex. 5 at 183:1-13. In contrast, Defendant Gramaglia testified that members of the press were exempt from the curfew order. Wischerath Dec., Ex. 6 at 285:16-19.

10. Some deemed the conduct of peacefully protesting (Wischerath Dec., Exhibit 7 at 139:17-23), attending a graduation (Wischerath Dec., Ex. 8 (Exhibit 68); Wischerath Dec., Ex. 9

at 38:7-12), walking your dog in public (Wischerath Dec., Ex. 10 at 48:4-8), and outdoor dining (Ex. 9 at 36:4-9) after curfew as lawful conduct.

11. Defendant Lockwood testified that he informed residents that no one would be arrested for traveling after curfew hours to attend a graduation that started at 7:30 pm on June 3, 2020, in the City of Buffalo. Wischerath Dec., Ex. 8. See also, Wischerath Dec., Exhibit 9 at 38:7-12.

12. The City's 30(b)(6) representative City Clerk Tianna Marks disagreed with Defendant Lockwood that outdoor dining was permitted under the curfew. She testified "the leisure of going out to eat, I would say it would be up under, it would be a no." Wischerath Dec., Ex. 2 at 46:11-18. She did not know if walking your dog after curfew was essential or not. Exhibit 2 at 46:4-7. ("Do you know if in May or June of 2020 if you were walking your dog after curfew, if that was an essential activity or not? A. I don't know.").

13. The City's press liaison, Michael DeGeorge testified that he could not recall if attending a graduation and/or outdoor dining after curfew hours were lawful activities or not. Ex. 10 at 48.

14. Martin Gugino testified that his "general intention was to find out if the police -- how the police weighed -- thought that the curfew applied to a protest." Wischerath Dec., Ex. 11 at 16:5-8. He testified that before curfew he approached three officers and asked them each, "As a policeman, how do you decide who is right and who is wrong? So what -- it's up to the policeman to kind of make an initial judgment of the legality, the various laws that are involved and how they interact. So does a curfew surpass the right to demonstrate, is it over -- okay." Id. at 18.

15. Martin testified that the officers were not able or willing to tell him about their own feelings on how to decide who the curfew applied to or not. Id. at 18 and 59.

16. The guidance issued by the City of Buffalo to residents misinformed residents that the curfew applied to garbage cans. Wischerath Dec., Ex. 12.

17. The Brown curfew was never published in the newspaper of record for the City. Ex. 2 at 24:20-23 and 25:1-13. Thus, residents and law enforcement were left to guess on its scope and penalties.

18. A limited press release was issued that vaguely informed people that "Individuals traveling to or from work or for some other legitimate reason including childcare, medical care, or other necessary activity, will be allowed to do so." Wischerath Declaration, Ex. 13.

19. Defendant Lockwood testified that it was "fair to say that that was up to the discretion of the police officers on the street when they encountered someone out after eight p.m., to make a decision as to whether this was a legitimate reason or not." Ex. 90 at 33:1-7.

20. Patrol officers were left to their own unbridled discretion to determine and decide what conduct was a legitimate and/or necessary activity.

21. Defendant Lockwood testified that, neither the City of Buffalo nor its police department defined what constituted non-essential pedestrian and vehicular traffic. Wischerath Dec., Ex. 9 at 21:21-23; 22:1-3. Defendant Lockwood also admitted that the Buffalo Police Department failed to adopt a policy or practice so its officers could determine how to enforce the curfew and determine what was lawful versus violative conduct. Id. at 22.

22. Defendant Lockwood testified that the first time that he saw the Brown curfew was at his deposition. Id. at 18:21.

23. Defendant Lockwood testified that having never read the curfew, he learned about it verbally from Captain Rinaldo, who had talked about it with the City's press officer, Michael DeGeorge. Id. at 19.

24. Defendant Lockwood testified that the scope of the citywide curfew was not discussed with him by either the mayor or any of the mayor's representatives. Id. at 24.

25. Defendant Lockwood was asked, "How, if at all, was the command, meaning you and your deputies, how, if at all, was it determined who would be exempt and who would not be exempt from the curfew? A. We just knew to follow the curfew, it just was curfew." Id.

26. Patrol officers were left to their own unbridled discretion to decide the penalty for violating the Brown curfew.

27. Defendant McCabe testified, that he had never reviewed the Brown curfew and was not sure what the penalty for a citizen was, but he thought it was "very minor" and believed it to be a violation of the city ordinance or violation. Wischerath Dec., Ex. 14 at 214:18-23; 215:3-5.

28. Defendant McCabe admitted to never reading the Brown curfew, "I don't know honestly, I never reviewed it." Id. at 215:4-5.

29. Defendant Losi testified that there were no exemptions for the press and that he planned to arrest the press if they did not leave the square. Wischerath Dec., Ex. 4 at 413:18-20.

30. When asked whether or not he had an understanding that the curfew did not apply to individuals who were engaged in essential activities, Defendant Losi admitted that he was not aware of the exceptions but assumed it meant "It didn't apply to the police department or to people that worked at the hospital." Id. at 426:3-17. When pressed further about the curfew exceptions Defendant Losi admitted, "I am not aware of all of them." Id.

31. Defendant Losi was asked, "how were you going to assess whether the individuals in and around Niagara Square were exempt from the curfew?" He admitted, "I guess that would have been found out when the arrest was being made." Id. at 426:13-23.

32. Defendant Losi also believed that a violation of the Brown curfew was a non-criminal violation, and not a misdemeanor crime. Id. at 515:12-15.

33. Defendant Torgalski testified:

> Q: Did you actually ever read the curfew?
> A: I don't recall.
> Q: Were you ever told what the penalty is or was for violating the curfew.
> A: I don't believe so.
> Q: Did you have an understanding of what the penalty was for violating a curfew?
> A: In the form of an arrest.
> Q: A what?
> A: In the form of an arrest, it would be an arrestable offense, that's all.
> Q: That's all you know?
> A: Correct.
> Q: Were you aware of what, if any, exceptions there were to the eight p.m. curfew?
> A: No.
> Q: Did you have anything in writing from the ERT supervisors concerning the curfew?
> A: I don't recall.
> Q: Did you have any training how to deal with people when you're deployed as a member of the ERT when the curfew was in effect?
> A: I don't remember any specific training.

Wischerath Dec., Ex. 15 at 273-274.

34. Patrol Officer and Union President Evans testified that he was never told but presumed that a violation of the curfew was trespassing. Wischerath Dec., Ex. 16 at 275:4-13.

35. Defendant Gramaglia testified that someone engaging in exercising their First Amendment rights to protest against police brutality constituted a legitimate public purpose. Wischerath Dec., Ex. 7 at 139:17-23. The press liaison for the City, Michael DeGeorge disagreed. An excerpt of that testimony is below:

> Q. What were legitimate reasons where citizens were allowed to do things during curfew?
> A: I think mainly, you know, medical, if there was some type of an emergency, things of that nature.
> Q: Was peaceful protesting a legitimate purpose?
> A: I would say that there were protests at the time. I think the hope and the goal of the City was that the protests would be peaceful.
> Q: It was your understanding that the police had been instructed to not unnecessarily detain any person who was out for a legitimate reason?
> A: Correct.
> Q: Was peacefully protesting after curfew a legitimate reason or not?
> A: I don't believe so.
> Q: Was a citizen out walking their dog after curfew a legitimate reason?
> A: You know, I guess, if the dog had to go outside.

Wischerath Dec., Ex. 10 at 40-49.

36. On June 2, 2020, Defendant Mayor Brown provided an update on the status of the protests and lack of violence throughout the City to the press

https://www.wgrz.com/video/life/protest-ends-peacefully-in-niagara-square/71-e3cb16c0-d634-47b6-b353-e5efe9f704c7 last accessed on November 9, 2025.

37. On June 2, 2020, Defendant Mayor Brown reported that a peaceful protest in Niagara Square had ended shortly after curfew and that everyone had left after dispersal orders were read. No arrests were made, and no reports of civil unrest, violence or destruction were reported anywhere else in the City. Id.

38. On June 3, 2020, as reported in the Investigative Post, "Police and protestors knelt together in the minutes leading up to the city's 8 p.m. curfew. Some then shook hands, even hugged, before everyone went on their way as the sun began setting in downtown Buffalo." The report is available at https://www.investigativepost.org/2020/06/04/police-protesters-give-peace-a-chance/ last accessed on November 10, 2025. As reported, "They did it 'in solidarity,' said Detective John Losi, the officer who led the effort." A video of the peaceful event where peaceful protesters and police engaged in a moment of solidarity is available here at

https://www.investigativepost.org/2020/06/04/police-protesters-give-peace-a-chance/ last accessed on November 9, 2025.

39. There were no reports of civil unrest, looting, riots, or destruction.

40. Another reporter commented on the small size, and peaceful nature of the protests in Buffalo on June 3, 2020, describing it at its largest as a crowd of 80 people, peacefully protesting largely on the steps of City Hall. This Court can take judicial notice of the report and video describing the peaceful protest available https://www.wgrz.com/video/news/local/protests-continue-in-niagara-square-before-city-wide-curfew-takes-effect/71-e71dfbc9-13c4-468f-b0de-d7dddbb6782e last accessed on November 9, 2025.

41. The same was true on June 4, 2020. The only reported violence was the assault on Martin Gugino by law enforcement themselves. The defendant Mayor himself, described the days leading up to the assault on Martin Gugino by police officers as peaceful. He stated, "After days of peaceful protests and several meetings between myself, Police leadership and members of the community, tonight's event [the assault on Martin Gugino by law enforcement] is disheartening." Dkt. 1 at Fig. 9.

42. On June 5, 2020, there was a peaceful demonstration in the City of Buffalo at Niagara Square, there was no violence nor protest related arrests, nor need for the deployment of the emergency team who was standing by in the event of riot or civil disorder. Wischerath Declaration, Exhibit 17 at 43-44; 53. Nigrelli further testified that in the City of Buffalo June 6 and 7 were "like non-events, there was really no protests those days." Id. at 50:8-14. This is also confirmed by the media reports.

43. Niagara Square has been the center of political assembly, including Presidential visits and civil rights protests, since its development. Dkt. 1. Resident abolitionists angered by

8

the signing of the 1850 Fugitive Slave Act by Buffalonian President, Millard Fillmore, filled the square to protest Fillmore's pro-slavery actions. Id. In 1932, tens of thousands of women gathered in Niagara Square to call for the end to Prohibition. Id. John F. Kennedy drew over 100,000 to Niagara Square with his visit on October 13, 1962. Id. Six months after Martin Luther King, Jr.'s visit to Buffalo, thousands gathered in Niagara Square for vigils mourning his assassination in Memphis. Id. Later that year, Presidential candidate, Hubert Humphrey, led anti-Vietnam War and Civil Rights protests in Niagara Square. Id.

44. Nowhere else in the city of Buffalo could one find a place more intentionally designed to afford the city's citizens their constitutionally enshrined rights to express their disapproval or seek change or accommodation than Niagara Square. Id. This is still true today. See e.g., news report on peaceful protest where thousands showed up to protest at Niagara Square on October 18, 2025 available at https://www.wivb.com/news/local-news/buffalo/thousands-take-to-niagara-square-in-buffalo-for-no-kings-protest/ last accessed on November 11, 2025.

45. The only place the ERT was deployed after the enactment of the curfew on June 2 through the termination of the curfew was Niagara Square. Ex. 5 at 194-195.

46. Similarly, the officials and officers testified that the arrests for curfew violations were concentrated at Niagara Square. Ex. 5 at 104.

47. The arrest data shows that during the period of May 31 to June 8, there were a total of 18 arrests for curfew violations. Nine of the curfew violation arrests were in and around Niagara Square. Three were at a Bufalo police garage located at 341 Seneca Street. Twelve were people of color. Wischerath Dec., Exhibit 24.

48. The Brown curfew was not filed within 72 hours "or as soon as practicable" in the office of the Erie County Clerk, City Clerk, and Secretary of State. The City never filed the Brown curfew with its City Clerk but rather uploaded it as an agenda item to a common council meeting. Ex. 2 at 26-27; Ex. 3. The Brown curfew was filed with the Erie County Clerk on June 12, 2020. Wischerath Dec., Ex. 18. It was filed with the Office of the Secretary of State on July 1, 2020. Ex. 1.

49. The calm that fell across Buffalo came early on June 2, 2020, and continued through the termination of the curfew. There was no criminality present in the form of documented violence (outside of the police violence experienced by Martin Gugino on June 4, 2020), destruction, and/or looting — let alone criminality bordering on chaos present in Buffalo from June 2 to the termination of the curfew. https://www.wivb.com/news/mayor-brown-lifts-curfew-for-buffalo/#:~:text=BUFFALO%2C%20N.Y.%20(WIVB)%20%E2%80%93%20Mayor%20Byron%20Brown,power%20of%20organized%20and%20peaceful%20protests%20 in last accessed on November 11, 2025.

50. At 8 p.m., the militarized ERT lined up at the entrance to Niagara Square on Perkins Drive. The 57 member ERT unit outnumbered the peaceful citizens sitting on the steps of City Hall and any pedestrians remaining in the square. Wischerath Dec., Ex. 20 at 00:00-00:41.

51. Plaintiff, Martin Gugino, was one of three peaceful citizens, along with reporter Mike Desmond of WBFO, who was seated on the steps of City Hall when the ERT was deployed. Id.

52. Plaintiff, Martin Gugino, noticed the ERT assembling on the edge of the square, and became alarmed when he saw they were dressed in military riot gear and wielding heavy

batons. Id. at 00:40-00:44. As he witnessed the ERT he expressed his disbelief aloud exclaiming, "Oh my god, I can't believe it." Id. See also, Wischerath Dec., Ex. 21 at 00:16-00:18.

53. After 8 p.m., the ERT formed a line that spanned across the entire street between City Hall and Niagara Square. Id.

54. Suddenly and without warning to the crowd, the ERT began to march in formation towards the three peaceful citizens sitting on the steps of City Hall, yelling "Move Forward March." Id at 00:19.

55. Plaintiff, Martin Gugino, stood up from the steps, out of concern for the safety of other peaceful citizens, and walked towards the line in an attempt to speak with the police officials. As he walked up to the officers he asked them, "I cannot believe it, are you using those sticks? You got those batons out here, no way." Id. at 00:23-00:26.

56. At the same moment in time, the ERT yelled out in chorus, "push him, push him." "Move. Push Him Back." Id. Less than a second later, the sound of Martin's skull fracturing echoed throughout the square. Id. at 00:30.

57. Other citizens screamed out, "Ooh, he is bleeding. He is bleeding out of his ear." Id. at 00:31-00:36.

58. The use of force was captured on the body cam of an officer who was standing on the steps of City Hall. Wischerath Dec., Ex. 20. At the 00:53 second mark, Martin Gugino can be observed standing still, with his feet planted on the ground while holding his cell phone and bike helmet. Id. at 00:53. At the 00:54 second mark, Defendant Losi can be observed walking up behind Defendants McCabe and Torgalski.

59. At the 00:55-00:56 second mark, Martin Gugino can be observed taking two steps backwards from the officers who surrounded him. Id. at 00:55-00:56.

11

60. As he continued to step backwards, he was intentionally and forcibly shoved in unison by Defendants McCabe, Torgalski, and Losi. Id. at 00:56.

61. The use of force was also documented by Michael Desmond, a local reporter who was present on the steps. Wischerath Dec., Ex. 22. This video went viral and can publicly be accessed and is available here https://x.com/i/status/1268892701585530880 (last accessed on November 11, 2025). The video depicts the incident from a different perspective (slightly from behind) and shows that Martin complied with the order to Move — by taking at least two steps backwards — prior to being pushed and shoved by Defendants Losi, McCabe, and Torgalski. Id. at 00:03-00:05.

62. After the assault on Martin Gugino, Defendant Losi ordered the immediate arrest of two of the other citizens who were sitting on the steps after curfew. Wischerath Dec., Ex. 20 at 1:05. Defendant Losi commands, "Grab these guys. Grab these two guys right now." Id. at 1:08. However, the only person the ERT members arrested was a quiet man holding a sign that said, "Black Lives Matter." Id. at 1:08-1:17. The man was arrested by a group of officers who formed a circle around him and cuffed him without need for force. Id. Seconds later, an officer directs Michael Desmond to "Back Up. Let's go. Let's go. Get off the steps." Id. at 1:17-1:23. Rather than strike the reporter with a baton, the officer simply used her words to move him back. Id.

63. Defendant McCabe was placed on the front line of the ERT despite having never been trained on ERT operations. Ex. 14 at 128-129. The members of the Emergency Response lacked the training and expertise to deal with citizens and public demonstrations to ensure that public demonstrators would be able to lawfully exercise their constitutional rights to protest and demonstrate, yet at the same time, protect public and private property against destruction or

12

damage, and/or any acts of violence in or around the public protest. Id. No ERT training occurred during 2020. Wischerath, Dec. Ex. 23.

64. Defendant Gramaglia was overseeing the ERT but admitted that he had not attended formal FEMA training. Wischerath, Dec., Ex. 7 at 160:11. Defendant Palizay also admitted that rather than document use of force during the protests, the Buffalo Police Department suspended its reporting and documenting of use of force by its officers and has failed to review the body cam footage or review any of the use of force that occurred during the protests since it was so rampant and widespread. Ex. 5 at 136-137; 153.

65. Buffalo Police Department Commissioner Byron Lockwood admitted that due to the complaints by Gugino to officers using batons during a peaceful protest, Defendants McCabe and Torgalski could have stopped, stepped back, and said "you can direct that complaint to our superiors at BPD HQ but you have to leave this area or you may be subject to arrest." Ex. 9 at 112:5. Defendant Lockwood also admitted that Defendant Losi, who was the commander, could have stepped up and took charge and informed Martin Gugino the same. Id. at 112:20.

66. Defendant McCabe admitted that 75-year-old Martin Gugino did not cause him to fear for his safety nor the safety of any of his fellow officers. Ex. 14 at 152:3. Defendant McCabe admitted that Gugino had a right to be at the location. Id. at 106:22.

67. Martin Gugino was wearing a surgical mask due to the COVID-19 pandemic. Ex. 21.

68. While Martin Gugino was speaking, Defendant McCabe claimed that he was unable to understand what Martin was saying. Ex. 14 at 135.  Defendant McCabe also claimed[1]

---

[1] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. at 380.

at his deposition that he ordered Martin Gugino to move back a couple of times. Id. at 144:11-14. However, these orders are not audible on any of the videos that captured the incident. Exhibits 21-22. Instead, the video contains audio of the ERT platoon yelling in concert "MOVE." Id.

69. Martin Gugino stepped back. Id.

70. Defendant McCabe claims not to have noticed that Gugino moved back. McCabe stated that at the time of the incident he assumed Gugino had mental health issues[2] which accounted for his failure to move back. Ex. 14 at 202-203.

71. Prior to the deployment of the ERT, no dispersal warnings were disseminated to the small group of citizens gathered at Niagara Square. Wischerath, Dec., Ex 21-22. As Martin Gugino was stepping backwards, Defendants Torgalski, McCabe, and Losi intentionally shoved and pushed Martin. Ex. 15 at 255-257.

72. The intentional act of shoving Martin, caused Martin to fall to the ground, and strike his head, resulting in a fracture to his skull and a brain bleed. Id.

73. The officers involved admitted that it was clearly visible that Martin Gugino had no weapon, and they were not in fear or any danger by Martin Gugino. Id.

74. As the video evidence demonstrated Martin Gugino was an elderly, thin man. Wischerath, Dec., Exhibits 21-22.

75. Martin had no weapon. Id. He was simply walking up to officers and speaking to them. Id. As he approached the officers, Martin was holding a cell phone in one hand, and a bike helmet in the other. Id. The cell phone was clearly visible to the officers. Id. See also, Ex. 15 at 176:3-7. So was the bike helmet. Id. at 173:15-17.

---

[2] If Defendant McCabe truly believed Martin Gugino had mental health issues, he had a heightened duty to ensure Gugino understood his orders to move and provide time to comply, rather than immediately use physical force.

76. As he stepped backwards, the officers forcibly shoved him and pushed him to the ground. Exhibits 21-22.

77. The officers admitted they did not fear for their own safety when Martin Gugino was walking on the sidewalk in front of City Hall. Ex. 14 at 153.

78. Defendant McCabe admitted that he had the ability to stop, step backwards, and listen to what Martin had to say, and that nothing prevented him from doing that. Ex. 14 at 186.

79. Defendant McCabe admitted that when he struck Martin Gugino with his baton, he extended his arms completely while holding the club and forcefully pushed Martin Gugino with his baton similar to a cross-check in hockey. Id. at 202.

80. Defendant Torgalski admitted that his bare hand shove was a violation of the ERT training. Ex. 15 at 227:6-17.

81. Defendant Gramaglia admitted that the officers act of shoving Martin Gugino to the ground did not comply with the policies of the Buffalo Police Department. Ex. 7 at 146:10. Defendant Lockwood also admitted that instead of using force, officers should have taken Martin Gugino by the arms and arrested him. Ex. 9 at 139:17.

82. Defendant Torgalski admitted that other than being out after curfew, Gugino had committed no crime at the time he intentionally shoved him. Ex. 15 at 259-260.

83. Defendant McCabe testified that they planned on charging Martin with crimes, likely disorderly conduct, and a curfew violation, but the charges were not filed. Ex. 14 at 213-214. McCabe testified that he Martin's act of walking up to him and his fellow officers and voicing his objection to him using clubs and sticks constituted the crime of disorderly conduct. Ex. 14 at 216:17-23; 217:1.

DATED:  November 12, 2025          s/ Melissa D. Wischerath
                                   LIPSITZ GREEN SCIME CAMBRIA, LLP
                                   Attorneys for Plaintiff
                                   42 Delaware Avenue, Suite 120
                                   Buffalo, New York 14202
                                   Tel: 716-849-1333 x397
                                   mwischerath@lglaw.com