IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

MARTIN GUGINO,

                        Plaintiff,                           Case No. 1:21-CV-283

vs.

CITY OF BUFFALO,                       **MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

MAYOR BYRON BROWN,
POLICE OFFICER ROBERT MCCABE,
POLICE OFFICER AARON TORGALSKI,
POLICE OFFICER JOHN LOSI,
POLICE COMMISSIONER BYRON C. LOCKWOOD,
DEPUTY POLICE COMMISSIONER JOSEPH GRAMAGLIA,

                        Defendants.

———————————————————————

## <u>TABLE OF CONTENTS</u>

POINT 1 ............................................................................................................................ 1

    I.   Plaintiff Suffered Constitutional Injuries. ................................................................. 1

POINT 2 ............................................................................................................................ 4

    II.   The Brown Curfew Violated the First Amendment. ............................................... 4

    III.   The Individual Defendants are Not Entitled to Qualified Immunity with Respect to the Curfew. ........................................................................................................................ 9

POINT 3 ............................................................................................................................ 13

    IV.   The Defendants Retaliated against the plaintiff. ............................................. 13

POINT 4 ............................................................................................................................ 16

    V.   Plaintiff's 42 USC § 1983 Excessive Force Claims do not fail as a matter of law if analyzed under either the Fourth or Fourteenth Amendment because the force was "objectively unreasonable". ...................................................................................................................... 16

POINT 6 ............................................................................................................................ 34

    VI.   The Brown curfew is void for vagueness. ........................................................ 34

    VII.   The Brown curfew did not provide explicit standards for Buffalo police officers to enforce the curfew in a nonarbitrary manner. ............................................................... 38

    VIII.   Martin's conduct did not fall within the ambit of the statute. ......................... 40

POINT 7 ............................................................................................................................ 41

    IX.   Plaintiff, compared with others similarly situated, such as non-protesters who were outdoors during curfew, was selectively treated; and this selective treatment was based on impermissible considerations such as intent to inhibit or punish the exercise o constitutional rights. 41

    X.   The constitutional right to be free from selective treatment was clearly established such that an objectively reasonable officer would know such selective treatment to be unlawful. .. 44

POINT 8 ............................................................................................................................ 45

POINT 10 .......................................................................................................................... 45

POINT 13 .......................................................................................................................... 47

    XI.   Plaintiff's Excessive Force claims must not be dismissed against Defendants Brown, Lockwood, and Gramaglia. ............................................................................................ 47

# TABLE OF AUTHORITIES

**Cases**

Brosseau v. Haugen, 543 U.S. 194 (2004)................................................................ 11

Adamides v. Warren, 2022 WL 2788435  (W.D.N.Y. July 15, 2022) ........................ 7

Allen v. Coughlin, 64 F.3d 77 (2d Cir.1995)............................................................ 10

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113 (2d Cir. 2004)........................ 31

Anonymous v City of Rochester, 13 NY3d 35 (N.Y. 2009)..................................... 5, 6

Ashcroft v. al-Kidd, 563 U.S. 731 (2011)................................................................ 24

Askins v Doe No. 1, 727 F3d 248 (2d Cir. 2013)..................................................... 1, 2

Baker v. McCollan, 443 U.S. 137 (1979) ................................................................. 17

Bangs v. Smith, 84 F.4th 87 (2d Cir. 2023).............................................................. 24

Benny v City of Long Beach, 2022 WL 2967810 (E.D.N.Y. July 27, 2022).............. 14

Berg v. Kelly, 897 F.3d 99 (2d Cir. 2018)............................................................ 44, 45

Bernstein v. Vill. of Wesley Hills, 95 F. Supp. 3d 547 (2d Cir. 2015)...................... 41

Bogart v. City of New York, No. 13-CV-1017 (NRB), 2016 WL 4939075 (S.D.N.Y. Sept. 6, 2016)................................................................................................................ 19

Boyler v. City of Lackawanna, 287 F. Supp. 3d 308 (W.D.N.Y. 2018)..................... 45

Brady v. Town of Colchester, 863 F.2d 205 (2d Cir.1988) ...................................... 42

Brock v. Wright, 315 F.3d 158 (2d Cir. 2003) .......................................................... 49

Brower v. Inyo County, 489 U.S. 593 (1989)............................................................ 18

Butler v City of New York, 559 F Supp 3d 253 (S.D.N.Y. 2021) ............................... 7

Chapin v. Town of Southampton, 457 F.Supp. 1170 (E.D.N.Y.1978)....................... 35

Charles W. v. Maul, 214 F.3d 350 (2d Cir. 2000) ...................................................... 9

Cine SK8, Inc. v Town of Henrietta, 507 F3d 778 (2d Cir. 2007) ............................ 42

City of Houston v. Hill, 482 U.S. 451 (1987)....................................................... 13, 15

Concerned Jewish Youth v McGuire, 621 F2d 471 (2d Cir. 1980)............................ 5

D.C. v Wesby, 583 US 48 (U.S. 2018)..................................................................... 11

DeCintio v. Westchester Cty Med. Ctr., 821 F.2d 111 (2d Cir. 1987 ....................... 16

DeJesus v Malloy, 531 F Supp 3d 650 (W.D.N.Y. 2021) .......................................... 9

Dolan v Connolly, 794 F.3d 290 (2d Cir. 2015)........................................................ 15

Eaton v. Estabrook, 144 F.4th 80 (2d Cir. 2025) ................................................. 29, 34

Edrei v. Maguire, 892 F.3d 525 (2d Cir. 2018) ................................................ passim

Field Day, LLC v County of Suffolk, 463 F3d 167 (2d Cir. 2006)............................ 10

Field Day, LLC v. County of Suffolk, 2005 WL 2445794 (E.D.N.Y. Sept.30, 2005)................. 44

Figuereo v City of Saratoga Springs, 1:23-CV-00922 (AMN/PJE), 2025 WL 460784 (N.D.N.Y. Feb. 11, 2025)................................................................................................. 47, 48, 49

Figueroa v. Mazza, 825 F.3d 89 (2d Cir. 2016)........................................................ 32

Flannery v. City of Rochester, 640 F.Supp.3d 267 (W.D.N.Y. 2022)....................... 19

Floyd v. City of New York, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ............................ 42

Franco v Kelly, 854 F2d 584 (2d Cir. 1988)............................................................................ 15

Fraser v. City of New York, 2022 WL 3045524 (E.D.N.Y. Aug. 1, 2022)................................ 16

Gentile v. State Bar of Nev., 501 U.S. 1030 (1991) ................................................................ 13

Giacalone v. Abrams, 850 F.2d 79 (2d Cir.1988).................................................................... 10

Gomez v. Toledo, 446 U.S. 635 (1980)...................................................................................... 9

Graham v. Connor, 490 U.S. 386 (1989)................................................................ 16, 17, 32

Graham v. Long Island R.R., 230 F.3d 34 (2d Cir.2000) ........................................................ 42

Grossman v City of Portland, 33 F3d 1200 (9th Cir 1994) ........................................................ 2

Hafer v. Melo, 502 U.S. 21 (1991) ......................................................................................... 10

Harlow v. Fitzgerald, 457 U.S. 800 (1982)............................................................................. 24

Hill v. Colorado, 530 U.S. 703 (2000)..................................................................................... 38

Hope v. Pelzer, 536 U.S. 730 (2002) ....................................................................................... 33

Houston Community Coll. Sys. v Wilson, 595 US 468 (2022)................................................... 15

In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383
    (S.D.N.Y 2021) ................................................................................................................ 6, 12

Jackson v Tellado, 236 F Supp 3d 636 (E.D.N.Y. 2017) .......................................................... 47

Jacobson v. Massachusetts, 197 U.S. 11 (U.S. 1905)................................................................. 7

Jeffery v. City of New York, 113 F.4th 176 (2d Cir. 2024) ....................................................... 12

Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973)...................................................................... 20

Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246 (2d Cir. 2001) ................................. 24

Johnson v. Wing, 178 F.3d 611 (2d Cir.1999)......................................................................... 42

Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006) ......................................................................... 31

Jones v. Town of E. Haven, 691 F.3d 72 (2d Cir.2012) ............................................................. 1

Kiernan v Town of Southampton, 734 Fed Appx 37 (2d Cir. 2018)........................................... 16

King v. New Rochelle Mun. Hous. Auth., 442 F.2d 646 (2d Cir. 1971)....................................... 8

Kingsley v. Hendrickson, 576 U.S. 389, (2015)................................................................. 18, 21

LaTrieste Rest. v Vil. of Port Chester, 188 F3d 65 (2d Cir. 1999)...................................... 41, 42

Lennox v Miller, 968 F3d 150 (2d Cir. 2020) .......................................................................... 30

Lepino v Town/Vil. of Harrison, 21 CV 6874 (VB), 2023 WL 4422892 (S.D.N.Y. July 10,
    2023).................................................................................................................................. 41

Linton v. Zorn, 135 F. 4th 19 (2nd Cir. 2025) .................................................................. 32, 34

Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12 (2d Cir.1999) ................................... 41

Lombardo v. City of St. Louis, Missouri, 141 S. Ct. 2239 (2021) ............................................. 18

Malave v. Austin, WL 2021 3603433 (E.D.N.Y. Aug. 13, 2021)................................... 19, 30, 31

Massi v Flynn, 254 Fed Appx 84 (2d Cir. 2007) ..................................................................... 44

Matusick v Erie County Water Auth., 757 F3d 31 (2d Cir 2014) ........................................... 2, 3

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (2018) .................................................................. 1

Moore v. Vega, 371 F.3d 110 (2d Cir. 2004) ........................................................................... 30

Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills, 815 F Supp 2d 679 (S.D.N.Y. 2011) ........ 42

Naprstek v. City of Norwich, 545 F.2d 815 (2d Cir.1976)......................................................... 35

iv

Outlaw v City of Hartford, 884 F3d 351 (2d Cir. 2018)......................................................... 9

Owen v. City of Independence, Mo., 445 U.S. 622 (1980) ................................................... 10

Pearson v. Callahan, 555 U. S. 223 (2009)................................................................... 24, 31

Pluma v. City of New York, 2015 WL 1623828 (S.D.N.Y. Mar. 31, 2015)............................ 19

Plumhoff v. Rickard, 134 S. Ct. 2012 (2014) .................................................................... 25

Police Dept. v. Mosley, 408 U.S. 92 (1972) ........................................................................ 5

Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 (2d Cir.1980)............................ 49

R.C. Diocese of Brooklyn v Cuomo, 592 US 14 (U.S. 2020) ................................................. 5

Ramos v. Town of Vernon, 353 F.3d 171 (2d Cir. 2003)................................................... 8, 9

Reyes v City of New York, 23-CV-6369 (JGLC), 2023 WL 7212192 (S.D.N.Y. Nov. 2, 2023) 15

Rodriguez v City of New York, 72 F3d 1051 (2d Cir. 1995).......................................... 10, 11

Rogoz v. City of Hartford, 796 F.3d 236 (2d Cir. 2015) ....................................................... 9

Rookard v. Health & Hospitals Corp., 710 F.2d 41 (2d Cir.1983)........................................ 49

Rupp v Buffalo, 91 F4th 623 (2d Cir 2024)................................................................. 13, 15

Saucier v. Katz, 533 U. S. 194 (2001) .............................................................................. 24

Singh v City of New York, 23-24-CV, 2024 WL 319117 (2d Cir Jan. 29, 2024)....................... 46

Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015) .................................................... 15

Smith v. Goguen, 415 U.S. 566 (1974)....................................................................... 35, 38

Tennessee v. Garner, 471 U.S. 1 (1985) ........................................................................... 18

Terebesi v. Torreso, 764 F.3d 217 (2d Cir. 2014) ............................................................. 48

Terry v. Ohio, 393 U.S. 1 (1968) ..................................................................................... 17

Thibodeau v. Portuondo, 486 F.3d 61 (2nd Cir. 2007)................................................. 35, 38

Tierney v. Davidson, 133 F.3d 189 (2nd Cir. 1998)........................................................... 20

Tinius v. Choi, 77 F. 4th 691 (D.C. Cir. 2023)................................................................... 7

Tinker v. Des Moines School District, 393 U.S. 503 (1969)................................................. 5

Tolan v. Cotton, 572 U.S. 650 (2014).............................................................................. 32

Torcivia v. Suffolk County, New York, 17 F.4th 342 (2d Cir. 2021) ......................................... 30

Torres v. Madrid, 592 U.S. 306 (2021)............................................................................ 17

Tracy v. Freshwater, 623 F.3d 90 (2d Cir. 2010) .............................................................. 30

Triolo v Nassau County, 24 F4th 98 (2d Cir. 2022) ..................................................... 46, 47

Vasquez v. Maloney, 990 F.3d 232 (2d Cir. 2021)............................................................... 9

Walker v. City of New York, 2010 WL 5186779 (E.D.N.Y. Dec. 15, 2020) ............................ 42

Walston v City of New York, 22-CV-10002 (LAK)(JW), 2024 WL 1376905 (S.D.N.Y. Mar. 7, 2024), report and recommendation adopted, 22-CV-10002 (LAK) (JW), 2024 WL 1374837 (S.D.N.Y. Apr. 1, 2024) ........................................................................................... 42

Webb v. City of Maplewood, 889 F.3d 483 (8th Cir. 2018).................................................... 2

Williams v Korines. 966 F.3d 133 (2d Cir. 2007) .............................................................. 40

**Statutes**

42 U.S.C.A. § 1983 ....................................................................................................... 10

N.Y. Veh. & Traf. Law § 152 (McKinney 2024) .............................................................. 36

**POINT 1**

**I.      Plaintiff Suffered Constitutional Injuries.**

Without citing to any evidence or providing an explanation, the defendants' conclusorily claim that "the record shows that Plaintiff did not suffer a constitutional injury." Dkt. 160-36 at 25. Defendants claim that "Because Plaintiff has failed to show an underlying constitutional injury, no need arises to conduct Monell discovery, and the Monell claim must be dismissed…" Id.

Defendants claim oversimplifies the law for municipal liability. "Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality. <u>Monell</u>, 436 U.S. at 690–91, 98 S.Ct. 2018; *see also* <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir.2012)." <u>Askins v Doe No. 1</u>, 727 F3d 248, 253 (2d Cir. 2013). As the Court explained, [i]t does not follow, however, that the plaintiff must obtain a *judgment* against the individual tortfeasors in order to establish the liability of the municipality. It suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality. In fact, the plaintiff need not sue the individual tortfeasors at all but may proceed solely against the municipality." <u>Id</u>. (internal citations omitted). Moreover, "the entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is also irrelevant to the liability of the municipality." <u>Id</u>. at 254. "Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's

rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights." Id. To rule otherwise, would "effectively extend the defense of qualified immunity to municipalities, contravening the Supreme Court's holding in <u>Owen</u>." Id.

As discussed in <u>Webb v. City of Maplewood,</u> 889 F.3d 483, 487-88 (8th Cir. 2018), "although 'there must be an unconstitutional act by a municipal employee' before a municipality can be held liable, there 'need not be a finding that a municipal employee is liable in his or her individual capacity.' The City's contrary rule conflicts not only with our longstanding precedent, but with one of the Supreme Court's reasons for denying municipalities immunity under § 1983: The need to provide 'victims of municipal malfeasance' with a remedy, especially since the officials responsible for the injury may enjoy personal immunity from suit.' (internal citations omitted)." <u>Id</u>. On point is <u>Grossman v City of Portland</u>, 33 F3d 1200, 1203-04 (9th Cir 1994). The Ninth Circuit explained, "a finding of probable cause under the ordinance in no way renders the arrest 'privileged' or immunizes the defendants from liability. Instead, if the ordinance is unconstitutional, [plaintiff] suffered constitutional injury despite the ordinance's applicability to his conduct." *Id*.

"[W]hile isolated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability, they can be the basis of liability if they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisors must have been aware. *Jones v. Town of E. Haven,* 691 F.3d 72, 81 (2d Cir.2012)." <u>Matusick v Erie County Water Auth.</u>, 757 F3d 31, 62 [2d Cir 2014](internal punctuation omitted). The lack of training on use of force was widespread and the policy of

suspending all use of force reporting against protesters was not isolated. A member of the ERT team, Keith Carter testified that he did not know the standards for use of force for the ERT team. He was asked, "What were the standards for use of force for the unit? He answered, "I don't recall." Dkt. 160-21 at 76:9-11. He erroneously testified that after verbal commands, an officer could proceed to "soft hands" as part of the department's use of force policy. Id. at 77. Cf. Wischerath Decl., Ex. 7. He further erroneously claimed that the Department's use of force policy permitted "hard hands." Dkt. 160-21 at 76. The Department's use of force policy states that "Physical force shall only be used when no other viable option is available." Id. at section 6.2 (B). The Use of Force Policy also requires that officers engage in critical thinking prior to deploying force. "Prior to using force, members should use a critical thinking and decision-making framework to analyze and respond to incidents. This framework will allow members to uphold the sanctity of life and protect themselves by decelerating and stabilizing a situation to minimize the likelihood of a Use of Force incident. Using this framework, members should: 1. Assess the situation, threats, and risks; 2. Gather relevant facts about the incident; 3. Consider police powers and BPD policy; 4. Identify options and determine the best course of action; and 5. Act, review, and re-assess the situation." Id. at section 6.2. The Policy also mandates that "Members are prohibited from using force against persons engaged in First Amendment protected activities or to punish persons for fleeing, resisting arrest or assaulting a member, or for any other reason." Id. at 6.3. No where in the policy are "soft hands" or "hard hands" mentioned. The concept of "soft" and "hard" hands on a continuum of force is an outdated policing model that is no longer the standard for use of force in the City of Buffalo and demonstrates a pattern, policy or custom sufficiently widespread and persistent to support a

3

finding that they constituted a custom, policy, or usage of which supervisors must have been aware.

Defendant Losi also testified in violation to the department's policy on use of force. He described the use of force as "the amount of force that you use is respective to the amount of resistance you're encountering. You would use a reasonable amount of force to gain compliance." Dkt. 160-21 at 92:2-5. This testimony and lack of understanding on the use of force further proves that the City's officers lacked training on use of force and violated the department's policy sufficiently widespread and persistent to support a finding of <u>Monell</u> liability. The department's policy required all use of force be reported. Wischerath Decl., Exhibit 7 at section 6.7. However, none was reported by officers during the June 2020 protests. Dkt. 161-7 at 136-137; 153. In addition to not reporting force, the City never even bothered to review the force by its officers, even when it resulted in known injuries that were reported by the media and known to superiors. Dkt. 161-9 at 172-173.

The complete failure to report use of force and review it was negligent and reckless. The Department's Use of Force policy applied for ERT operations and members. Wischerath Decl. Exhibit 7.


**POINT 2**

**II.    The Brown Curfew Violated the First Amendment**.


Assuming *arguendo* this Court sets aside the lack of statutory authority to enact the Brown curfew, (plaintiff incorporates by reference Point I at Dkt. 162), the content-based application of the Brown curfew (plaintiff incorporates by reference Point II at Dkt. 162), the absence of a genuine emergency (plaintiff incorporates by reference Point III at Dkt. 162), the

4

fact that it was not narrowly tailored to serve a significant government interest (plaintiff incorporates by reference Point IV at Dkt. 162) and the unconstitutionally vague language as well as arbitrary enforcement (plaintiff incorporates by reference Point V at Dkt. 162), the defendants' claim that the Brown curfew is constitutional because "nearly identical curfew orders were permissible and did not violate the First Amendment—especially under the circumstances present throughout the country in the summer of 2020." Dkt. 160-36 at Point II(A). This is an oversimplification of the law, the facts, and the language and purpose of the curfews at issue in the other cities.

Defendants claim that "[a]fter the emergence of protests in Buffalo, the Buffalo Police Department had to take action, as protests have **the potential** of turning violent and disorderly." Dkt. 160-36. (emphasis added). However, promulgating a city-wide ban of all pedestrian and vehicular traffic due to the potential of protests turning violent, is not enough to pass constitutional muster.

"(I)n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Police Dept. v. Mosley, supra, 408 U.S. at 101, 92 S.Ct. at 2293 (quoting Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969))." Concerned Jewish Youth v McGuire, 621 F2d 471, 481 (2d Cir. 1980). "Government is not free to disregard the First Amendment in times of crisis." R.C. Diocese of Brooklyn v Cuomo, 592 US 14, 21 (U.S. 2020).

The curfews cited by the defendants as "nearly identical" are not identical in text, purpose, or application.  The Court of Appeals was confronted with a similar claim, where a curfew that lacked key language and critical exemptions was flatly rejected as similar in Anonymous v City of Rochester, 13 NY3d 35, 50 (N.Y. 2009). "It is puzzling that the City

purported to rely on curfews from other municipalities in the adoption of what was claimed to be a 'similar' curfew ordinance yet failed to include the critical exceptions which supported the constitutionality of those other curfews." Id. Yet, this is exactly what the defendants have done.

The City of New York's curfew examined by the District Court in In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383, 412-13 (S.D.N.Y 2021), contained critical exemptions that were absent from the Brown curfew. Wischerath Decl. Ex. 1.

Section 2 of the City of New York's curfew provided critical exemptions for a class of workers such as police officers, and other individuals traveling to and from "essential work" - a term that was expressly defined, as well as for homeless individuals and those without access to viable shelter, and individuals seeking medical treatment or supplies. Id. Unlike the City of Buffalo, the City of New York actually published the curfew to its citizens, and even went so far as to publish guidelines so as to inform City residents if they were able to walk their dog during the curfew, access the subway or pick up food after work during curfew hours. Wischerath Decl. Ex. 2. The purpose of the City of New York curfew was to curb the spread of COVID-19 because at the time it was propounded unlike Buffalo, NYC was in Phase I of curfew regulations until June 8, 2020, whereas the City of Buffalo was in Phase II, at the time that the Brown curfew was implemented. See, https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enter-phase-1-reopening-june-8-and-five-regions-enter last accessed on January 14, 2026. The New York City curfew was promulgated during a period of undisputed escalating nighttime crime and disorder occurring unpredictably throughout the City that was resisting control by traditional means of policing arising unpredictably across the New York City. 548 F. Supp. 3d at 412-13.

The City of Rochester's emergency order was not a curfew at all, but rather a limitation of the number of individuals permitted to gather together during overnight hours, both indoors and outdoors. As discussed by the District Court in <u>Adamides v. Warren, 2022 WL 2788435 *5-8 (W.D.N.Y. July 15, 2022)</u>, the Rochester curfew did not limit where anybody may go or may be in the City of Rochester—it restricted the number of people who may gather together during overnight hours. Wischerath Decl. Ex. 3. The curfew order implemented by the Mayor of Washington, D.C. discussed in <u>Tinius v. Choi</u>, 77 F. 4th 691, 699-703 (D.C. Cir. 2023) was different from the City of Buffalo's. The D.C. curfew was implemented because more than 80 arrests, mostly involving felonies, had occurred over a 2-day period in addition to the express purpose of Covid-19. Wischerath Decl. Ex. 4. D.C.'s curfew was limited to 2-days and contained critical exemptions for voting, essential workers, and travel for medical needs. Id.

In <u>Butler v City of New York</u>, 559 F Supp 3d 253, 261 (S.D.N.Y. 2021) at issue was the "Mayor's Emergency Executive Order 103 ("EEO 103"), which was propounded on March 25, 2020. <u>Id</u>. EEO 103 was propounded "to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19." <u>Id</u>. Since it was a public health law, the <u>Butler</u> Court analyzed the Executive Order under the deferential framework set forth in <u>Jacobson v. Massachusetts</u>, 197 U.S. 11, (U.S. 1905). <u>Id</u>. "Under <u>Jacobson</u>, a state or local law 'enacted to protect the public health' will survive judicial scrutiny unless it bears "no real or substantial relation to [the public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." <u>Id</u>. at 264-265. (internal citations omitted). The <u>Butler</u> Court emphasized that the plaintiffs did not dispute that "EEO 103 was enacted to protect the public health." <u>Id</u>. at 266.

The Butler framework is not applicable here because the Brown curfew is not a public health law and contained no reference to COVID-19 or any purpose to protect the public health. Moreover, unlike the plaintiffs in In re New York City Policing During Summer 2020 Demonstrations, Butler, and Tinius, supra, the facts here show a content-based application of the City of Buffalo's curfew order. Buffalo's City-wide arrest data (unlike NYC) showed that only 11 individuals were cited solely for curfew violations and that all citations were issued around areas of protest. Wischerath Decl. Ex. 5. See also the report of plaintiff's expert Darrin Porcher, Wischerath Decl. 6, at ⁋48.

Defendants claim that "[e]ach of these Courts has specifically held that curfew orders like Mayor Brown's passed the appropriate level of constitutional scrutiny, here intermediate scrutiny" is not on point. The orders referred to by the defendants varied greatly, ranging from juvenile curfews to public health laws to more limited means of controlling the number of people congregating and/or to stop the spread of COVID-19 in major cities. This is because the Brown curfew was not promulgated to stop the spread of COVID-19 but rather was a 7-day travel ban that restricted the movement of all pedestrians and vehicles city-wide from 8 p.m. to 5 a.m., with no express exceptions, that was enacted at a time when there were no riots and in the absence of a genuine emergency. Dkt. 163-1. A general curfew order that generally restricted the intrastate or interstate right of travel of adults is subject to strict scrutiny in the Second Circuit. See Ramos v. Town of Vernon, 353 F.3d 171, 172 (2d Cir. 2003). It is well established that the Second Circuit has recognized an explicit right to intrastate travel. Id. at 176. (citing King v. New Rochelle Mun. Hous. Auth., 442 F.2d 646, 648 (2d Cir. 1971)). In Ramos, the Court distinguished the scrutiny tiers for a general curfew that applied to juveniles, applying intermediate level scrutiny for juveniles, and explaining that strict scrutiny would have applied

had the same general curfew applied to adults. "Because the curfew limits the constitutional right to free movement within the Town of Vernon at certain hours of the night, we assume that were this ordinance applied to adults, it would be subject to strict scrutiny." Id. Thus, because the Brown curfew was a general curfew order that generally restricted the intrastate or interstate right of travel of adults it is subject to strict scrutiny.

**III.    The Individual Defendants are Not Entitled to Qualified Immunity with Respect to the Curfew.**

Defendants' claim that the "the individual Defendants are certainly entitled to qualified immunity with respect to the curfew." Dkt. 160-36 at Point II(B). This is an oversimplification of the law.

**a.    The defendants failed to meet their burden of proof affording the individual defendants qualified immunity with respect to the curfew.**

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof. See, e.g., Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); Rogoz v. City of Hartford, 796 F.3d at 247." Outlaw v City of Hartford, 884 F3d 351, 367 (2d Cir. 2018).

"At the summary judgment stage, a defendant bears the 'burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.' Vasquez v. Maloney, 990 F.3d 232, 238 (2d Cir. 2021) (citations omitted)." DeJesus v Malloy, 531 F Supp 3d 650, 665 (W.D.N.Y. 2021). "Higher-ranking officials, as is the case here, are held to a higher standard of legal knowledge than are their subordinates." Charles W. v. Maul, 214 F.3d 350, 360 (2d Cir. 2000).

"[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, see generally <u>Hafer v. Melo</u>, 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991), and it protects only against claims for damages, not against claims for equitable relief, see, e.g., <u>Allen v. Coughlin</u>, 64 F.3d 77, 81 (2d Cir.1995); <u>Giacalone v. Abrams</u>, 850 F.2d 79, 84 (2d Cir.1988)." <u>Rodriguez v City of New York</u>, 72 F3d 1051, 1065 (2d Cir. 1995). This Court must deny qualified immunity to the City since there is no qualified immunity available to a municipality or other similar governmental employer or policymaking individual sued in his "official capacity" under 42 U.S.C.A. § 1983. See, <u>Owen v. City of Independence, Mo</u>., 445 U.S. 622 (1980). This Court must also deny qualified immunity to the individual defendants because, it is also undisputed that the plaintiff has asserted claims for equitable relief. Dkt. 1.

### b. Qualified Immunity is Not Available Because the Brown Curfew was Enforced in an Unconstitutional Manner.

This Court must deny qualified immunity with respect to the curfew to the individual defendants because the individual defendants enforced the Brown curfew in an unconstitutional manner.  See, <u>Field Day, LLC v County of Suffolk</u>, 463 F3d 167, 193 (2d Cir. 2006) ("Like the District Court, we thought it 'too obvious to state ... that a constitutional law must be enforced in a constitutional manner.'"

### c. Qualified immunity does not protect an official against redress for performance that was plainly incompetent.

Defendant Brown's violation of N.Y. Ex. Law §24 was plainly incompetent. Since the Brown curfew did not comply with State law, when the individual defendants acted to enforce the Mayor's curfew, they could not reasonably believe that they acted pursuant to valid laws. It would be unreasonable for the individual defendants to be afforded qualified immunity for an

ordinance that was never published by the City, that exceeded the statutory authority afforded the

Mayor, of which none of the individual defendants had been provided a copy of, nor had read,

nor were trained on, that was content-based facially and as applied, and enacted in the absence of

widespread, looting, vandalism, or violence but rather small predictable and peaceful protests

that were centered around Niagara Square.  "[T]hough mistaken judgments reasonably arrived at

are protected, qualified immunity does not protect an official against redress for performance that

was plainly incompetent." Rodriguez v City of New York, 72 F3d 1051, 1065 (2d Cir. 1995).

### d.  Qualified immunity should also be denied pursuant to the obvious violation exception.

Qualified immunity should also be denied pursuant to the obvious violation exception.

See, D.C. v Wesby, 583 US 48, 49, 138 S Ct 577, 582, 199 L Ed 2d 453 (U.S. 2018) ("there can

be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear

even though existing precedent does not address similar circumstances. Brosseau v. Haugen, 543

U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)." For the reasons more fully

discussed supra, qualified immunity should also be denied pursuant to the obvious violation

exception since it is obvious that failing to comply with statutory authority—including

publication to the general public of a curfew that affected all residents city-wide for 7-days—and

then leaving it up to the individual officers to decide who had a legitimate purpose while

selectively enforcing it against protesters, proves the rare exception.

### e.  The Main Case Relied upon by the Defendants Does Not Stand for the Legal Proposition Asserted by them.

First, the defendants erroneously cite to a Second Circuit precedent that does not exist.

The defendants claim that "[a]s of June 2020, precedent had not clearly established a right to

protest during a temporary curfew imposed to limit civil unrest during a pandemic" citing to

Jeffery v. City of New York, 113 F.4th 176, 198–200 (2d Cir. 2024). However, Jeffery does not

stand for this legal proposition. No where in the opinion does the Second Circuit hold this, let

alone even address the issue of qualified immunity, beyond a footnote. Rather, Jeffery stands for

the proposition that a general curfew that intrudes on the right to travel demands strict scrutiny

analysis. Id. Jeffery also supports plaintiff's motion for summary judgment, because the plaintiff

has demonstrated that the Brown curfew lacked the compelling state interest in curbing

escalating nighttime crime and disorder occurring unpredictably throughout the City that was

resisting control by traditional means of policing arising unpredictably across the New York

City. On June 2, 2020, the Brown curfew was enacted, and the days that followed up to its

termination, the City of Buffalo was experiencing predictable peaceful protests in Niagara

Square. See, Dkt. 162. Plaintiff incorporates his arguments and exhibits set forth at Dkt. 162 at

12-30.

> **f.  In re New York City Policing During Summer 2020 Demonstrations is
> factually distinguishable and not controlling.**

The individual defendants claim of qualified immunity is based on one District court case

in the Southern District of New York that is factually distinguishable and not controlling.  In re

New York City Policing During Summer 2020 Demonstrations, 548 F Supp 3d 383, 414

(S.D.N.Y. 2021), the District Judge held that "in June 2020, there was no clearly established law

prohibiting a mayor from imposing a content-neutral curfew, during a pandemic, to protect

citizens from widespread looting, vandalism, and violence that were occurring in connection

with similar protests elsewhere in the country." Id.

None of the factors that the In re New York City Policing During Summer 2020

Demonstrations Court relied upon in finding qualified immunity can be met here.

12

First, the Brown curfew was not content-neutral but was rather content-based as written and as applied. Second, the City of Buffalo was in a different phase of the pandemic than NYC with Buffalo having moved onto Phase II of the State's curfew plans due to low hospitalization rates in Western New York, and Buffalo (unlike NYC) was not experiencing widespread looting, vandalism, and violence across the City. In Buffalo, the looting, vandalism, and violence was extremely limited in frequency and location, having only occurred in and around Niagara Square days prior to the implementation of the Brown curfew. See, Dkt. 160-129. Buffalo's City-wide arrest data (unlike NYC) showed that only 11 individuals were cited for curfew violations and that all citations were issued around areas of protest. Wischerath Decl. Ex. 5. In sum, because the Brown curfew was not content-neutral and there was no evidence of widespread looting, vandalism, and violence, arising unpredictably across the City when it was enacted, nor afterwards, qualified immunity should be denied.

**POINT 3**

### IV.    The Defendants Retaliated against the plaintiff.

The Supreme Court has stated that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." City of Houston v. Hill, 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," City of Houston, Texas v. Hill, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)." Rupp v Buffalo, 91 F4th 623, 635 (2d Cir 2024). "'There is no question,' the Supreme Court has said, 'that speech critical of the exercise of the State's power lies at the very center of the First Amendment.'" Gentile v. State Bar of Nev., 501 U.S. 1030, 1034 (1991).

The defendants claim they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim because "the individual Defendants did not retaliate against Plaintiff because the Buffalo curfew was a reasonable time, place, and manner restriction on how he could exercise his First Amendment rights." Dkt. 160-36 at Point III. Defendants' sole reliance on one case, <u>Benny v City of Long Beach</u>, 2022 WL 2967810, at *23 (E.D.N.Y. July 27, 2022) is misplaced. Unlike the instant action, in <u>Benny</u> the plaintiff was arrested after repeatedly ignoring commands of an officer to step back while filming an arrest and had only asserted a First Amendment right to videotape police officers in the performance of their official duties. The District Judge noted, "however, that the right to videotape is 'not without limitations' and 'may be subject to reasonable time, place, and manner restrictions.'" <u>Id</u>. In dismissing Benny's retaliation claim the Court emphasized that "Defendants' initial and repeated instructions to step back constitute a justified and narrow restriction on the place and manner in which Mr. Benny could exercise his asserted First Amendment right to film Defendants' arrest of Mr. Coad." <u>Id</u>. Alternatively, the Benny court held that "a reasonable officer could believe that it was lawful to arrest Mr. Benny for refusing to obey an order to retreat and cease disrupting the Defendants' performance of their official duties as a crowd of onlookers continued to yell and step towards the officers." <u>Id</u>.

The video evidence and testimony demonstrate that Martin Gugino was moving backwards at the time he was shoved and had committed no crime. Defendant Gramaglia acknowledged that shoving Martin Gugino to the ground violated the policies of the Buffalo Police Department. Dkt. 161-9 at 146:10. Defendant Lockwood also acknowledged that instead of using force officers should have taken Martin Gugino by the arms and arrested him. Dkt. 161-11 at 139:17. Thus, Benny is highly distinguishable.

14

"An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper." Franco v Kelly, 854 F2d 584, 590 (2d Cir. 1988) (internal citations and quotations omitted).

The elements of a first amendment retaliation claim are "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Dolan v Connolly, 794 F3d 290, 294 (2d Cir. 2015) (internal citations omitted). Turning to the first factor, recording police performing their official duties in public is protected under the First Amendment. Reyes v City of New York, 23-CV-6369 (JGLC), 2023 WL 7212192, at *5 (S.D.N.Y. Nov. 2, 2023). Complaining about police brutality is likewise protected under the First Amendment. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," City of Houston, Texas v. Hill, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)." Rupp v Buffalo, 91 F4th 623, 635 (2d Cir. 2024).

As for the second factor, Plaintiff suffered an adverse action in the form of an arrest. "Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment. See id., at, —— – ——, 139 S.Ct., at 1721–22 (arrest)." Houston Community Coll. Sys. v Wilson, 595 US 468 477 (2022).

For the third and last factor, "To demonstrate a causal connection a plaintiff must show that the protected speech [or conduct] was a substantial motivating factor in the adverse [ ] action." Smith v. County of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015) (internal quotation marks omitted). "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly

through evidence of retaliatory animus directed against a plaintiff by the defendant.' <u>DeCintio v. Westchester Cty Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987 (citations omitted) (emphasis in original)." <u>Kiernan v Town of Southampton</u>, 734 Fed Appx 37, 42 (2d Cir. 2018).

Here, the confinement, loss of consciousness, and subsequent arrest that plaintiff endured was within moments and hours of making complaints to police and recording their activities. There is also indirect evidence that shows that the protected activity of recording and complaining about police brutality was followed closely by discriminatory treatment in the form of being assaulted, detained, and subsequently arrested. There is also other evidence that shows the disparate treatment of non-protesters who were out during curfew hours who were permitted to walk around at their leisure without being arrested, detained, or assaulted.

**POINT 4**

    **V.**    **Plaintiff's 42 USC § 1983 Excessive Force Claims do not fail as a matter of law if analyzed under either the Fourth or Fourteenth Amendment because the force was "objectively unreasonable".**

Defendants assert that since "plaintiff was not arrested or seized during his interaction with [defendants]," his excessive force claims must be analyzed "under a Fourteenth Amendment framework rather than a Fourth Amendment framework," citing to the established requisite that "when a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously." Dkt. 160-36 at 20-21, quoting <u>Fraser v. City of New York</u>, 2022 WL 3045524, at *2 (E.D.N.Y. Aug. 1, 2022) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).) But the determination as to whether to continue under one framework or the other is not as simple as defendants assert: In

Graham v. Connor, the Court indicated its disfavor for lower courts' indiscriminate use of

"substantive due process" framework under the 14th Amendment to address all excessive force

claims lodged under 42 USC § 1983, "without considering whether the particular application of

force might implicate a more specific constitutional right governed by a different standard." 490

U.S. 386, 394 (1989). The Court explained that § 1983 "is not itself a source of substantive rights

but merely provides a method for vindicating federal rights elsewhere conferred," and proceeded

to offer specifics:

> In addressing an excessive force claim brought under § 1983, analysis begins by
> identifying the specific constitutional right allegedly infringed by the challenged
> application of force…In most instances, that will be either the Fourth Amendment's
> prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban
> on cruel and unusual punishments, which are the two primary sources of constitutional
> protection against physically abusive governmental conduct. The validity of the claim
> must then be judged by reference to the specific constitutional standard which governs
> that right, rather than to some generalized "excessive force" standard.

Id., citing Baker v. McCollan, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit" is

"to isolate the precise constitutional violation with which [the defendant] is charged.") The

Fourth Amendment protects the right of people to be free from unreasonable searches and

seizures in their persons, houses, papers, and effects. See, e.g., Torres v. Madrid, 592 U.S. 306

(2021). It is well established jurisprudence that a police encounter results in a seizure, "when the

officer, by means of physical force or show of authority, has in some way restrained the liberty

of a citizen…" Terry v. Ohio, 393 U.S. 1, 19 n.16 (1968).

Defendants argue that plaintiff's excessive force claims must be excluded under the

Fourth Amendment, thereby leaving the Court to apply a substantive due process framework.

However, while the constitutional basis for Fourth and Fourteenth Amendment excessive force

claims have been distinguished by federal courts since Graham, "they are judged by the same

standard, which examines whether the force was objectively unreasonable in light of the facts and circumstances of each particular case." Lombardo v. City of St. Louis, Missouri, 141 S. Ct. 2239, 2241 n.2 (2021) (internal quotations omitted); Kingsley v. Hendrickson, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015). Thus, while plaintiff believes the facts governing his excessive force claims support his "seizure" under the Fourth Amendment, applying the current standard for substantive due process excessive force claims will also result in plaintiff establishing his claims should not be dismissed as a matter of law and fact.

   **a. Plaintiff was seized under the Fourth Amendment.**

   Defendants claim that because the plaintiff was not arrested at Niagara Square or charged with a crime—later dismissed—until after the police shoved and injured him, the plaintiff was not seized under the Fourth Amendment. Dkt. 160-36. at 21. However, a seizure under the Fourth Amendment is much broader than defendants aver: "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, 471 U.S. 1, 7 (1985); see also, Brower v. Inyo County, 489 U.S. 593, 597 (1989) (A seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied.") In Brower, the Court held that a fleeing suspect killed when he lost control of his vehicle was not covered under the Fourth Amendment. Id. at 594. But the Court reasoned that if "the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." Id. at 597.

   While defendants affirmatively cite to Fraser, supra, in that instance, the Court allowed plaintiff's claims to proceed under the Fourth Amendment framework, accepting her allegations that during a peaceful protest, police officers "wrongly and affirmatively restrained" her,

"depriving her of her personal liberty, by twice forcibly pushing and striking her, and pushing her to the ground," despite no alleged intent by police to arrest or otherwise detain her. 2022 WL 3045524, at *2. Defendants use of <u>Malave v. Austin</u> to advance the argument that "courts addressing similar claims have held that an officer's push was not a Fourth Amendment seizure, even where the individual was knocked over," is clearly distinguishable from this case. Dkt. 160-36 at 21; WL 2021 3603433, at *3 (E.D.N.Y. Aug. 13, 2021). In each case referenced in <u>Malave</u>, none of the individuals struck or pushed by police—even to the ground—were injured to the point of incapacitation: In each instance, the individuals were "free to stay or leave the demonstration both before and after" they were struck or pushed. <u>Id</u>., citing <u>Bogart v. City of New York</u>, No. 13-CV-1017 (NRB), 2016 WL 4939075, at (S.D.N.Y. Sept. 6, 2016).

Courts, including in this district, have routinely expanded the bounds of seizure-by-incapacitation, including the use of crowd control measures against protestors, such as military-grade weapons and chemical weapons, constitutes a seizure for purposes of the Fourth Amendment. <u>Flannery v. City of Rochester</u>, 640 F.Supp.3d 267, 280 (W.D.N.Y. 2022). In <u>Pluma v. City of New York</u>, the Court explained that the use of such weapons constituted a Fourth Amendment seizure since the blinding and disorienting effects of pepper spray temporarily incapacitated Plaintiff such that he was unable to walk away. 13 Civ.2017(LAP), 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015).

On June 4, 2020, the plaintiff was knocked unconscious—fully incapacitated with a skull fracture after three police officers shoved him to the ground with their batons and had to be physically evacuated from the scene by ambulance. Dkt. 161-23 at 00:16-00:36. The combined force behind the shove by ERT officers McCabe, Losi, and Torgalski restrained the freedom of

Martin to walk away by directly causing his incapacitation and establishing a seizure of his person under the Fourth Amendment.

**b. Plaintiff's claim of excessive force should not be dismissed under the Fourteenth Amendment.**

As addressed *supra*, defendants argue that because the plaintiff was not arrested or seized, his Fourth Amendment excessive force claims should be dismissed. Defendant do not otherwise address plaintiff's Fourth Amendment claims, and only address plaintiff's excessive force claims under the Fourteenth Amendment. Defendants assert that because "the minimal amount of force used by defendants against [plaintiff] does not meet the conscience shocking standard," plaintiff cannot succeed on his claims under a Fourteenth Amendment excessive force theory. Dkt. 160-36 at 22 (citing Tierney v. Davidson, 133 F.3d 189, 199 (2nd Cir. 1998). Basing the entirety of their defense on ERT officers Torgalski's and McCabe's testimony during their Disciplinary Arbitration proceedings that both men lightly pushed plaintiff to "create space" between them and plaintiff, defendants concluded, "[t]here is nothing conscience shocking about officers using minimal force to create space between them and a civilian, especially during an ongoing global pandemic and at a time of wide-spread violence and unrest." Dkt. 160-36 at 22-23. However, even overlooking that the standard set forth in Tierney is outdated, Defendants' undeveloped argument does not meet any of the standard's requirements, specifically that "a four-part test is employed to determine whether force is excessive under the Fourteenth Amendment, i.e., whether it "shocks the conscience." 133 F.3d at 200 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).) Under the test, those factors are: "[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id.

20

Nor does defendants' minimal argument fulfill the requirements of the updated test—"the appropriate standard for all excessive force claims brought under the Fourteenth Amendment" and the controlling law on June 4, 2020—as developed by the Court of Appeals in Edrei v. Maguire, 892 F.3d 525, 536-537 (2d Cir. 2018). The Court comparing the first three factors of the Johnson v. Glick test with those set out in the Supreme Court's 2015 Kingsley decision on pretrial detainees, elucidated a test that more accurately advanced the purpose the Court than the earlier "shocks the conscience" standard: "[T]he central inquiry has always been whether the government action was rationally related to a legitimate government objective." Id., citing Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 576 U.S. 389 (2015). As the Edrei Court explained that the first three factors identified in Glick—"the need for force, the relationship between the need and the degree of force used, and the extent of the injury"—paralleled the non-exhaustive factors identified in Kingsley. Id. at 537.

Under the new test, "the need to use force" prong encompassed three Kingsley considerations—"the severity of the security problem," the threat perceived, and "whether the plaintiff was actively resisting", all of which bear on whether force was necessary. Id. (internal citations omitted.) The two additional prongs under Glick, "the relationship between the need and the amount of force that was used" and "the extent of injury inflicted," were explicitly incorporated into Kingsley. Id. (internal citations omitted.) Kingsley also asks whether the officers tried to "temper or to limit the amount of force." 135 S.Ct. at 2473.

In applying the Edrei Court's reconfigured Glick test, we first consider the need for force. Testimony from defendants acknowledge that the security threat posed by the 10 to 12 individuals in Niagara Square was low. Dkt. 161-16 at 123-125. (Defendant McCabe testified that when the ERT was deployed it looked like a beautiful June night with a couple people

hanging around the square and City Hall); Dkt. 161-6 at 329-331. (Defendant Losi testified there

was a small group, there was no violence, fighting, property destruction, or marching and that it

looked like a small group enjoying a nice warm summer night while sitting on the steps of City

hall). See also, Id. at 335. The video footage confirms that the few peaceful demonstrators and

members of the press remaining after the curfew were non-violent and there was a robust police

presence monitoring Niagara Square throughout the day. Dkt. 161-23. The total number of armed

ERT, SWAT, and state police officers in full riot gear who entered the Square in formation and

supported by armored vehicles at 8:15 pm on June 4, 2020, exceeded 80—outnumbering

peaceful demonstrators more than 10 to 1. Id. The plaintiff peacefully walked up to the front line

of approaching ERT officers with only his phone and a medical shield in each hand to speak with

officers regarding the applicability of the curfew to First Amendment activities in the Square. Id.

Plaintiff was not resisting and had stepped back from the police line when pushed by defendants.

Id. See also, Dkt. 161-16 at 184:1-22; Dkt. 161-16 at 153. (McCabe testified that he had no fear

of Martin Gugino walking up to him for himself or other officers).

Considering the second factor—proportionality of the force needed and used—the disparity

between law enforcement's need to remove the plaintiff—whose only alleged offense was

disregarding the curfew—and the force of three officers in unison pushing the elderly man

backwards off his feet, fracturing his skull as it struck the concrete sidewalk—was glaring.

Regarding the third factor, the plaintiff's injuries—including a fractured skull—were life

threatening and resulted in significant neurological and auditory damage. Plaintiff was confined

for a month in the ICU and spent more months recovering in long-term care settings. Subsequent

testing indicated plaintiff now suffers permanent hearing loss. See, Dkt. 160-19 at 49-50.

Nothing in evidence suggests that defendants attempted to mitigate or temper the force they applied; Platoon commander Losi advancing quickly to push McCabe forward—just as McCabe shoved the plaintiff with his baton, likely had the opposite effect, increasing the momentum of McCabe's forward motion as he pushed the retreating plaintiff, knocking him back off his feet. In addition, video evidence and testimony from plaintiff and other pedestrians present in Niagara Square establish that the ERT gave no audible dispersal warning before defendants marched into Niagara Square, nor any other visible attempt to move protesters out of the Square.

Viewing these elements collectively, plaintiffs' allegations indicate that the defendants deployment of eighty armed officers employing riot-control tactics, including forcefully pushing non-violent pedestrians with batons, was disproportionate to the limited security risk posed by the small number of peaceful individuals—members of the press included—remaining in Niagara Square after the start of the curfew, and in particular the approach of a single 75-year-old plaintiff seeking to speak with police. In addition, the disproportionate actions of the police caused life-threatening physical injuries to the plaintiff. More succinctly, the defendants' use of ERT, SWAT, and state police forces to enforce a curfew and suppress peaceful and legitimate First Amendment activities was an "exercise of power without any reasonable justification in the service of a legitimate government objective." For these reasons, if the Court determines that plaintiff's excessive force claims are more suitably heard as substantive due process claims under the Fourteenth Amendment, the defendants' motion to dismiss plaintiff's claims should be rejected.

### c. Defendants are not entitled to qualified immunity on plaintiff's excessive force claims if the claims must proceed under the Fourteenth Amendment.

Under 42 U.S.C. § 1983, individuals may seek monetary damages in claims "against state officials, acting under color of law, who violate a constitutional or statutory right." Edrei v.

Maguire, 892 F.3d 525, 532 (2d Cir. 2018). "To balance the need for accountability and the potential chilling effect, 'the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims.'" Id. (citing Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001). Government officials, including law enforcement officers, are entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982)). "This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Bangs v. Smith, 84 F.4th 87, 96 (2d Cir. 2023) (internal quotes omitted). While the Supreme Court previously held in Saucier v. Katz that "the first inquiry must be whether a constitutional right would have been violated on the facts alleged," 533 U. S. 194, 200 (2001), it subsequently tempered that mandate to a strong suggestion. Pearson v. Callahan, 555 U. S. 223, 242 (2009).

Plaintiff asserts he has met the first prong by showing, *supra*, that defendants' conduct violated his Fourteenth Amendment right to be free from excessive force. Turning to the second prong, plaintiff asserts that he can also prove that the right was "clearly established" on June 4, 2020.

Defendants frame their question as whether it was clearly established that "one shove from an officer during a curfew in the middle of a global pandemic violates the Fourteenth Amendment." Dkt. 160-36 at 23. However, the Second Circuit has warned against framing that puts "thumbs on the scale in favor of defendants." Edrei, 892 F.3d at 539. In Edrei, defendants framed the question as "whether the officers violated the Fourteenth Amendment by using the

LRAD 100X to aid in moving protesters to the sidewalks after the protest became obstructive and potentially violent." Id. The Court rejected this framing as focusing on immaterial details such as "the officers' professed objective—moving protesters onto the sidewalk—while ignoring the degree of force that the officers allegedly used." Id. The Court also rebuffed defendants casting the protest as violent, an issue plaintiffs disputed. Id. The Court announced its own inquiry to better match the "particular circumstances" to the right the plaintiffs' claimed was violated, and which "requires attention to the precipitating events, the government interest at issue, the degree of force used, and the reasonably anticipated consequences of the government action." Id. at 539-340 (illustrating the Supreme Court's analysis in Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014).) After weighing the Plumhoff factors, the Edrei panel restated the defendants' claim thusly: "Whether, in 2014, non-violent protesters and onlookers, who officers had not ordered to disperse, had a right not to be subjected to pain and serious injury that was inflicted to move them onto the sidewalks." 892 F.3d at 539.

Plaintiff also objects to defendants' question as they present it, and claims that applying the Plumhoff factors will result in a restatement that more clearly and precisely matches the particular circumstances to the right the plaintiff claims defendants violated. First, defendants refer to the global pandemic as a "novel context" without explaining how it is relevant as an alleged precipitating event. The Brown curfew did not address any concerns with public health, but was declared explicitly, "due to the conditions of civil unrest and disturbance within the City…," Dkt. 161-3. Defendants cannot rely on "wide-spread (sic) violence and unrest" as relevant context: there was no widespread violence, rioting, or property damage occurred in Niagara Square after since the original protest on May 30, 2020.[1]  At the time of the events at

---

[1] On June 2, 2020, Defendant Mayor Brown provided an update on the status of the protests and lack of violence throughout the City to the press https://www.wgrz.com/video/life/protest-ends-peacefully-in-niagara-

issue, beginning shortly after 8:00 pm on June 4, 2020, fewer than a dozen individuals—protestors, members of the press, and observers—were present in Niagara Square, and there were no apparent security concerns. Dkt. 161-11 at 85. Platoon commander Losi testified that he did not give a verbal order for the people remaining in Niagara Square to disperse before the ERT entered the area. Dkt. 161-6 at 354-355. Thus, at the time the defendants are alleged to have violated plaintiff's Fourteenth Amendment rights, the actual context—a small group of non-violent individuals gathered for First Amendment purposes—was a non-novel event, and one previously addressed by both the Supreme Court and the Second Circuit Court of Appeals, as discussed in detail below.

The June 2, 2020, press release from on the city's website stated, the "goal of the curfew" was "to protect the lives and property of residents..." Dkt. 161-15. As discussed in plaintiff's moving papers at Dkt.162, the text of the curfew order of June 2, 2020, was not available on the city website, and—in violation of state law—had not been published in newspapers of record or transmitted to local TV and radio for dissemination. Defendants McCabe and Torgalski each testified that they had not read it (Dkt. 161-16 at 215:4-5) or could not recall reading the curfew order but never provided with guidance to know what a violation was or who was exempt. Dkt.

---

square/71-e3cb16c0-d634-47b6-b353-e5efe9f704c7 last accessed on November 9, 2025. Defendant Mayor Brown reported that a peaceful protest in Niagara Square had ended shortly after curfew and that everyone had left after dispersal orders were read. No arrests were made, and no reports of civil unrest, violence or destruction were reported anywhere else in the City. Id. On June 3, 2020, "Police and protestors knelt together in the minutes leading up to the city's 8 p.m. curfew. Some then shook hands, even hugged, before everyone went on their way as the sun began setting in downtown Buffalo. As reported, "They did it 'in solidarity,' said Detective John Losi, the officer who led the effort." A video of the peaceful event where peaceful protesters and police engaged in a moment of solidarity is available here at https://www.investigativepost.org/2020/06/04/police-protesters-give-peace-a-chance/ last accessed on November 9, 2025. There were no reports of civil unrest, looting, riots, or destruction. Another reporter commented on the small size, and peaceful nature of the protests in Buffalo on June 3, 2020, describing it at its largest as a crowd of 80 people, peacefully protesting largely on the steps of City Hall. This Court can take judicial notice of the report and video describing the peaceful protest available https://www.wgrz.com/video/news/local/protests-continue-in-niagara-square-before-city-wide-curfew-takes-effect/71-e71dfbc9-13c4-468f-b0de-d7dddbb6782e last accessed on November 9, 2025.

161-17 at 273-274. The press release posted to the city's website on June 2, 2020, indicated that police enforcement of the curfew would be restrained: "Individuals congregating in groups or groups of people moving around the city during curfew hours will be asked to disperse and go home," and "the Buffalo Police Department has been instructed not to unnecessarily detain any person who is out for a legitimate reason." Dkt. 161-15. However, Losi testified that his goal at the time of the action was to clear everyone from Niagara Square, and he would arrest individuals before determining if they were out for a legitimate reason. Dkt. 161-6 at 426-427.

Defendants describe the force used against the plaintiff as "one shove." Dkt. 160-36 at 23. This characterization minimizes the joint force of ERT officers McCabe and Torgalski as they used their batons to shove the plaintiff, while platoon commander Losi quickly moved to push McCabe forward into the plaintiff, propelling the plaintiff backwards off his feet with such force that his skull was fractured as it hit the sidewalk. The plaintiff was not resisting arrest. Dkt. 161-23. Defendants McCabe and Torgalski testified that they were creating "space" between themselves and the plaintiff by pushing him rather than waiting for him to be arrested. Dkt. 161-17 at 256:14-15; Dkt. 160-6 at 439:8-11. However, deputy police commissioner Gramaglia testified that there was "no provision in the law whatsoever that authorizes a police officer or a citizen to use unjustified force on anybody," and that even during the curfew, it was unjustified force for "Buffalo police officers to push and shove citizens who are on the streets or sidewalks." Dkt. 161-9 at 141. Former police commissioner Byron Lockwood testified that after the plaintiff approached and met the advancing line of ERT officers, officers could have moved plaintiff to the side without using force. Dkt. 161-11at 101-103. Lockwood's testimony was unequivocal: "He shouldn't have been pushed." Id. at 104. Responding to reasonably anticipated consequences of the ERT's actions, Lockwood further testified that Losi, as platoon commander,

"should have stepped forward and taken control of the situation to ensure that Martin Gugino was not pushed and shoved to the ground." Id. at 119.

After applying the Plumhoff factors, the result here is markedly similar to the one crafted by the Edrie panel: Whether, on June 4, 2020, a non-violent individual observing and approaching police with questions had a right not to be subjected to pain and serious injury that was inflicted to move him." Edrei, 892 F.3d at 539.

Looking to the legal standard applicable to violations of substantive due process under the Fourteenth Amendment on June 4, 2020, the test for excessive force claims in the Second Circuit required that the "force must be necessary and proportionate to the circumstances." Id at 540. Here, the presence in Niagara Square a few minutes into curfew of a very small group of press, peaceful protesters, onlookers—including plaintiff, an elderly man who approached the police line voicing concern over the ERT's batons—did not justify the use of any force by heavily militarized police, much less force capable of causing life-threatening injuries, such as a skull fracture. As former police commissioner Lockwood testified, the regular patrol officers monitoring Niagara Square at the time the curfew could have directed the few people remaining to move along and leave the square, and if they didn't, to simply arrest them. Dkt. 161-11 at 95. Simply put, the force of nearly 100 heavily-militarized police officers tasked with clearing Niagara Square of the few peaceful individuals who remained after curfew—including the force then used against the plaintiff and resulting in his severe injuries—was completely out of proportion to what was necessary in the circumstances.

Plaintiff now turns to defendants' assertions that "clearly established" precedent as of June 4, 2020, was "not articulated with sufficient specificity [to set forth that Defendants'] conduct was unconstitutional." Dkt. 160-36. at 23 (quoting, in part, Eaton v. Estabrook, 144

28

F.4th 80, 94 (2d Cir. 2025.) Plaintiff, however, offers the entirety of this quoted passage, rather than the defendants' selective edit, as support for his own argument: "Having concluded that a reasonable jury could find that Estabrook's force was objectively unreasonable, Estabrook is entitled to qualified immunity *only if*, at the time of his conduct, binding case law had not articulated with sufficient specificity that such conduct was unconstitutional, either because of the novelty of the type of force or its application in a novel context." Eaton, 144 F.4th at 94 (emphasis added). In Eaton, the Court held that an officer's conduct—grabbing and throwing to the ground an observer at a non-violent protest—was not "materially novel in either respect," finding instead that "the conduct fits comfortably within that which was prohibited as unconstitutionally gratuitous force against non-resisting arrestees or protestors as of August 8, 2020." Id. Plaintiff notes that while the events in Eaton also occurred during first summer of the COVID-19 pandemic and in the wake of chaotic George Floyd protests, neither of these issues controlled the Court's "clearly established" analysis; in fact, the Court never mentioned either event.

Plaintiff reliance on Edrei v. Maguire extends past its utility as a model for drafting and applying excessive force framing: The Edrei court, representing the Second Circuit, declared that, as of at least 2018, "our cases amply establish that protesters enjoy robust constitutional protection" and that "this Court has repeatedly emphasized that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force." Edrei, 892 F.3d at 541. In upholding the district court's refusal to extend qualified immunity to defendants, the Court listed the following, which clearly establish the right Martin Gugino claims defendants in this case violated: "When engaging with non-violent protesters who had not been

ordered to disperse, no reasonable officer would have believed that the use of such dangerous

force was a permissible means of moving protesters to the sidewalks." Id. at 544.

 In Lennox v Miller, 968 F3d 150, 157 (2d Cir. 2020), the Court reiterated, "[y]ears

before the incident at issue here, we took note of the "well established" principle "that the use of

entirely gratuitous force is unreasonable and therefore excessive." Tracy v. Freshwater, 623 F.3d

90, 99 n.5 (2d Cir. 2010). Id. "[I]t is clearly established that officers may not use a taser against a

compliant or non-threatening suspect. Id. Under this framework, it is clearly established that

officers may not use a baton against a compliant or non-threatening suspect like Martin Gugino

especially since the defendant officers candidly admitted that the need for the force was entirely

gratuitous to "create space." Dkt. 160-8 at 508; Dkt. 160-6 at 439. Under the department's own

policy, the use of a baton to strike and shove someone to the ground was prohibited and

gratuitous on a nonresistant nor assaultive protester who was not trying to escape but rather

stepping backwards at the time the force was delivered. Wischerath Decl., Exhibit 7.

In contrast to these cases, the defendants' reliance on Malave v. Austin,

19CV5534ENVSJB, 2021 WL 3603433, at *6 (E.D.N.Y. Aug. 13, 2021) is misplaced,

procedurally and substantively. "Only Supreme Court and Second Circuit precedent existing at

the time of the alleged violation is relevant in deciding whether a right is clearly established."

Torcivia v. Suffolk County, New York, 17 F.4th 342, 367 (2d Cir. 2021) (quoting Moore v.

Vega, 371 F.3d 110, 114 (2d Cir. 2004)). But even on the substantive issues, Malave is easily

distinguished. In Malave, a student was in an ongoing fight with another student, when the

officer approached, the students far outnumbered him. Id. In finding the push to be reasonable

the Court emphasized, "[p]ushing the unrelenting Malave in an effort to end a chaotic fight

between students was reasonable. Further, although the push was quite forceful, sending Malave

flying backward onto the ground, she was able to stand up and continue fighting within four seconds. In all, the use of force appears proportionate to the needs of the situation." Id.

Plaintiff maintains that considering the controlling authority within the Second Circuit, there is sufficient clearly established precedent "that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force." Edrei, 892 F.3d at 541; see also, Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 119, 123-24 (2d Cir. 2004). Thus, plaintiff's right under the Fourteenth Amendment was clearly established and defendants should be denied qualified immunity.

### d. Defendants are not entitled to qualified immunity on plaintiff's Fourth Amendment excessive force claims.

Defendants have not moved for summary judgment on plaintiff's Fourth Amendment claims relating to excessive force, false arrest, and the dispersal orders. However, without citation, the defendants claim that "in the summer of 2020, there was no controlling precedent that would have put the officers who interacted with Plaintiff on notice that their conduct would violate the Constitution. There was no precedent demonstrating that the type of force exerted by these officers during curfew hours in a global pandemic was constitutional." Dkt. 160-36 at 24-25. Similarly, to plaintiff's analysis under the Fourteenth Amendment, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." Pearson v. Callahan, 555 U.S. 223, 232, (2009) (internal citations omitted.) Determining qualified immunity when excessive force is alleged under Fourth Amendment is a two-prong analysis: First, do the facts that a plaintiff has alleged make out a violation of a constitutional right, and second, was the right at issue "clearly established" at the time of the defendant's alleged misconduct. Id. While defendants neglected to undertake the first prong of this analysis,

plaintiff will do so below, with the result, as predicted by the Edrei panel, to be similar to that produced under a Fourteenth Amendment analysis. Edrei, 892 F.3d at 545.

When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989). Whether an officer has violated that right "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tolan v. Cotton, 572 U.S. 650, 656, (2014). The balancing test applies three factors set forth in Graham: "[T]he nature and severity of the crime leading to the arrest; whether the suspect pose[d] an immediate threat to the safety of the officer or others; and whether the suspect was actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Additional factors—which mirror those required under a Fourteen Amendment analysis, are suggested: The need for the application of force; the relationship between the need and the amount of force that was used; and the extent of the injury inflicted. Linton v. Zorn, 135 F. 4th 19, 31 (2nd Cir. 2025) (citing Figueroa v. Mazza, 825 F.3d 89, 105 (2d Cir. 2016). "If this balancing exercise supports a conclusion that a reasonable jury could find that a defendant applied excessive force in a manner that was objectively unreasonable under the circumstances, after drawing inferences in the light most favorable to the plaintiff, the plaintiff has made out a constitutional violation for purposes of surviving the defendant's motion for summary judgment." Id.

Plaintiff was a non-violent observer seeking clarification on the application of the curfew to First Amendment activities when he entered Niagara Square on the evening of June 4, 2020. Dkt. 161-13. As the plaintiff approached the massive line of 80-100 police officers in riot gear and wielding batons, his only conceivable offense was being present in the square after the start of

the curfew at 8:00 pm. Defendants testified that they did not view plaintiff—a tall, thin, elderly man—as a security threat. Dkt. 161-16 at 154. Plaintiff did not resist police; in fact, plaintiff was stepping back from the police line, acquiescing to police commands, when he was pushed. Dkt. 161-11 at 117-119.  Addressing the secondary factors, plaintiff incorporates his excessive force claims Fourteenth Amendment previously similarly analyzed for proportionality: That the force of nearly 100 heavily-militarized police officers tasked with clearing Niagara Square of the few peaceful individuals who remained after curfew—including the force then used against the plaintiff and resulting in his severe injuries—was completely out of proportion to what was necessary in the circumstances.

Plaintiff asserts that this balancing analysis supports a conclusion that a reasonable jury could find that the defendants pushing plaintiff with such force that he fell back on his feet and fractured his skull on the sidewalk was objectively unreasonable under the circumstances. Thus, the plaintiff has made out a constitutional violation for purposes of surviving the defendant's motion for summary judgment dismissing plaintiff's Fourth Amendment excessive force claims based upon qualified immunity.

The second prong required for determining whether defendants are entitled to qualified immunity is whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. The "clearly established" prong of the qualified immunity defense requires that "officers are on notice that their conduct is unlawful" before they may be held personally liable for that conduct. Hope v. Pelzer, 536 U.S. 730, 739, (2002) (internal quotation marks and citation omitted). When reviewing precedents for application to Fourth Amendment excessive force cases, the Edrei panel rebuffed defendant's opposition to using Fourteenth Amendment precedents, stating that such was the "practice of the Supreme Court and this Circuit, both of

which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts." <u>Edrei</u>, 892 F.3d at 545.

Plaintiff thus maintains that the "clearly established" precedents which applied to plaintiff's Fourteenth Amendment excessive force claims apply as well to his claims should they fall under the Fourth Amendment. As noted consistently throughout plaintiff's arguments, "the right not to be subject to excessive force," can arise equally under the Fourteenth, Fourth, and Eighth Amendments. <u>Eaton</u>, 144 F.4th at 91 (internal citation omitted).

While incorporating plaintiff's previous arguments against defendants' entitlement to qualified immunity under the Fourteenth Amendment, plaintiff points to <u>Linton v. Zorn</u> to further support his claims under the Fourth Amendment. In <u>Linton</u>, the Second Circuit confirmed that circuit precedent from <u>Amnesty America</u> clearly established that officers cannot gratuitously employ pain compliance techniques against protesters passively resisting arrest. <u>Linton</u>, 135 F4th at 34. The plaintiff in <u>Linton</u> alleged a defendant officer had violated her Fourth Amendment rights by subjecting her to the unreasonable use of excessive force on account of her race while she was protesting the lack of public healthcare for all at the Vermont Statehouse. <u>Id</u>. The <u>Linton</u> panel emphasized that the Second Circuit has consistently held that "it clearly established that the use of gratuitous force, whether by pepper spray, taser, or similar significant force, against a non-resistant or handcuffed arrestee violates that arrestee's Fourth Amendment rights." <u>Id</u>.

**POINT 6**

**VI. The Brown curfew is void for vagueness.**

    **a. Plaintiff has standing.**

While defendants claim otherwise, plaintiff has standing to bring his void for vagueness claim since it was applied to and enforced against him. It is of no matter that the charges were

dismissed. See <u>Naprstek v. City of Norwich</u>, 545 F.2d 815, 817 (2d Cir.1976). In <u>Naprstek</u>, the Second Circuit upheld a finding of standing by the lower court who held that minors and their parents had standing to challenge constitutionality of curfew ordinance even when it had not been applied to them, because it had been applied to and enforced against persons under circumstances identical to those in which the plaintiffs found themselves at the time of the action despite having not been arrested, charged, or fined); See also, <u>Chapin v. Town of Southampton</u>, 457 F.Supp. 1170, 1172 (E.D.N.Y.1978). In <u>Chapin</u>, the Court held that the plaintiff, who had been arrested for nude sunbathing had standing to challenge constitutionality of ordinance, even though charges had been dismissed.

> **b.  The curfew was not sufficiently clear for persons to know what conduct during the curfew hours was prohibited.**

Defendants correctly assert that to prevent a determination that a law or ordinance is void-for-vagueness, it must be "sufficiently clear that such a person of ordinary intelligence has a reasonable opportunity to know what conduct is prohibited." Dkt. 160-36 at 26 (citing <u>Thibodeau v. Portuondo</u>, 486 F.3d 61, 65 (2nd Cir. 2007).) This prong of the doctrine incorporates "notions of fair notice or warning." <u>Smith v. Goguen</u>, 415 U.S. 566, 572 (1974). "Where a statute's literal scope…is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." <u>Id</u>.

Defendants, however, err in their claim that Brown's curfew was not vague under the doctrine's notice prong, stating the curfew "clearly proscribed non-essential travel in Niagara Square during specified hours." Dkt. 160-36 at 27; Sahasrabudhe Decl. Ex. 22. Brown's curfew promulgated "a city-wide curfew of all nonessential pedestrian and vehicular traffic within the City of Buffalo, NY from 2000 and 0500 hours," without defining the key term "nonessential".

The declaration also failed to clarify the standard definition of "traffic"—which under NY state transportation laws referred specifically to activity on roads and highways. See, e.g., N.Y. Veh. & Traf. Law § 152 (McKinney 2024) ("Pedestrians, ridden or herded animals, vehicles, bicycles, and other conveyances either singly or together while using any highway for purposes of travel.")

A limited press release was issued that vaguely informed people that "Individuals traveling to or from work or for some other legitimate reason including childcare, medical care, or other necessary activity, will be allowed to do so." Dkt. 161-13.

The public, City officials, and law enforcement were unsure what "legitimate reasons" and/or "necessary activities" included during the Brown curfew. Defendant Lockwood testified that it was "fair to say that that was up to the discretion of the police officers on the street when they encountered someone out after eight p.m., to make a decision as to whether this was a legitimate reason or not." Ex. 161-11 at 33:1-7

Buffalo City Clerk Tianna Marks, who was designated as the City's 30(b)(6) representative admitted that the city did not "publish any guidance to citizens about what the order applied to or didn't apply to or any correspondence with the public about what was covered or not covered." Ex. 161-4 at 24.

While the Defendants' failure to clearly define ambiguous material terms in the Brown curfew is sufficient to determine the statute was vague on its face, Defendants also claim a prohibition that does not actually exist in the curfew's text: That the "curfew proscribed all outdoor activity other than essential travel," Dkt. 160-36 at 27. The express text of the curfew prohibited nonessential pedestrian and vehicular traffic. The City clerk testified that she did not

know whether walking a dog or being homeless was allowed under the curfew. Dkt. 161-4 at 46-47. Ms. Marks also did not know if the press and media were exempt from the curfew. Id. at 48.

    **c.** **Brown's curfew declaration was unclear to all witnesses who testified, including high ranking officials who were charged in enforcing it, and thus it was unclear to a person of ordinary intelligence.**

When Mayor Brown announced the curfew at a press conference on June 2, 2020, he did not read the text of his emergency declaration, simply announcing that "[t]o protect our residents, to protect our businesses, and to protect peaceful protesters exercising their freedom of speech rights, we will be implementing a curfew," which would run 8 p.m. until 5 a.m. through Sunday, June 8, 2020. Dkt. 160-25.

Not only was the text of the Brown curfew so insufficiently clear that a person of ordinary intelligence could not determine if a trip to the grocery store to buy milk was "nonessential", and thus prohibited, it rendered all activities outside of "pedestrian and vehicular traffic"—including walking a dog in the front yard or documenting an outdoor event as a member of the press—a potential violation. This was compounded by the Defendants' failure to publicize the text of the curfew while until after it had been terminated through executive action and by issuing ambiguous statements to media and the press that left Buffalo residents—including Martin Gugino—uncertain as to whether activities they believed were necessary or legitimate were prohibited by the curfew. Martin Gugino testified that he specifically went to Niagara Square on the evening of June 4, 2020, to ask those police officers tasked with enforcing the city's laws to clarify whether the curfew applied to demonstrators exercising their First Amendment rights. Dkt. 160-19 at 60-61. The notice provided by the Defendants was so deficient that a 75-year-old man risked travel to—per Defendant's description—the "epicenter of recent violence" to obtain information the Defendants were obligated to provide to the public on

June 2, 2020, when the curfew was enacted:  To rectify Defendants' failure to sufficiently ensure a person of ordinary intelligence, like himself, had a reasonable opportunity to know what conduct the curfew allowed or prohibited.

**VII.    The Brown curfew did not provide explicit standards for Buffalo police officers to enforce the curfew in a nonarbitrary manner.**

Defendants cited *Thibodeau v. Portuondo*, for the first prong—actual notice—of its void-for-vagueness test but ignored second prong as established by the Court: Laws must "provide explicit standards for those who apply them." 486 F.3d 61, 65 (2nd Cir. 2007.) "Perhaps the most meaningful aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." Smith v. Goguen, 415 U.S. 566, 575 (1974). A law or ordinance is "unconstitutionally vague if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).

Defendant Gramaglia testified that no written definitions of "essential pedestrian and vehicular traffic"—as included in the Brown curfew—were disseminated to patrol officers in the City of Buffalo. Dkt. 160-12 at 128-131. Defendant Gramaglia similarly acknowledged no written definition for "essential activities"—as referenced by the June 2, 2020, press release was posted on the city's website. Id. at 131-133. The same press release also stated that "the Buffalo Police Department has been instructed not to unnecessarily detain any person who's out for a legitimate reason." Dkt. 161-15. Defendant Gramaglia testified that he did not provide written guidance to patrol officers "not to unnecessarily detain any person who's out for legitimate reasons." Dkt. 160-12 at 133-134.

Defendant Gramaglia acknowledged that a "purpose of the curfew was to protect peaceful protestors," and that protesting after the curfew was not defined as an illegitimate activity by the Buffalo Police. Id. at 140. Commissioner Gramaglia also testified that members of the press were also exempt from the curfew. Dkt. 161-8 at 25. The mayor's office added to the uncertainty for residents and law enforcement in determining legitimate activities: "Brown strongly recommended that people refrain from protesting daily, and that protests not be held after dark." Dkt. 160-25. The mayor did not qualify his suggestion as mandatory, and that such protests held after dark—thus presumably after 8pm—were prohibited under the curfew.

This ambiguity led to confusion among police officers on the street, including in the Buffalo Police Department's Emergency Response Team (ERT) Defendant John Losi, who commanded the ERT in Niagara Square on the evening of June 4, 2020, testified that "there wasn't any policy or procedure put in place to figure out how to assess whether someone [was] exempt from the curfew." Dkt. 161-6 at 154. Losi further testified that he would arrest everyone out during the curfew and determine exemptions after their arrest. Id. at 152-53. Losi also stated that members of the press were not exempt from the curfew. Id. at 139-140; 178-79.

The clear disparity between what Commissioner Gramaglia believed was essential, protected activity exempt from the curfew—including peacefully protesting against police violence and live reporting by the press—and the beliefs and actions of ERT platoon leader John Losi establish that the Brown curfew did not provide explicit standards and the minimal guidelines sufficient to deter police from arbitrary and discriminatory enforcement of the curfew. Together with Defendants' insufficient notice under the vagueness doctrine's first prong, this refutes Defendants argument that the Brown curfew was not unconstitutionally vague on its face and warrants a finding of summary judgment on this issue in the favor of plaintiff.

**VIII.    Martin's conduct did not fall within the ambit of the statute.**

Defendants seek to thwart Martin's "as applied" claim of void-for-vagueness with a comparison to <u>Williams v Korines</u>. 966 F.3d 133 (2nd Cir. 2007). In <u>Williams</u>, the Court held that an as-applied vagueness challenge failed when the conduct at issue fell within the "core of the statutes prohibitions", even though the statute did not provide sufficiently clear standards to eliminate the risk of arbitrary enforcement. 966 F.3d at 142-43.

The defendants claim that the conduct the curfew proscribed was "non-essential travel in Niagara Square during specified hours" (Dkt. 160-36 at 38) and that Martin Gugino fell within the ambit of the statute by being present in Niagara Square to exercise his first amendment rights to "challenge the curfew." Id. In support of their claim, the defendants conclude that had plaintiff been on his way to visit his sick grandmother at the time of his arrest that his actions would have fallen outside of the ambit of the statute. This misses the mark. There is nothing unessential about engaging in first amendment activities that would lead one to conclude that the conduct of visiting a sick family member was essential while the conduct of engaging in first amendment activities was not. Based on the ordinary dictionary meaning of "essential", which Webster's defines as, "fundamental, basic" and provided the example "Freedom of speech is essential to democracy." https://www.merriam-webster.com/dictionary/essential last accessed on January 18, 2026. Even Webster agrees, first amendment activities are essential. Defendant Brown's public statements also told people that peaceful protests were a legitimate purpose and an activity outside of the curfew's ambit. Defendant Gramaglia agreed, he testified that protest was a legitimate activity that fell outside of the ambit of the curfew.

In sum, because Martin Gugino was engaged in essential conduct, it fell outside of the ambit of the statute.

POINT 7

**IX.    Plaintiff, compared with others similarly situated, such as non-protesters who were outdoors during curfew, was selectively treated; and this selective treatment was based on impermissible considerations such as intent to inhibit or punish the exercise of constitutional rights.**

Defendants claim that plaintiff cannot show that any defendant targeted him for an impermissible or discriminatory reason because none of the defendants knew who Plaintiff was during the subject incident and did not know his race or ethnicity, his religion, or his political viewpoints. Dkt. 160-36 at 28. This misses the point.

The law doesn't require that an officer know who Martin Gugino was or what his protected characteristics were if any to prove an equal protection claim based on selective enforcement.  Rather, [i]n order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as ... intent to inhibit or punish the exercise of constitutional rights.' Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 15–17 (2d Cir.1999) (quotations and citations omitted)." LaTrieste Rest. v Vil. of Port Chester, 188 F3d 65, 69 (2d Cir. 1999).

"To sustain a selective-enforcement claim, 'the plaintiff must demonstrate that the defendant was aware of similarly-situated entities, and failed to take comparable action against them.' Bernstein v. Vill. of Wesley Hills, 95 F. Supp. 3d 547, 571 (2d Cir. 2015) (citing Diesel v. Town of Lewisboro, 232 F.3d 92, 104 (2d Cir. 2000))." Lepino v Town/Vil. of Harrison, 21 CV 6874 (VB), 2023 WL 4422892, at *4 (S.D.N.Y. July 10, 2023). "[A] claim for selective

enforcement exists whereas allegedly happened here municipal officials have selectively enforced the laws in an attempt to prevent the exercise of protected expression." <u>LaTrieste Rest. & Cabaret v. Village of Port Chester</u>, 40 F.3d at 587.

"'Generally, whether two [comparators] are similarly situated is a factual issue that should be submitted to the jury.' See, e.g., <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir.2000)." <u>Cine SK8, Inc. v Town of Henrietta</u>, 507 F3d 778, 790 (2d Cir. 2007). "Similarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists." <u>Walker</u>, 2010 WL 5186779, at *7 (citations and internal quotation marks omitted." <u>Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills</u>, 815 F Supp 2d 679, 696 (S.D.N.Y. 2011).

To prove intentional discrimination that violates the Equal Protection Clause "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner.' <u>Floyd</u>, 959 F. Supp. 2d at 571 (citing <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 373–74 (1886)). <u>Walston v City of New York</u>, 22-CV-10002 (LAK)(JW), 2024 WL 1376905, at *9 (S.D.N.Y. Mar. 7, 2024), <u>report and recommendation adopted,</u> 22-CV-10002 (LAK) (JW), 2024 WL 1374837 (S.D.N.Y. Apr. 1, 2024). "[A] 'plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.' <u>Id.</u> (citing <u>Johnson v. Wing</u>, 178 F.3d 611, 615 (2d Cir.1999))." <u>Id</u>.

The Second Circuit has long recognized that "... enforcement of an otherwise valid [code or] ordinance violates the Constitution ... if ... the decision of the particular [governing] body is arbitrary ... or if the ordinance is applied or enforced with a discriminatory intent or purpose." <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 217 (2d Cir.1988) (citations omitted).

Buffalo's City-wide arrest data showed that only 11 individuals were cited solely for curfew violations and that all citations were issued around areas of protest. Wischerath Decl. Ex. 5.

By making no arrests, the police effectively exempted non-protesters who were outdoors during curfew hours, from the requirements of the ordinance. In contrast, the police showed up in force and threatened and arrested individuals who were engaged in first amendment activities. The comparators are similarly situation because non-protesters who were outside during curfew hours and protesters who were outside during curfew hours were governed by the same ordinance and were engaged in the same basic conduct. Put simply, both plaintiff and the comparator were outside during curfew hours. Because protesters and non-protesters were both engaged in the same conduct, and subject to the same ordinance there is a reasonably close resemblance of the facts and circumstances of plaintiff's (first amendment activities during curfew hours) and the comparator's (non-first amendment activities such as attending a graduation during curfew hours), to the extent that there is an objectively identifiable basis for comparability.

Turning to the second factor, the defendants were aware of their selective enforcement of the curfew. Defendant Lockwood testified that he informed residents that no one would be arrested for traveling after curfew hours to attend a graduation that started at 7:30 pm on June 3, 2020, in the City of Buffalo. Dkt. 161-10. See also, Dkt. 161-10 at 38:7-12. On June 3, 2020, Defendant Losi was asked by a protester about the selective enforcement of the curfew against protesters in Niagara Square. The person said, "I have been noticing that in other neighborhoods, other parts of the city, other police districts the curfew has not been enforced. It's only been enforced down here, downtown. Um. And I believe that the curfew may be a violation of our

constitutional rights to freedom of speech." Defendant Losi interrupted and said, "I am not going

to be able to speak on that because obviously it's not my call." The person politely replied, "I

understand." The video of the exchange regarding the selective enforcement of the curfew is

available at https://www.investigativepost.org/2020/06/04/police-protesters-give-peace-a-chance/

at 00:44-01:10 last accessed on February 2, 2026.

### X.    The constitutional right to be free from selective treatment was clearly established such that an objectively reasonable officer would know such selective treatment to be unlawful.

The defendants also claim that given the uncertain times and the lack of any controlling

Supreme Court or Second Circuit precedent on point, reasonable officers could believe the

curfew order was not being selectively applied in an unconstitutional manner as to Plaintiff,

citing to Berg v. Kelly, 897 F.3d 99, 113-114 (2d Cir. 2018).

This fails for the reasons set forth below.

First, it is well established and there can be no dispute that, the constitutional right to be

free from selective treatment was clearly established such that an objectively reasonable officer

would know such selective treatment to be unlawful. See, Massi v Flynn, 254 Fed Appx 84, 87

(2d Cir. 2007). Second, "[i]t is clearly established that selective enforcement of a facially valid

law based on an official's dislike of protected expression is unlawful." Field Day, LLC v. County

of Suffolk, 2005 WL 2445794, *17 (E.D.N.Y. Sept.30, 2005) (citations omitted).

Finally, the defendants' reliance on Berg v Kelly, 897 F3d 99, 114 [2d Cir 2018] is

misplaced. Berg was a "special need" qualified immunity case in the context of protecting the

president of the United States. In reversing the district court, the Second Circuit explained that

"[p]rotecting the President's safety is among the most important of law enforcement duties." Id.

<u>Berg</u> has little to no applicability beyond cases that do not deal with protection of the president. The <u>Berg</u> court framed the qualified immunity analysis, as "whether, under well-established law at the time, and based on these facts, an officer could reasonably have believed that the actions taken to detain the OWS protesters were lawful in light of the special need to protect the President." <u>Id</u>. at 111.

**POINT 8**

For the reasons discussed more fully at Point 4 *supra* and Point 7 of plaintiff's moving brief (Dkt. 172), the defendants observed the excessive force and had sufficient time to prevent it. Rather than prevent it through options that were available to them such as stepping backwards, deploying the arrest team embedded within the team, or simply talking to him, they intentionally and jointly shoved and injured Martin Gugino.

**POINT 10**

The Defendants claim this Court must reject as a matter of law Plaintiff's state law assault and battery tort claims because they substantially overlap with his constitutional excessive force claim, they arise from the same set of facts, and Plaintiff alleges that they merit the same relief. In support of this they cite to <u>Boyler v. City of Lackawanna</u>, 287 F. Supp. 3d 308, 326 (W.D.N.Y. 2018), however, <u>Boyler</u> the court dismissed claims against officers and thus against the city as well because the "arrest was supported by probable cause." In cases that do not involve underlying wrongful conduct, there is no underlying liability, and there can be no vicarious liability. However, plaintiff has moved for summary judgment on the first amendment and fourth amendment constitutional violations, including that plaintiff's arrest was not

supported by probable cause. In sum, the City may be vicariously liable on state law claims brought against their defendant employees, and the City remains liable for damages caused by its agent, even when that agent is individually immune. When an employee-officer commits an underlying violation, such as false arrest without probable cause and/or assault and battery, but is personally shielded by qualified immunity, the municipal employer, like any other principal under New York law, remains vicariously liable for its agent's conduct. See, Triolo v Nassau County, 24 F4th 98, 110 (2d Cir. 2022).

"'[Q]ualified immunity is an individual affirmative defense that does not protect municipalities' and 'under New York law and basic agency principles, a municipal employer is vicariously liable for the wrongs of its employee, even when the employee is individually immune, so long as the wrong was committed within the scope of employment.' Triolo v. Nassau County, 24 F.4th 98, 110 (2d Cir. 2022)." Singh v City of New York, 23-24-CV, 2024 WL 319117, at *7 (2d Cir Jan. 29, 2024). A "[c]ity can be liable under the state law theory of respondeat superior for the actions of [its officers], and cannot rely on the doctrine of qualified immunity, even assuming that it protects [its officers]." Id.   State law assault and battery claims must not be dismissed where "a rational jury could find that [an officer's] use of force was objectively unreasonable when all the evidence is construed most favorably to [the officer]." Id.

A recent Second Circuit opinion, Triolo v Nassau County, 24 F4th 98, 113 (2d Cir 2022), sets forth vicarious liability principles for municipalities involving state law claims brought against police officers. The Triolo Court held that a County remained "vicariously liable under New York law for the compensatory damages because (1) municipalities are not entitled to qualified immunity, (2) municipal employers may be vicariously liable on state law claims brought against their police officer employees, (3) a principal remains liable for damages caused

by its agent, even when that agent is individually immune, and (4) Lee was acting within the scope of his employment when he arrested Triolo." Id. To put it simply, "even though [the officer] is shielded from personally paying for the damages he caused by falsely arresting Triolo, the County remains liable for those damages under New York state law." Id.

In sum, plaintiff's state law claims, including assault and battery must not be dismissed because a rational jury could find that the use of force was objectively unreasonable when all the evidence is construed most favorably to the officer; and because the City can be liable under the state law theory of respondeat superior for the actions of its officers, and cannot rely on the doctrine of qualified immunity, even assuming that it protects its officers.


**POINT 13**


### XI.    Plaintiff's Excessive Force claims must not be dismissed against Defendants Brown, Lockwood, and Gramaglia.

Defendant Losi argues that because he made no contact with Martin Gugino the fourth amendment claims, and related state claims must be dismissed against him. Defendant Losi intentionally shoved Defendant McCabe into Martin Gugino, while ordering him to push plaintiff. "[A]supervisor may be held liable if he is a 'direct participant' in a constitutional violation such as a false arrest, meaning that he 'authorizes, orders, or helps others to do the unlawful acts, even if he ... does not commit the acts personally.' Terebesi, 764 F.3d at 234." Jackson v Tellado, 236 F Supp 3d 636, 654 (E.D.N.Y. 2017). "[D]efendants need not actually 'pull the trigger,' or use force themselves, to be liable for excessive force as a direct participant." Figuereo v City of Saratoga Springs, 1:23-CV-00922 (AMN/PJE), 2025 WL 460784, at *9 (N.D.N.Y. Feb. 11, 2025). "'A defendant who plans or directs an unreasonable use of force is

liable for the resulting constitutional violation as a 'direct participant.' Terebesi v. Torreso, 764

F.3d 217, 234 (2d Cir. 2014)." Id.

In Figuereo v City of Saratoga Springs, 1:23-CV-00922 (AMN/PJE), 2025 WL 460784,

at *10 (N.D.N.Y. Feb. 11, 2025), the court reject supervisor defendants' claims that their

authorization to deploy pepper balls was not enough to establish liability. The Court dismissed

this holding that the supervisors "knew or should have known that their alleged 'authorization'

would somehow cause others to deprive Plaintiff of his constitutional rights." Id. In reaching this

holding the Court emphasized that the state of mind is not a matter that a plaintiff is required to

prove" in excessive force claims outside of the Eighth Amendment. The Court held, "What

matters is whether the decision to authorize projectiles and pepper balls was *objectively*

reasonable."

Here, Defendant Lockwood testified that Defendant Losi, the commander on scene,

should have taken control of the situation to ensure that physical force not be used against

Gugino instead of pushing McCabe towards Gugino (Dkt. 161-11 at 119:12). Defendant

Lockwood acknowledged that if Defendant Losi ordered the line to stop and deal with Martin

Gugino by either arrest or warnings the incident would not have occurred (Id. at 120).

The actions of Defendant Losi in shoving McCabe toward Plaintiff, Martin

Gugino, and yelling "push him" was unnecessary and a violation of the custom and practice in

the field of law enforcement.

The use of the militarized Emergency Response Team to disperse a small group of

citizens in front of City Hall based upon a perceived verbal disagreement among two individuals

was unnecessary and violated the custom and practice in the field of law enforcement. This

decision was made by Defendant Gramaglia and Defendant Losi, based on a policy and curfew

promulgated by Defendant Brown, and thus, plaintiff's fourth amendment claims must not be dismissed against them.

In addition, defendant Losi was a direct participant in the excessive force used against Martin Gugino. Not only was he the direct platoon supervisor on the ground, but he also intentionally shoved Defendant McCabe into plaintiff and yelled orders to "PUSH" the plaintiff. He deployed his team to Niagara Square, got out to the front of city hall, observed that no one was fighting, that there was no property damage occurring, no people walking, demonstrating, no one was shouting or yelling, and there were maybe a dozen people in the area of Niagara Square and/or the front of city hall, and failed to call his superiors to further assess the need for their presence and instead deployed the ERT. Dkt. 161-6 at 335.

Defendant Lockwood testified that instead of pushing McCabe, Defendant Losi should have stepped forward and taken control of the situation to ensure that Martin Gugino was not pushed and shoved to the ground. Dkt. 161-11 at 119. Defendant Lockwood further testified that Defendant Losi should have simply ordered the line to stop and deal with this citizen either by arrest, warnings or otherwise. Id.

Plaintiff's excessive force claims must not be dismissed against Defendants Losi, Brown, Lockwood, and Gramaglia since the use of force was the result of a policy promulgated by the defendant. "[S]upervisors are liable 'where unconstitutional acts are *the result* of a policy promulgated by the defendant.' Brock v. Wright, 315 F.3d 158, 166 (2d Cir. 2003)" Figuereo v City of Saratoga Springs, 1:23-CV-00922 (AMN/PJE), 2025 WL 460784, at *10 (N.D.N.Y. Feb. 11, 2025). "Mayors may be treated as policy-makers without proof of their specific powers and responsibilities." Rookard v. Health & Hospitals Corp., 710 F.2d 41, 45 n. 4 (2d Cir.1983) (citing Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 448 (2d Cir.1980) ("Surely

49

the mayor is the one city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and successfully implementing the plan" to deprive a plaintiff of constitutional rights.).

Respectfully submitted this 2nd day of February 2026.

/s/ Melissa D. Wischerath
Melissa D. Wischerath
Lipsitz Green Scime Cambria LLP
47 Delaware Avenue, Suite 120
Buffalo, NY 14202
(716) 849-1333, ext. 397
mwischerath@lglaw.com