IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---

MARTIN GUGINO,

                Plaintiff,

vs.

CITY OF BUFFALO,

MAYOR BYRON BROWN,
POLICE OFFICER ROBERT MCCABE,
POLICE OFFICER AARON TORGALSKI,
POLICE OFFICER JOHN LOSI,
POLICE COMMISSIONER BYRON C. LOCKWOOD,
DEPUTY POLICE COMMISSIONER JOSEPH GRAMAGLIA,

              Defendants.

---

Case No. 1:21-CV-283

**REPLY MEMORANDUM OF
LAW IN FURTHER SUPPORT
OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

LIPSITZ GREEN SCIME CAMBRIA LLP
Richard P. Weisbeck, Jr., Esq.
Melissa D. Wischerath, Esq.
Attorneys for Plaintiff
Office and P.O. Address
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
(716) 849-1333

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Armstrong v Exceptional Child Ctr., Inc.*, 575 US 320 (2015)......................................................23

*Beckles v United States*, 580 US 256 (2017) ...............................................................................6

*Borough of Duryea, Penn. v Guarnieri*, 564 US 379 (2011)........................................................8

*Brown v. Entertainment Merchants Ass'n*, 564 US 786 (2011)....................................................22

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 US

  661 (2010) ...............................................................................................................................8

*Cincinnati* v. *Discovery Network, Inc.,* 507 US 410 (1993) ..............................................................8

*City of Chicago v Morales*, 527 US 41  (1999) .............................................................................7

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971)........................................................................5

*Consolidated Edison Co. of N.Y. v Public Serv. Comm'n of N.Y.*, 447 US 530 (1980)...........10, 14

*Forsyth County v. Nationalist Movement*, 505 US 123 (1992) .......................................................11

*Fulton v. City of Philadelphia*, 593 US 522 (2021)........................................................................23

*Holder v Humanitarian Law Project*, 561 US 1 (2010)..............................................................3, 4

*Hynes v Mayor and Council of Borough of Oradell*, 425 US 610 (1976)...................................4, 6

*McDonald v. Smith*, 472 US 479 (1985)........................................................................................9

*NAACP v. Alabama* ex rel. *Patterson*, 357 US 449 (1958).........................................................9, 15

*Natl. Ass'n for Advancement of Colored People v Button*, 371 US 415 (1963) .............................7

*Police Dept. of Chicago v Mosley*, 408 US 92 (1972)....................................................................11

*R.C. Diocese of Brooklyn v Cuomo*, 592 US 14 (2020)...............................................13, 14, 16, 23

*Reed v. Town of Gilbert*, 576 US 155 (2015) .................................................8, 9, 10, 11, 12, 14, 20

*Scull v Com. of Va. ex rel. Comm. on Law Reform and Racial Activities*, 359 US 344, 353, (1959) ................................................................................................................7

*Smith v Goguen*, 415 US 566 (1974) ...........................................................................3, 5

*Sorrell v IMS Health, Inc.*, 564 US 552 (2011) .................................................................11

*Texaco, Inc. v Short*, 454 US 516 (1982)..........................................................................6

*Turner Broadcasting System, Inc. v FCC*, 512 US 622 (1994)........................................15

*United States v Davis*, 588 US 445 (2019).........................................................................3

*Vil. of Hoffman Estates v Flipside, Hoffman Estates, Inc.*, 455 US 489  (1982)............................4

*Ward v. Rock Against Racism*, 491 US 781 (1989)................................................9, 12, 21

*Wooden v United States*, 595 US 360 (2022) ...................................................................6

**Federal Cases**

*Fuller v Salt Lake City*, 775 F.Supp.3d 1212 (2025) ......................................................19

*Hodgkins ex rel. Hodgkins v Peterson*, 355 F3d 1048 (7th Cir. 2004)............................16

*In re N.Y. City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 382 (S.D.N.Y. 2021)..............................................................................................................19

*Janet Ramos v. Town of Vernon*, 353 F3d 171 (2d Cir. 2004) .......................................18

*Jeffery v City of New York*, 113 F.4th 176 (2d Cir. 2024) ...................................19, 20, 22

*Knowlton v City of Wauwatosa*, 119 F.4th 507 (2024) ...................................................19

*Maher v All. Mortg. Banking Corp.*, 650 F Supp 2d 249 (E.D.N.Y. 2009) .....................3

*Nunez by Nunez v City of San Diego*, 114 F3d 935 (9th Cir 1997) ..........................16, 22

*Open Socy. Justice Initiative v Trump*, 510 F Supp 3d 198 (S.D.N.Y. 2021)................23

*Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2004) ................................................21

*Robinson v Att'y Gen.*, 957 F.3d 1171 (11th Cir. 2020) .................................................21

*Rupp v Buffalo,* 91 F. 4th 623 (2nd Cir. 2024)................................................................25

*Thibodeau v Portuondo*, 486 F3d 61 (2d Cir. 2007) ....................................................3, 4

*United States v Scott*, 979 F3d 986 (2d Cir. 2020)......................................................3, 4

*Volokh v. James*, 148 F.4th 71, 108 (2025) .................................................................22

*Williams v Korines*, 966 F3d 133 (2d Cir. 2020) ...........................................................3

**State Cases**

*People on Info. of Costello v Sheldon*, 16 Misc 2d 518 (NY Co. Ct 1959).....................5

## POINT I

**This Court Must Invalidate the Brown curfew on void for vagueness grounds.**

By failing to address 1) plaintiff's void for vagueness facial challenge to the ordinance and 2) plaintiff's void for vagueness claim that the curfew order encouraged arbitrary enforcement by police officers, this Court may deem their opposition abandoned. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Maher v All. Mortg. Banking Corp*., 650 F Supp 2d 249, 267 (E.D.N.Y. 2009).

Turning to the sole claim the defendants raised in opposition, the defendants claim that even if the curfew was vague, it was not vague as applied to Plaintiff. Dkt. 173-5. Contrary to defendants claim otherwise, "[i]n our constitutional order, a vague law is no law at all." *United States v Davis*, 588 US 445, 447 (2019). First Amendment voidness challenges demand greater scrutiny than others. See, *Smith v Goguen*, 415 US 566, 573 (1974). ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

Because first amendment voidness challenges are different than other contexts, the defendants' reliance on *Williams v Korines*, 966 F3d 133, 140 (2d Cir. 2020), *Thibodeau v Portuondo*, 486 F3d 61, 66 (2d Cir. 2007), and *Holder v Humanitarian Law Project*, 561 US 1, 20, (2010) is misplaced. In *United States v Scott*, 979 F3d 986, 993 (2d Cir. 2020), the Second Circuit emphasized the limitations of *Holder* and expressly held that "[o]utside of the First Amendment context, we look to whether the 'statute is vague as applied to the particular facts at

issue.;" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)." *United States v Scott*, 979 F3d 986, 993 (2d Cir. 2020). "(S)tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Hynes v Mayor and Council of Borough of Oradell*, 425 US 610, 620, (1976).

*Williams* concerned an as applied challenge to an inmate over a rule prohibiting gang and gang material such as photographs of persons making known gang symbols. *Thibodeau v Portuondo*, 486 F3d 61, 66 (2d Cir. 2007) was another as applied challenge to a statute that prescribed the evidentiary presumption of death in certain situations. In *Thibodeau*, the defendant argued that the statute he was convicted under and sentenced to twenty-five years to life imprisonment was unconstitutionally vague because it lacked any definite time period by which an abducted or missing person may be presumed dead. *Id*. The Second Circuit expressly cautioned other courts on the limitation of its ruling stating, "[t]his case does not present the typical vagueness challenge..." *Id*.

In *Holder v Humanitarian Law Project*, 561 US 1, (2010), the plaintiffs sought preenforcement review of a criminal statute and limited their challenge to the question of whether or not the statute "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Id*. at 20. *Holder* is also distinguishable because unlike Martin Gugino, the *Holder* plaintiffs did not argue that the statute granted too much enforcement discretion to the Government, but solely addressed notice of three terms. *Id*. *Holder* is not instructive in the context of a first amendment challenge. See, *United States v Scott*, 979 F3d at 993; See also, *Vil. of Hoffman Estates v Flipside, Hoffman Estates, Inc.*, 455 US 489, 495, (1982).

While unsupported by the record, defendants essentially claim that because plaintiff went to Niagara Square to challenge the curfew intending to get arrested, that the curfew was not vague as applied to Martin Gugino. See generally Dkt. 173-5 at Point II (A). This claim is illogical and absurd. Martin Gugino clearly was not engaged in a hypothetical situation at the periphery of the regulation's scope. This ignores plaintiff's claim that the curfew was vague as applied to the conduct specifically charged against him, namely his presence as a peaceful protester in Niagara Square during curfew hours which was deemed nonessential by the enforcing officers. Even if this Court were to accept that plaintiff's decision to go to Niagara Square was a hypothetically vague application of the curfew, the ordinance must fail because no standard of conduct was specified at all in the ordinance. Rather it prohibited "all nonessential pedestrian and vehicular traffic." See, e.g. *People on Info. of Costello v Sheldon*, 16 Misc 2d 518, 519 (NY Co. Ct 1959) (vehicle and traffic law was not sufficiently explicit to inform those who may become subject to its penalty as to what conduct on their part would not be an 'interference with' or an 'endangering of traffic'). Instructive on this point is *Smith v Goguen*, 415 US 566 (1974). In *Smith*, the defendant was charged with violating a flag-misuse statute because he wore a small cloth version of the United States flag sewn to the seat of his trousers, which he was thereafter tried and convicted. *Id*. The *Smith* Court held that where an ordinance has no core and lacks any ascertainable standard for inclusion and exclusion, there is no "hard-core" violator concept, so it does not matter whether or not the conduct at issue fell within the core of the statute's prohibition. *Id*. In rejecting a similar claim, the Supreme Court held in *Smith* that "[t]his criminal provision is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of

7

conduct is specified at all.' *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). Such a provision simply has no core." *Id*. at 578.

Contrary to defendants claims otherwise, this Court must rule as a matter of law that the Brown curfew was void for vagueness because it violated two separate but distinct principles of fair notice. Fair notice requires that a citizen be informed what conduct is prescribed and what consequence applied for violating it. *Beckles v United States*, 580 US 256, 262, (2017). "[P]unishments should never be products of judicial conjecture about this factor or that one. They should come only with the assent of the people's elected representatives and in laws clear enough to supply 'fair warning ... to the world.'" *Wooden v United States*, 595 US 360, 397, (2022) (internal citation omitted) (Gorsuch, J., concurring in the judgment). It is undisputed that the Brown curfew was not published nor contained a penalty advising that punishment resulted from its violation. While defendants attempt to minimize the failure to publish the Brown curfew as "mistake" (Dkt.173-5 at Point I (B)); this mistake is fatal. Fair notice is not an idle concept. It is a fundamental principle of due process, one that requires that a person of ordinary intelligence be given the reasonable opportunity to understand what the law prohibits and what punishment will result from its violation. "…[F]or any legislative enactment affecting substantial rights. Generally, a legislature need do nothing more than enact and publish the law." *Texaco, Inc. v Short*, 454 US 516, 531-32 (1982). Here, the City defendants could not even meet that fundamental core minimum. In this void, Martin Gugino was forced to venture down to a public forum to ask those responsible for enforcing it what conduct was prescribed. Due process demands more.

This Court must rule as a matter of law and find that the Brown curfew was void for vagueness because it left men of common intelligence, including many defendants who testified,

to guess at its meaning. In *Hynes* the Supreme Court invalidated an ordinance on first amendment void for vagueness grounds because "in certain respects 'men of common intelligence must necessarily guess at its meaning.'" *Hynes v Mayor and Council of Borough of Oradell,* 425 US at 620. "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v Com. of Va. ex rel. Comm. on Law Reform and Racial Activities*, 359 US 344, 353, (1959). "The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Natl. Ass'n for Advancement of Colored People v Button*, 371 US 415, 432-33, (1963).

This Court must rule as a matter of law and find that the Brown curfew was void for vagueness because it did not provide sufficient minimal standards to guide law enforcement officers. "To grant to a policeman virtually standardless discretion to close off major portions of the city to an innocent person is, in my view, to create a major, not a 'minor,' 'limitation upon the free state of nature.'" *City of Chicago v Morales*, 527 US 41, 70, (1999). Like *Morales*, even if this Court were to find that plaintiff, Martin Gugino, had notice of an ordinance that was never published, this Court can rule as a matter of law that the Brown curfew was void for vagueness not because it provided insufficient notice, but because it did not provide "sufficient minimal standards to guide law enforcement officers." *Id*. at 72.

## POINT II.

### Plaintiff is entitled to summary judgment on his First Amendment claims related to the curfew.

### A.  The curfew was facially content based and therefore subject to strict scrutiny.

To determine whether a law that infringes on speech and other expressive rights violates the First Amendment, courts must consider both the nature of the burden imposed by the law and the nature of the speech or assembly at issue. Laws that target protected speech "based on its communicative content" are presumptively unconstitutional and may be justified only if they satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U. S. 155, 163 (2015). Indeed, "a law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. 156, citing *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 429 (1993). It is these three issues that have confounded defendants' response to plaintiff's First Amendment claims.

As an initial matter, because government regulation of speech, assembly, press, and other activities protected under the First Amendment frequently intertwine within cases, the Supreme Court frequently addresses these interests through a single legal framework. "[I]n recent decades, the Supreme Court has tended to collapse the various expressive freedoms of the First Amendment …into an undifferentiated "freedom of expression," or more often, simply "freedom of speech."[1] *See, e.g.*, *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 388 (2011)(acknowledging that the rights of speech and petition share substantial common ground); *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S.

---

[1] Michael W. McConnell, "Reconsidering Citizens United as a Press Clause Case," 123 Yale L.J. 412, 416 (2013).

661, 680 (2010) (finding petitioners' "expressive-association and free-speech arguments merge"); *McDonald v. Smith*, 472 U.S. 479 (1985)(holding that the right of petition is subject to the same limitations applicable to free speech claims); *NAACP v. Alabama* ex rel. *Patterson*, 357 U.S. 449, 460 (1958)(noting the close nexus between the freedoms of speech and assembly). "Under this approach, the Free Speech Clause has subordinated and largely supplanted its close First Amendment cousins."[2] Plaintiff has similarly pled (Dkt. 1 at ¶ 1) that defendants violated his rights to free speech, assembly, and to petition the government through the enactment and enforcement of the City of Buffalo's June 2, 2020, curfew (henceforth the "Brown Curfew") while referencing cases that collapse the separate "expressive" rights into variants on "freedom of speech".

In their response to plaintiff's First Amendment claims, defendants argue that Mayor Brown's curfew of June 2, 2020, was a "permissible content-neutral regulation subject to intermediate scrutiny, because it is facially content-neutral and supported by content-neutral purposes." Dkt. 173-5 at 2. Defendants then plant these arguments on shaky ground, centering their level-of-scrutiny arguments on a common misreading of analysis required by federal courts. Defendants' assert that "[t]o determine whether a regulation is content-neutral or content-based, courts consider whether the government regulated the speech because it disagrees with the message conveyed." Dkt. 173-5 at 2, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). However, this analysis is only warranted if the court has determined the regulation is content neutral: "Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each

---

[2] Timothy Zick, "Assembly, Press, and Petition", *The Dynamic Free Speech Clause: Free Speech and its Relation to Other Constitutional Rights* (2018; online edn, Oxford Academic, 23 Aug. 2018), https://doi.org/10.1093/oso/9780190841416.003.0004, accessed 16 Mar. 2026.

question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed*, 576 U.S. at 166 (emphasis added).

In *Reed*, a town ordinance imposed greater restrictions on the size and display of signs based on the sign's function or purpose. 576 U.S. at 159-161. The plaintiff, whose church held services at various locations, used temporary signs to inform the public of the location of the week's service. *Id*. at 161. This placed the sign into a category which restricted the size and shortened the time Reed could place his signs—especially compared with "ideological" or "political" signs—and resulted in fines when the signs were placed longer than allowed under the ordinance. *Id*. The district and appellate courts upheld the sign categories as content neutral, surviving intermediate scrutiny. *Id*. at 162-163.

The Supreme Court reversed, finding that the code was content based on its face, as it defined categories of temporary, political, and ideological signs based on their messages and placed different restrictions on each category. *Id*. at 163. A law that is content-based on its face is subject to strict scrutiny regardless of benign motive, content-neutral justification, or lack of animus toward the message. *Id*. at 165. While the law did not single out any viewpoint, the "First Amendment's hostility to content-based regulation extends to prohibition of public discussion of an entire topic." Id. at 169, citing *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980). The sign regulation singled out specific subject matter, even if it did not target viewpoints within that subject matter, rendering it a content based regulation subject to strict scrutiny. *Id*.

Justice Thomas, speaking for the Court, specifically admonished the appellate court's determination—identical to the argument defendants make in the present case—that because the town "did not adopt its regulation of speech based on disagreement with the message conveyed,"

the challenged ordinance was content-neutral. But Thomas noted that the appellate court

"skipped the crucial first step in the content-neutrality analysis: determining whether the law is

content neutral on its face." The Court expanded:

> The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward* had nothing to say about facially content-based restrictions because it involved a facially content-neutral ban on the use, in a city-owned music venue, of sound amplification systems not provided by the city. In that context, we looked to governmental motive, including whether the government had regulated speech because of disagreement with its message, and whether the regulation was justified without reference to the content of the speech. But *Ward's* framework applies only if a statute is content neutral.

576 U.S. 155, 166 (2015) (internal citations omitted). Defendants ask this court to make the same

error and put the cart before the horse: Determining whether the law is content based or neutral

on its face before analyzing the government's motivations.

A regulation is content based on its face when government officials must examine the

content of a message or viewpoint to determine the applicability of a law. See, e.g., *Forsyth

County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (striking down an ordinance allowing

forum fees to vary depending upon the cost of keeping public order, because "the administrator

must necessarily examine the content of the message that is conveyed, estimate the response of

others to that content, and judge the number of police necessary to meet that response"

(quotation omitted)); *see also, R.C. Diocese of Brooklyn v Cuomo*, 592 US 14, 22, (slip op., at 2–

4); *Sorrell* v. *IMS Health, Inc.*, 564 U. S. 552, 563–565 (2011); *Police Dept. of Chicago v.

Mosley*, 408 U. S. 92, 93, 96 (1972).

In *Sorrell*, the Court, in determining whether a Vermont restriction on medical research

was content neutral, held that a "commonsense meaning of the phrase 'content based' requires a

court to consider whether a regulation of speech 'on its face' draws distinctions based on the

message a speaker conveys." *Read*, 576 U.S. 155 at 163, citing *Sorrell*, 564 U.S. at 565. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id*. at 163. "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id*. at 163-164. In simpler terms, a law that appears content neutral on its face will be deemed content based if the law cannot be justified without reference to the content of the regulated speech. *Id*. at 164 (citing *Ward*, 491 U. S. at 791).

In their response, defendants claim that curfew was facially content-neutral because "[a]ll citizens were subject to [the curfew]," and "its enforcement did not depend upon the content of the message conveyed." Dkt. 173-5 at 5. Yet the official language of Brown's June 2nd curfew prohibited "all *nonessential* pedestrian and vehicular traffic" between the hours of 8pm and 5am. Dkt. 161-3 (emphasis added). The statement announcing the curfew on the city website stipulated, "[i]ndividuals traveling to and from work or for some other *legitimate reason* including childcare, medical care, or other *necessary activity* will be allowed to do so." Dkt. 161-15 (emphasis added). Thus, applying the Court's reasoning in *Reed*, the Brown curfew was a facially content based regulation because during the nine hours it was in effect each night, the freedom to participate in an activity, including engaging in First Amendment activities, was dependent on whether a traveler conveyed—and an enforcer of the curfew accepted—that the reason for their travel to the anticipated activity was "essential", "legitimate", or "necessary". Travelers who did not provide an approved reason were threatened or faced with legal consequences.

Defendants divert attention from the curfew's actual message of prohibiting travel based upon those approved reasons by asserting that although the curfew applied to everyone,

14

"[o]fficers could determine whether those outside during curfew hours were traveling for essential or nonessential reasons without reference to the content of their speech." Id., citing to Dkt. 160-28. In the absence of any definitions included in the curfew or subsequent announcement, defendants offer that "essential travel" was "a term that was repeatedly used throughout the pandemic and one that most reasonable people understood." Def. Mot. Summ. J. at 5; see also Def. Resp. Summ. J. at 16. In support of this argument, defendants submit as an exhibit the official list of businesses and services deemed "essential" in New York State at the time of the curfew. Dkt. 160-28. ("Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on Pause' Executive Order" hereafter "Guidance".). The document identified 64 categories and subcategories of businesses, services, and activities not subject to in-person restrictions otherwise imposed on entities across the state as of March 22, 2020. Id. Businesses and services listed included grocery stores, laundromats, hardware and building supplies, automotive repair, banks, pharmacies, gas stations, convenience stores, and restaurants and bars (take out only). Id. While "News Media" was listed an essential category, no specifics respecting other protected First Amendment activities within the listing: A single sentence was added after the category list addressing religious services, stating "[h]ouses of worship are not ordered closed however it is strongly recommended not congregate services be held and social distance maintained." Id.

In *R.C. Diocese of Brooklyn v Cuomo*, 592 U.S. 14 (2020), the Supreme Court, granting an application for injunctive relief in a separate First Amendment case, relied upon the Guidance in defining "essential" for purposes of Covid-19 in-person restrictions in New York State. The Court found that the governor's executive order restricting in-person attendance at religious services to 10 to 25 persons was not facially content-neutral, agreeing with the plaintiffs' claim

that "the regulations treat houses of worship much more harshly than comparable secular facilities." *Id.* at 14-15. The Court, reviewing the commercial businesses and non-profit services listed as "essential" in the Guidance, expressed skepticism that "businesses categorized as "essential" may admit as many people as they wish…[i]ncludes things such as acupuncture facilities, camp grounds, garages, as well as many whose services are not limited to those that can be regarded as essential, such as all plants manufacturing chemicals and microelectronics and all transportation facilities." *Id*. The Court held that because the Guidance allowed so many exceptions, the challenged restrictions on religious services were not "'neutral' and of 'general applicability,' and applied strict scrutiny. *Id*. at 16-17. Similarly, if the court in the present case accepts defendants' claim that "essential" was widely understood as defined in the Guidance to mean hundreds of businesses, services, and activities in and around Buffalo were exempt from the travel restrictions otherwise placed on individuals within the city, then it is unfathomable to consider the curfew to be content neutral, especially given the preferential treatment granted by that specific message.

Defendants also argue the curfew was content neutral because enforcement "depended on *when* the message was conveyed, not *what* the message conveyed." Def. Resp. Mot. Summ. J. at 5 (emphasis in original). However, "regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Consolidated Edison Co.*, 447 U.S. at 537; see also, *Reed*, 576 U.S. at 170 (The sign code's viewpoint distinctions did not "hinge on whether and when an event" occurred.). The Brown curfew likewise singled out a subject matter—essential travel—for differential treatment, even if it did not target viewpoints within that subject matter. Travel for dozens of activities deemed "essential"—including commercial activities such as shopping, banking, doing laundry, and

16

picking up restaurant take out—are given more favorable treatment than attending a public discussion or assembling with a group of like-minded individuals to "petition the government for a redress of grievances", regardless of the viewpoints of speakers or those assembled. As the *Reed* Court noted when addressing the same issues with the sign code, "that is a paradigmatic example of content-based discrimination." 576 U.S. at 169. The court should thus reject defendants' argument the curfew was content neutral on its face.

**B.  The government's purpose in enacting the curfew was not content neutral and therefore the curfew is subject to strict scrutiny.**

Defendants erroneously also claim that the city's *purpose* for enacting the curfew was also content-neutral: "Mayor Brown justified the curfew with content-neutral purposes of preventing civil unrest; maintaining law and order; and protecting the life, property, safety, and welfare of Buffalo residents." Def. Resp. Mot. Summ. J. at 5. Defendants further assert that "a facially content-neutral regulation supported by a content-neutral purpose that incidentally burdens some messages more than other remains a content-neutral regulation." Id. at 3. Laws that only incidentally burden protected speech are subject to intermediate scrutiny. *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 642 (1994). However, laws that claim to have only an incidental effect on speech may be held unconstitutional. In *NAACP v. Alabama*, the Court invalidated an Alabama law that required all out-of-state organizations that operate in the state to disclose the names of all Alabama residents who are members of the organization. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). The Court determined that disclosure of one's affiliation with the NAACP would have led to a serious chilling effect on the willingness of Alabama residents to affiliate with the NAACP and thus the purportedly incidental effect significantly interfered with expressive rights protected under the First Amendment. *Id*. at 462-463.

17

At the press conference announcing the restrictions on pedestrian and vehicular travel that the mayor then called a curfew, Mayor Brown declared that he ordered the restrictions specifically "to protect our residents, to protect our businesses, and to protect peaceful protesters exercising their freedom of speech rights." Sahasrabudhe Decl. Ex. 23 at 2. Yet while Brown claimed he sought to protect resident's speech, the curfew placed severe restrictions on Buffalo residents' freedom to peacefully assemble and express themselves, restricting the public expression of speech and assembly to non-curfew hours. These restrictions were not merely "incidental"—for people whose work, family, and other responsibilities rendered them unable to join protests during the day, the restrictions on peaceful assembly—specifically in a public forum—rendered the regulation a bar to participation in any public speech and assembly activity, regardless of the views expressed during the activity.

In *Hodgkins v. Peterson*, when addressing whether the effects of an overnight juvenile curfew on First Amendment right of affected youths were "incidental", the Court expounded at length:

> [T]he curfew ordinance regulates minors' abilities to engage in some of the purest and most protected forms of speech and expression… [A] wide range of First Amendment activities occur during curfew hours, including political events, death penalty protests, late night sessions of the Indiana General Assembly, and neighborhood association meetings or nighttime events. A number of religions mark particular days or events with late-night services, prayers, or other activities: many Christians, for example, commemorate the birth of Christ with a midnight service on Christmas Eve and the Last Supper with an all-night vigil on Holy Thursday; Jews observe the first night of Shavuot by studying Torah all through the night; and throughout the month of Ramadan, Muslims engage in late-evening prayer. Late-night or all-night marches, rallies, and sleep-ins are often held to protest government action or inaction. And it is not unusual for political campaigns, particularly in the whirlwind final hours before an election, to hold rallies in the middle of the night…These are but a few examples. The curfew ordinance regulates access to almost every form of public expression during the late night hours. The effect on the speech of the plaintiffs is significant. Significant

18

*Hodgkins ex rel. Hodgkins v Peterson*, 355 F3d 1048, 1058 (7th Cir. 2004). Similarly, although in place for nine hours at night, the Brown curfew imposed more than an incidental burden on protected expression. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *R.C. Diocese*, 592 U.S. at 19. First Amendment protections are important in determining the constitutionality of a curfew. The Court held San Diego's overnight curfew "significantly restricts expression in all forums for one-third of each day." *Nunez by Nunez v City of San Diego*, 114 F3d 935, 951 (9th Cir 1997).

Brown also did not hide his ambivalence regarding public protests when announcing the curfew, opining that even peaceful protests inevitably encouraged property damage if left unchecked: "Our recommendation is that people not try to protest every day…There is a real danger to the community, to the protesters, particularly as protests try to stretch into darkness, of other things taking hold. Of looting, of people trying to set fires, of vandalism, of store owners, who live in the community, trying to protect their property." Dkt. 160-3, Sahasrabudhe Decl. Ex. 2. Brown blamed the previous evening's civil disorder on the protests: "For some people it was a cover to loot, to vandalize, to throw rocks, to try to injure...We cannot allow that to happen." Id. Brown's focus in his comments was on the activity of protesting, not the message of the protestors. Furthermore, implementing a curfew in anticipation of protests against police brutality involves a judgment that the content of protestors' speech makes it likely to lead to violence.

Despite defendants' claims, whether Mayor Brown disagreed or endorsed the viewpoint of Buffalo protestors angered by national incidents of police brutality is not relevant in determining whether the purpose of the curfew was content-neutral, since the actual purpose the curfew was not to suppress only one specific reason for protesting. At the press conference

19

announcing the curfew, Brown stated he ordered the restrictions specifically "to protect our residents, to protect our businesses, and to protect peaceful protesters exercising their freedom of speech rights." Dkt 160-25 at 2. While Brown claimed he sought to protect resident's speech, the curfew placed severe restrictions on Buffalo residents' freedom to peacefully assemble, associate, and petition the government— restricting the public expression of speech to non-curfew hours. Brown did not hide his animosity towards protests, avowing that even peaceful protests inevitably encouraged property damage if left unchecked: "Our recommendation is that people not try to protest every day…There is a real danger to the community, to the protesters, particularly as protests try to stretch into darkness, of other things taking hold. Of looting, of people trying to set fires, of vandalism, of store owners, who live in the community, trying to protect their property." Id. at 4. Brown blamed the previous evening's civil disorder on the protests: "For some people it was a cover to loot, to vandalize, to throw rocks, to try to injure...We cannot allow that to happen." Id.

Defendants concede this with their claim that the curfew was content-neutral "despite any incidental burden on anti-police-brutality messages, because Mayor Brown's purpose was not to suppress those messages; in fact, he endorsed those messages," Def. Resp. Mot. Summ. J. at 5-6. This, however, does not save the curfew, since it remained content based on its face regarding its actual purpose: To suppress all public activity that did not have a "legitimate" or "essential" purpose, such as pertaining to work, commerce, or health care. The mayor's hostility—or lack thereof—towards anti-police-brutality messaging was not relevant, because it was not a specific viewpoint the curfew sought to suppress, but all demonstrations after dark.

The defendants' claim that they can rely on other late-Spring 2020 curfews that the Brown curfew "closely resembles" is flawed because the analysis required to determine the level

of appropriate scrutiny is case-specific and evidence-based. As noted in *Janet Ramos v. Town of Vernon*, "[i]t is not enough for defendants to recite interests that have been used to support curfew ordinances in other municipalities. Instead, defendants must show that this ordinance, which restricts constitutional rights, is the product of reasoned analysis." 353 F.3d 171 (2d Cir. 2004) (internal citations omitted.)

Historically, the Second Circuit applies strict scrutiny to curfew ordinances: "Because the curfew limits the constitutional right to free movement within the Town of Vernon at certain hours of the night, we assume that were this ordinance applied to adults, it would be subject to strict scrutiny. " *Id*. Defendants also acknowledge the Second Circuit applied strict scrutiny to right-to-travel claims in *Jeffery v. City of New York* but argue that rulings from the appellate case do not apply here since the plaintiff did not plead a "right to travel" claim. Def. Resp. Mot. Summ. J. at 13 fn. Defendants, however, neglected to disclose that the lower district court, while finding for the City defendants, applied strict scrutiny to both the Jeffery plaintiff's First Amendment and right to travel claims: "Plaintiffs contend, and the court agrees, that the curfew burdened fundamental rights guaranteed by the First, Fourth, and Fourteenth Amendments and, therefore, is subject to strict scrutiny review." *Jeffery v. The City of New York*, 20-CV-2843 (NGG) (RML) (Jan 21, 2022). Plaintiffs subsequently abandoned their First Amendment claims on appeal in order to focus on their right to travel arguments. *Jeffery v. City of New York*, 113 F.4th 176, 188-189 (2d Cir. 2024).

However, the lower court cases defendants rely upon are also distinguishable from the situation in Buffalo. In the consolidated New York City cases, the municipal defendants cited extensive evidence detailing hundreds of arrests and significant property damage and physical injuries caused prior to the mayor's decision to enact the curfew, as well as the mayor's daily

review of the curfew's effect. See *In re N.Y. City Policing During Summer 2020 Demonstrations*, 548 F.Supp.3d 383 (S.D.N.Y. 2021). In *Fuller v. Salt Lake City*, the municipal defendant also provided evidence that the mayor reviewed the situation on the ground daily, and after extending the curfew once after the first weekend, ended it shortly thereafter: "But while the second curfew order was originally scheduled to last for approximately a week, Mayor Mendenhall terminated the order on June 3rd after concluding that the protests in the City had become sufficiently nonviolent that a curfew was no longer necessary." *Fuller*, 775 F.Supp.3d 1212, 1220 (2025). In *Knowlton v. City of Wauwatosa*, the curfew was enacted in the fall of 2020, not in response to the George Floyd murder, but in anticipation of a grand jury declining to indict officers after the shooting death of a local teen by municipal police. *Knowlton*, 119 F.4th 507 (2024).

Here, the defendants referenced the curfew's "purpose of preventing civil unrest that endangered the health, safety, and property of the city's residents," but provided no direct evidence that the level of "civil unrest" in the city of Buffalo at night was either exceptionally higher than previously experienced after comparable events or beyond the capabilities of local and state law enforcement to address safely. The defendants' proffered news articles reported only seven individuals arrested prior to the curfew and provided no details of citywide property damage or injuries. Dkt. 160-29, Sahasrabudhe Decl. Ex. 27. In the defendants' news exhibit from June 2, Mayor Brown rejected calling up the national guard, announcing instead meetings with state and local law enforcement for "to look at additional planning needs." Dkt. 160-25, Sahasrabudhe Decl. Ex. 23.

As noted in *Reed*, *supra*, while the Supreme Court clarified that a government's animosity towards a speaker's viewpoint may transform a content-neutral purpose into one that is content-based, the opposite is not the case. And in this instance, Mayor Brown's actual

22

vacillation over the propriety of protests against police violence would not support such a transformation. The court should therefore reject the defendants' claim that the government purpose in enacting the Brown curfew was not content neutral.

Once a court has determined that strict scrutiny applies, the challenged law starts from a presumption of unconstitutionality, shifting the burden of persuasion to the government, which must then produce evidence sufficient to show that the government interest was compelling, and the curfew was the least restrictive means to advance that interest. See *Jeffery*, 113 F.4th at 188. As noted previously, plaintiff's the First Amendment claims integrate assembly with speech, as have many courts which have addressed curfews, many of which then "apply the traditional three-part test to determine whether the ordinance is a reasonable time, place, and manner restriction:  (1) it must be content neutral;  (2) it must be narrowly tailored to a significant government interest;  and (3) it must leave open ample alternative channels for legitimate expression." *Ward*, 491 U.S. at 791. While the parties in the present case dispute that the regulation is content neutral, the curfew fails the other two prongs of the test.

Defendants list "preventing civil unrest and disturbance that endangered life, property, safety and welfare," as compelling interests. Dkt. 173-5 at 14. Yet they provide no evidence as to why these interests—which existed before the curfew and were conceivably managed by Buffalo law enforcement—suddenly required the entire city population to be confined to their homes for nine hours per day. Their entire response to plaintiff's claims is essentially, "other cities did it." Dkt. 173-5 at 13-14. As noted, *supra*, in *Ramos*, this is not sufficient.

As noted, the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U. S. at 799. The plaintiff does not dispute that preventing property damage and civil strife are not

23

significant government interests and one means of preventing these activities is to enforce a

curfew barring city residents from leaving their homes. At the same time, however, such a

curfew imposes serious burdens on several fundamental rights, including speech, assembly, and

travel. "Recognizing government officials to have wide latitude in issuing emergency orders to

protect public safety or health, however, does not warrant giving such officials carte blanche to

impose any measure without justification or judicial review." *Robinson v. Att'y Gen.*, 957 F.3d

1171, 1179 (11th Cir. 2020) (internal citations omitted); see also *Melendez v. City of New York*,

16 F.4th at 1041. But the government must use means that are substantially related to that

interest: "To determine whether there is an adequate justification for the curfew ordinance we

examine whether the burdens imposed by it are substantially related to the government's interests

as just outlined." *Ramos*, 353 F.3d 171 (2d Cir. 2004). Specifically, defendants have the burden

to prove—with evidence—that restricting all nonessential pedestrian and vehicular traffic in a

city of 278,000 people was narrowly tailored to the government's stated interests. *Volokh v.

James*, 148 F.4th 71, 108 (2025). The defendants, however, provide no evidence specific to the

situation in Buffalo on June 2, 2020, opting instead to rely on the *Jeffery* Court's review of the

substantial evidence the New York City defendants submitted.[3] *Jeffery*, 113 F.4th at 178-183. See

also, *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799-800 (2011).

As noted previously, Mayor Brown also stated that he enacted the curfew to "protect

peaceful protesters exercising their freedom of speech rights." Dkt. 160-25. In publicly

expressing this as justification for the curfew, defendants clearly viewed this as a compelling

government interest, and the ordinance must be narrowly tailored to achieve this interest. *Nunez*

---

[3] Despite their assertion that the "right to travel" analysis in *Jeffery* could not be applied to plaintiff's First Amendment claims, defendants rely on the Court's determinations to bolster their conclusion that the Brown curfew survives strict scrutiny review.

*by Nunez v City of San Diego, 114 F3d 935, 951 (9th Cir 1997)*. However, the order was not narrowly tailored because "it does not sufficiently exempt legitimate First Amendment activities from the curfew." *Id*. In *Nunez-Nunez*, the Court found that the City defendants "did not create a robust, or even minimal, First Amendment exception to permit minors to express themselves during curfew…apparently preferring instead to have no First Amendment exception at all." *Id*. The Court held the curfew was not narrowly tailored, and thus, was not a reasonable time, place, and manner restriction under the First Amendment. *Id*. The Court further held that because the curfew failed one of the prongs, it was not necessary to "reach the question of whether the ordinance leaves open adequate alternative channels of expression."  *Id*.

In the present case, while the mayor's order exempted dozens of activities from the curfew's travel restrictions, it made no attempt to even provide a designated forum for Free Speech activities—such as traditionally held in Niagara Square—thereby significantly restricting expression in all forums for one-third of each day. The question, then, is not whether the City had a compelling interest in enforcing the curfew generally, but whether it has such an interest in denying an exception to those wanting to exercise their First Amendment rights during the hours the curfew was in effect. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

The curfew's clear omission of exceptions for First Amendment expression destroys any argument that the City narrowly tailored its ordinance to serve its compelling interest to "protect peaceful protesters exercising their freedom of speech rights," while imposing only a minimal burden on their First Amendment rights. As Justice Gorsuch noted in his concurrence in *R.C. Diocese*, "[t]he only explanation for treating religious places differently seems to be a judgment that what happens there just isn't as 'essential' as what happens in secular spaces." *R.C. Diocese*, 592 U.S. at 22 (Gorsuch, J., concurring).

The Court should find that the Brown curfew was not narrowly tailored to advance the compelling government interest of protecting the First Amendment rights of Buffalo residents and was therefore unconstitutional.

### D.  Courts are able to review illegal executive action.

Contrary to the defendants claims otherwise (Dkt. 173-5 at Point I (B), courts are able to review illegal executive action. "[T]here is a 'long history of judicial review of illegal executive action,' arising out of English courts of equity. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015)." *Open Socy. Justice Initiative v Trump*, 510 F Supp 3d 198, 214 (S.D.N.Y. 2021). As the Court explained, "[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Id*. (internal citations omitted).

### POINT III

### A. The assault committed by law enforcement officers upon Plaintiff, Martin Gugino.

The overarching claim by Defendants is that law enforcement officers are constitutionally permitted to physically shove and seriously injure a citizen on a public sidewalk for simply exercising a constitutional right to speak against the government even when the individual is not being arrested or detained and makes no threats of physical harm.[4] That claim cannot be the law. If that claim is presently the law, the law is wrong and must be changed.

Pursuant to the First Amendment to the United States Constitution, Martin Gugino had the constitutional right to approach a line of law enforcement officers and voice his concern about their display of weapons that could be used against peaceful demonstrators. The Defendant

---

[4] Here, the citizen-victim of police violence was demonstrating against police brutality.

law enforcement officers (McCabe, Torgalski, and Losi) in response, failed to engage in a conversation with Martin Gugino, failed to inform him that he had committed any illegal act, and failed to even simply advise him that he was under arrest for some violation of law. Instead, in a loud and hostile voice, those Defendants ordered Martin Gugino to "back up". As Martin Gugino began to comply, the three law enforcement officers assaulted Martin Gugino causing him a life-threatening injury which required hospitalization for at least two weeks.

It is well established that "the First Amendment guarantees all persons freedom to express their views. The scope of permitted expression is broad; insults that contain neither threats of coercion that intimidate nor fighting words that create the possibility of imminent violence must be tolerated.... speech on matters of public concern is at the heart of First Amendment protection… For these reasons, the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Rupp v. Buffalo,* 91 F.4th 623, 634-35 (2nd Cir. 2024).

Defendants make the claim that "this case distills down to one basic issue: did the BPD officers involved simply push Plaintiff too hard?"[5] Dkt. 160-36, Defendants' Memorandum of Law in Support of its Motion ("Defs' Memo of Law in Support"), at 1. That claim is misplaced because it assumes it was constitutionally and legally permissible for them to shove and knock Martin Gugino to the ground. Instead, the controlling legal issue for the Court is: since law enforcement was not detaining or arresting Martin Gugino, they had no authority to attack him verbally and physically. Instead, the assault was due to Martin Gugino having the temerity to

---

[5] Even under that claim, they did so.

approach a militarized domestic police force and voice objections and concerns. Consequently, there was no justification for the use of any force against him.

This case is at the very heart of the civil liberties enshrined in the Constitution, which confers upon every citizen the right to approach police officers and raise issues concerning weapons displayed by them without fear of being assaulted by the officers. There is no law for the proposition that in a non-arresting situation involving citizens invoking a First Amendment right, a law enforcement officer is entitled to push and knock a citizen to the ground. That is an illegal and unnecessary use of force which is often labeled "gratuitous" by various judicial decisions. The assault upon Martin Gugino by law enforcement officers was a violation of his constitutional rights under the Fourth and Fourteenth Amendment to the Constitution.

Consequently, the fact that two or three law enforcement officers knocked Martin Gugino to the ground is an unnecessary and illegal use of force as a matter of law and entitles Martin Gugino to summary judgment.

**B. The admissible undisputed facts establish that Defendants violated the Fourth and Fourteenth Amendment to the United States Constitution when they inflicted injuries upon Martin Gugino.**

Defendants have made the following admission: "With the sensational video capturing the moment that Martin Gugino ('Plaintiff') sustained his injuries, this incident has generated … condemnation from elected officials, public outcry…and this civil action." Dkt. 160-36, Defs' Memo of Law in Support, at 1.

Additionally, "Defendants acknowledge that the short video depiction of the incident giving rise to this lawsuit…does not look good." *Id.*

The video—which Defendants admit "does not look good"—looks even worse when coupled with other admissions by Defendants and entitles Martin Gugino to summary judgment on his claim against Defendants who injured him in violation of the Fourth and/or Fourteenth Amendment to the United States Constitution.

Defendants further admit the following:

a.  A citizen has an absolute right to approach a police officer and make a statement including when the militarized police force is deployed. Dkt. 160-9 (Losi EBT, Vol. 1), 88:9-14; 96:8-12; Dkt. 161-17 (Torgalski EBT), 222:4-11, 171:15-173:8;

b.  The actions of Martin Gugino did not create any fear on the part of defendants. Dkt. 161-16 (McCabe EBT), 151:21-153:22;

c.  Martin Gugino stopped one or two feet from law enforcement officers and did not strike, push, or threaten them. Dkt. 161-16 (McCabe EBT), 148:1-14, 145:18-23, 172:7-11; Dkt. 161-17 (Torgalski EBT), 219:3-221:1;

d.  Upon direction by Defendants, Martin Gugino began to comply, stepping back away from the police. Dkt. 161-16 (McCabe EBT), 183:1-184:22; Dkt. 161-17 (Torgalski EBT), 188:8-9, 241:12-16, 246:21-248:6;

e.  Even though Martin Gugino was complying with the demand to "move back", he was shoved and knocked to the ground by Torgalski and McCabe. Dkt. 161-17 (Torgalski EBT), 247:15-248:6, 254:7-257:7;

f.  The entire encounter could have occurred and should have occurred without Defendants pushing and shoving Martin Gugino and at most, placing him in restraints to effectuate an arrest and which would have prevented the life-

29

threatening injury. Dkt. 161-16 (McCabe EBT), 185:9-190:6; Dkt. 161-17 (Torgalski EBT), 259:1-12, 265:4-269:11; Dkt. 160-9 (Losi EBT, Vol. 1), 124:9-19; 171:23-172:6, 176:3-13, 184:4-185:20; Dkt. 161-11 (Lockwood EBT), 119:8-120:1;

g.  Immediately thereafter, another citizen was arrested/detained without pushing or shoving him. Dkt. 161-6 (Losi EBT, Vol. 2), 454:6-455:1; Dkt. 161-11 (Lockwood EBT), 104:5-9;

h.  The then-police commissioner explicitly admitted that the two law enforcement officers should not have used force and shoved Martin Gugino to the ground but instead simply should have taken him into custody and arrested him. Dkt. 161-11 (Lockwood EBT), 100:1-21, 104:5-19, 119:8-120:1;

i.  The direction and plan by law enforcement officers was to arrest any individuals instructed to, but who did not leave, move away, or disperse. Dkt. 161-16 (McCabe EBT), 92:16-20, 118:11-119:19;

j.  Defendant Losi admitted that the use of force policy the City of Buffalo do not change for civil disorder events. Dkt. 160-9 (Losi EBT, Vol. 1), 155:12-157:1;

k.  Losi admitted that the use of force policies by the City of Buffalo Police Department must not be changed for civil disorder events. Dkt. 160-9 (Losi EBT, Vol. 1), 155:12-157:1. Losi admitted that the safest method of dealing with citizens not complying is to arrest them. *Id.*, 171:23-176:13;

l.  Defendant Losi admitted that the City of Buffalo Police Department use of force policy does not permit pushing and shoving a citizen even when

effectuating an arrest, but at most, authorizes "grabbing" which is a different action. *Id.*, 184:4-188:16.

These undisputed facts coupled with the video entitles Martin Gugino to partial summary judgment on the Fourth and Fourteenth Amendment claims.

**C. The claimed facts cited by Defendants do not and cannot justify their assault upon Martin Gugino.**

For the reasons set forth below, the claims in opposition are irrelevant, inadmissible, and/or insufficient to deny the summary judgment motion based on a violation of the Fourth and/or Fourteenth Amendment to the United States Constitution and are as follows:

- "…Plaintiff walked up to the ERT line carrying a motorcycle helmet that could be used as a weapon";

- "Plaintiff got into McCabe and Torgalski's personal space during an ongoing pandemic after curfew hours";

- "Plaintiff was told repeatedly by multiple officers to get back";

- "Plaintiff scanned his cell phone inches away from Officer Torgalski's gun";

- "The encounter took place at City Hall, where vandalism, violence, and arson had occurred only days prior";

- "Plaintiff was wearing a mask and officers could not make out what he was saying";

- "The officers could not tell how old he was";

- "The defense expert…concluded that it was appropriate under the circumstances for the officers to apply minimal force to Plaintiff";

- "A grand jury decided not to indict the officers…";

31

- "…an Arbitrator cleared the officers of wrongdoing and dismissed disciplinary charges against them" Dkt.173-5, Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Defs' Memo of Law in Opp."), at 20.

The claim that Martin Gugino "…walked up to the ERT line carrying a motorcycle helmet that could be used as a weapon."[6], Dkt. 173-5, Defs' Memo of Law in Opp, at 20, is an effort to justify an assault upon a citizen which must be rejected as a matter of law. Otherwise, any time a citizen is carrying an object, a law enforcement officer could justify assaulting that individual with a claim that it "could be used as a weapon." For example, a person carrying a handbag; a person carrying a grocery bag; a person carrying books. Simply stated, a law enforcement officer cannot use an object held by a citizen as a basis for assaulting that citizen simply because the object "could be used as a weapon."

Moreover, Defendant Torgalski admitted that he did not assault Martin Gugino due to the helmet in his left hand. Dkt. 161-17 (Torgalski EBT), 273:2-4.

The claim that "Plaintiff got into McCabe and Torgalski's personal space during an ongoing pandemic after curfew hours" is irrelevant and/or misplaced. Use of force by a law enforcement officer does not change based on whether the force is employed before or after 'curfew hours.'", nor is the illegal and unnecessary use of force justified simply because of an "ongoing pandemic." Defendant Torgalski admitted New York Law cannot justify shoving Martin Gugino to the ground because of an alleged fear of COVID Dkt. 161-17 (Torgalski EBT),

157:13-18. None of the three assaulting law enforcement officers justified, or could justify, their use of force on that basis.

The claimed invasion of "personal space" was fabricated, after-the-fact, verbiage created to justify an unjustifiable assault upon a citizen. The invocation of "personal space" is inartful code for the following: Police officers are entitled to shove and push a citizen to the ground who approaches and stops within close range of the police officer. Defendant fails to cite any law to support that proposition and it is in complete violation of established practices in the field of law enforcement as set forth in the Buffalo Police Department use of force policy. *See § 6.2b; Retaliatory Force; De-escalation Techniques*. At the very same location earlier in the day, demonstrators engaged in unlawful assembly, failed to disperse, yelled with anger at police officers, held objects close to police officers, and certain individuals were arrested or detained who failed to leave. Despite all those facts, there was no pushing and shoving by law enforcement officers against citizens due to an "invasion of personal space" Dkt. 160-9 (Losi EBT, Vol. 1), 208:1-209:19, 214:13-22, 222:16-223:13, 242:13-246:5, 251:10-252:8, 257:20-25, 259:15.

More importantly, Martin Gugino stopped walking forward, heeded the demands by Defendants to "move back", stepped back away from Defendants thereby "creating space" and it was Torgalski who invaded Martin Gugino's "personal space," Dkt. 161-17 (Torgalski EBT), 254:7-255:12, and further admitted he could have created the same space by stepping back away from Martin Gugino. Dkt. 161-17 (Torgalski EBT), 193:9-194:23, 195:8-198:23.

Thus, the fact that Martin Gugino was "told repeatedly" to "get back" is not a fact that can justify the assault upon him by police officers because he began to "step back". It is apparent that Defendants decided not to permit Martin Gugino to "move back" and instead, at that

33

moment, decided to assault him. At most, they should have secured him, detained him, and placed him under arrest.

The use of the word "scanned in the claim that "Plaintiff scanned his cell phone inches away from Officer Torgalski's gun" is nothing more than a fabrication after the fact to impute a nefarious intent to nothing other than recording by cell phone video. Dkt. 161-16 (McCabe EBT), 180:2-182:22. It was common knowledge that demonstrators use cell phones to video police actions. Dkt. 160-9 (Losi EBT, Vol. 1), 235:2-236:22. Torgalski admitted that this is not a justification for his assault upon Martin Gugino, (Dkt. 161-17 (Torgalski EBT), 223:15-21), and that Martin Gugino never touched the baton, waistband, gun, or holster of Torgalski and never claimed that Martin Gugino was reaching for the weapon. *Id.,* 219:3-220:4-10.

The assault cannot be justified on the grounds that "vandalism, violence, and arson had occurred only days prior" in the same area. *See* Defs' Memo of Law in Opp., at 20. Defendants cite no law to support that proposition. Indeed, Defendant Losi admitted actions of others cannot be used as a basis to shove Martin Gugino. Dkt. 161-6 (Losi EBT, Vol. 2), 293:2, 294:1. Moreover, merely stating the claim establishes it is meritless. Imagine a law or policy permitting law enforcement officers to assault citizens merely because on some prior day acts of property damage or violence occurred in the same area. In sum, it is not legally permissible to graft the acts of one individual onto another individual to justify state violence.

The claims that Defendants could not hear the words of Martin Gugino and/or ascertain his age are irrelevant and not facts that can justify shoving Martin Gugino. Imagine if it was legally permitted for a police officer to shove a citizen to the ground merely based on not understanding or hearing that person's words or an inability to ascertain the age of a citizen.

Moreover, Defendants McCabe and Torgalski both admitted understanding the words of Martin Gugino and his objection to the use of weapons. Dkt. 161-16 (McCabe EBT), 192:1-15; Dkt. 161-17 (Torgalski EBT), 178:2, 179:8. Consequently, the claims are absurd, irrelevant, and underscore the meritless arguments advanced in opposition to the motion.

The statement by Defendants' expert does not provide a basis to deny Plaintiff's summary judgment motion concerning the unnecessary use of force and the violation of the Fourth and/or Fourteenth Amendment.

The defense expert concluded "…McCabe and Torgalski were justified to use a reasonable and minimum amount of force to move Gugino back by pushing him, to ensure officer safety, overcome his obstruction of the ERT mission, and force him to disperse from the area under the city-wide curfew order." Dkt. 173-3, Defendants' Expert Disclosure, at 21. Indeed, the statement/opinion supports Plaintiff's position that Defendants used force against the citizen-demonstrator instead of simply detaining and/or taking him into custody without physical force or violence.

Contrary to the expert's opinion, no officer has ever stated that he felt "unsafe" due to the actions and words of Martin Gugino and any obstruction of the ERT mission did not permit police violence against the citizen but rather detainment and/or arrest.

Finally, the claimed reliance upon "dispers[al] from the area under the city-wide curfew order" is irrelevant and factually untrue. Dispersal means moving someone from one place to another; here, a dispersal in which a person simply moves several blocks would still violate the curfew. Consequently, the curfew order did not have "dispersal" as the intent, but rather, arrest and/or detainment. Moreover, even if "dispersal" was relevant, it cannot justify the assault.

35

The citation to and reliance upon the grand jury minutes, an employment arbitration decision, and television broadcasts are all misplaced. Apparently, Defendants McCabe and Torgalski claim that the lack of a criminal indictment and/or employment discipline provides a factual basis to justify the assault. Neither fact is relevant or admissible. Additionally, Plaintiff objects to the documents because they are not in admissible form, even if the documents were in admissible form, they are hearsay. [7]. At trial, if any person testified to either fact, it would be objected to as not relevant and not admissible.

Defendants failed to include in the opposition papers the claim that Martin Gugino touched the forearm of Defendant Torgalski. There was good reason for that omission because it was included within the string of fabricated statements intended to justify the unjustifiable act of assaulting Martin Gugino. The undisputed video evidence rebuts any claim of physical contact by Martin Gugino against any police officer that would justify the assault.

Contrary to the claim by Defendants, there is no "conflicting view of the evidence" as to the interaction between law enforcement officers and Plaintiff, Martin Gugino.

## CONCLUSION

For the foregoing reasons, the Court should grant plaintiff's motion for summary judgment in its entirety, and grant such further and additional relief as the Court deems just and proper.

Respectfully submitted this 18th day of March 2026.

**Lipsitz Green Scime Cambria LLP**

---

[7] Indeed, defendants make no effort to establish that their exhibits are admissible under the Federal Rules of Civil Procedure or otherwise relevant to the facts of this motion.

/s/ Melissa D. Wischerath

Melissa D. Wischerath, Esq.
Richard P. Weisbeck, Esq.
42 Delaware Avenue, Suite 120
Buffalo, NY 14202
(716) 849-1333, ext. 397
mwischerath@lglaw.com